# To Assure Pride and Confidence
## *in the Electoral Process*

August 2001



# *The* National Commission
## *on* Federal Election Reform

*Organized by*
Miller Center of Public Affairs,
    University of Virginia
The Century Foundation

*Supported by*
The David and Lucile Packard Foundation
The William and Flora Hewlett Foundation
The John S. and James L. Knight Foundation

## Miller Center of Public Affairs

University of Virginia
P.O. Box 400406
2201 Old Ivy Road
Charlottesville VA 22904-4406

*tel*   804-924-7236
*fax*   804-982-2739
*web*  http://millercenter.virginia.edu

## The Century Foundation

41 East 70th Street
New York NY 10021

*tel*   212-535-4441
*fax*   212-879-9190
*web*  http://www.tcf.org

## www.reformelections.org



## The Commission

### Honorary Co-Chairs
President Gerald R. Ford
President Jimmy Carter

### Co-Chairs
Robert H. Michel
Lloyd N. Cutler

### Vice-Chairs
Slade Gorton
Kathleen M. Sullivan

### Commissioners
Griffin Bell
Rudy Boschwitz
John C. Danforth
Christopher F. Edley, Jr.
Hanna Holborn Gray
Colleen C. McAndrews
Daniel Patrick Moynihan
Leon Panetta
Deval L. Patrick
Diane Ravitch
Bill Richardson
John Seigenthaler
Michael Steele

### Executive Director
Philip D. Zelikow

## Public Hearings

### March 26, 2001
*Citizen Participation*
The Carter Center
Atlanta, Georgia

### April 12, 2001
*Election Administration*
The Ronald Reagan Presidential Library
Simi Valley, California

### May 24, 2001
*What Does the Law Require?*
Lyndon B. Johnson Library and Museum
Austin, Texas

### June 5, 2001
*The American and International Experience*
Gerald R. Ford Library
Ann Arbor, Michigan

# To Assure Pride and Confidence
## *in the Electoral Process*

August 2001

# *The* National Commission
## *on* Federal Election Reform

*Organized by*
Miller Center of Public Affairs,
    University of Virginia
The Century Foundation

*Supported by*
The David and Lucile Packard Foundation
The William and Flora Hewlett Foundation
The John S. and James L. Knight Foundation

# Contents

1   Letter to the American People

2   Preface to the Report

5   Summary of Principal Recommendations

16  **Report**

**I**
17  The Goals of Federal Election Reform

**II**
22  The Federal Government
    and the Federal Election System

    22  The Constitution's Allocation
        of Authority

    23  Presidential Elections
        and the Electoral College

    25  The Primary Role of
        State Governments

**III**
26  A Democratic Process that
    Maintains an Accurate List of Citizens
    Who are Qualified to Vote

    26  The Problem of Accurate Voter Lists

    28  Voter Registration, Past and Present

    29  A Better Way:
        Statewide Voter Registration Systems

**IV**
34  A Democratic Process that Encourages
    Every Eligible Voter to Participate Effectively

    35  Provisional Voting

    38  "Same Day" Registration?

    39  Improving Voter Participation

    40  Election Day Holiday

    42  Military and Overseas Voting

    43  Early, Remote, and Internet Voting

    44  Citizens with Criminal Records

    46  Ensuring the Voting Rights of
        All Citizens

**V**
50  A Democratic Process which
    Uses Equipment that Reliably Clarifies and
    Registers the Voter's Choices

    51  Very Close Elections Happen—
        Often

    51  Benchmarks, Not Mandates

    54  Benchmarks Applied—
        The Forty Most Populous Counties

    56  Standards for More Effective
        and Accessible Voting Technology

**VI**
60  A Democratic Process that Handles Close
    Elections in a Foreseeable and Fair Way

    60  Objective Vote Definitions and
        Foreseeable Post-Election Procedures

    63  Media Projections of Election Results

**VII**
68  A Democratic Process that Reflects
    Limited but Responsible Federal Participation

    68  A Pattern of Neglect

    69  Estimating and
        Allocating the Costs of Improvement

    71  The Federal Institutional Role

    72  Structuring Federal Legislation
        and Financial Assistance

74  **Endnotes**

78  **Additional Statements**

78  Concurring in Part and Dissenting in Part,
    by Christopher Edley, Joined by
    Leon Panetta, Deval Patrick, Bill Richardson,
    John Seigenthaler, and Kathleen Sullivan

82  Concurring, by Colleen McAndrews,
    Joined by Slade Gorton and Leon Panetta

83  Concurring in Part and Dissenting in Part,
    by John Seigenthaler, Joined in Part by
    Griffin Bell

86  **Organization**

86  About the National Commission
    on Federal Election Reform

94  Organizing and Sponsoring Institutions

96  **Appendix A**
    Contributors to the Commission's Work

102  **Appendix B**
     The Michigan Qualified Voter File:
     A Brief Introduction

# Letter

## *to the American People*

In 2000 the American electoral system was tested by a political ordeal unlike any in living memory. From November 7 until December 12 the outcome of the presidential election was fought out in bitter political and legal struggles that ranged throughout the state of Florida and ultimately extended to the Supreme Court of the United States. The American political system proved its resilience. But we must think about the future.

The ordinary institutions of election administration in the United States, and specifically Florida, just could not readily cope with an extremely close election. Many aspects of the election process were put under a microscope and viewed by an anxious nation. With dismay and growing anger we saw controversial ballot design; antiquated and error-prone voting machines; subjective and capricious processes for counting votes; voter rolls that let unqualified voters vote in some counties and turned away qualified voters in others; confusion in the treatment of overseas military ballots; and a political process subjected to protracted litigation.

Stepping back from Florida, the picture is no more encouraging. The chief election official of Georgia, Cathy Cox, testified to our Commission that: "As the presidential election drama unfolded in Florida last November, one thought was foremost in my mind: there but for the grace of God go I. Because the truth is, if the presidential margin had been razor thin in Georgia and if our election systems had undergone the same microscopic scrutiny that Florida endured, we would have fared no better. In many respects, we might have fared even worse." Across America, we have heard from official after official who feels the same way.

There is good news, though. In the last few years, and now spurred by the events last year, election reform has returned to the legislative agenda in many states. In much of the country cadres of able and dedicated election administrators are in place who can show what is possible and carry reforms into practice. In a world of problems that often defy any solution, the weaknesses in election administration are, to a very great degree, problems that government actually can solve.

In this report we and our colleagues offer very specific recommendations on what should be done. In other words, Americans can and should expect their electoral system to be a source of national pride and a model to all the world.

Gerald R. Ford

Jimmy Carter

Robert H. Michel

Lloyd N. Cutler

*Co-chairs of the National Commission on Federal Election Reform*

# Preface
## to the Report

The report begins with a summary of the principal policy recommendations. To understand why those recommendations were chosen, and why some others were not, readers should take the time to study the entire report before passing judgment.

To share some of the wealth of background material that informed our work, please read the Background Papers prepared by the Commission's task forces on the Federal Election System and on Legal and Constitutional Issues. Those Background Papers are being published under a separate cover. They, like the transcripts of our Commission's public hearings around the country, are also available on the Commission's website—www.reformelections.org. The task force coordinators who performed such formidable labors are John Mark Hansen of the University of Chicago, David King of Harvard University, and Daniel Ortiz of the University of Virginia.

Richard Leone, president of The Century Foundation, was critical at every stage of the Commission's creation, development, and work. As much as anyone, he was the person who turned this Commission from an idea into reality. Robert Pastor of Emory University was a senior adviser to the Commission and offered especially valuable counsel. Leonard Shambon, of the law firm Wilmer, Cutler & Pickering, added his outstanding energy and professional judgment to our work.

This project would not have been successful without the work of the joint professional staff of the University of Virginia's Miller Center and The Century Foundation. Among our professional staff, day-in and day-out Ryan Coonerty's contribution was central. Margaret Edwards, Thad Hall, Mary McKinley, Wistar Morris, and Lisa-Joy Zgorski rounded out the core of our team, with frequent aid from Margaret Bell, Hillary Bracken, Anne Chesnut, Ryann Collins, Tina Doody, Kimberly Girard, Rick Gunning, Christy Hicks, Rachael Kelly, Shirley Kohut, Robin Kuzen, Cynthia Maertz, Carol Starmack, Tova Wang, and Garth Wermter.

The Carter Center, Ronald Reagan Presidential Library, Lyndon Johnson Presidential Library, and Gerald Ford Presidential Library all offered their facilities and staff to help with the Commission's public hearings in a gracious, hospitable spirit.

Finally, everything the Commission may accomplish is the result of the public-spirited generosity of Paul Brest, representing the William and Flora Hewlett Foundation; Richard T. Schlosberg, representing the David and Lucile Packard Foundation; and Hodding Carter III, representing the John S. and James L. Knight Foundation.

*Philip Zelikow*

Philip Zelikow
*Executive Director*





**8**

PE / 26 / 1

**Envelope No. 8**

**ABSENTEES**

**GENERAL ELECTION
NOVEMBER 7, 2000**

Return the following items in this envelope to the Marion
County Election Board and indicate the number of
that you enclose:

Name of
Applications f

# Summary
## *of Principal Recommendations*

### The Goals of Federal Election Reform

When they choose the president, the vice president, and members of Congress, the American people should expect all levels of government to provide a democratic process that:

- Maintains an accurate list of citizens who are qualified to vote;
- Encourages every eligible voter to participate effectively;
- Uses equipment that reliably clarifies and registers the voter's choices;
- Handles close elections in a foreseeable and fair way;
- Operates with equal effectiveness for every citizen and every community; and
- Reflects limited but responsible federal participation.

For Americans, democracy is a precious birthright. But each generation must nourish and improve the processes of democracy for its successors. In the near-term, the next three to five years for instance, we envision a country where each state maintains accurate, computerized lists of who can vote, networked with local administrators. Using that system, qualified voters in our mobile society would be able to vote throughout their state without being turned away because of the vagaries of local administration. Using the system we recommend here, millions of military and other overseas voters would find it easier to get and return their ballots. Election Day would be held on a national holiday, freeing up more people to serve as poll workers and making polling places more accessible. Voting machines would meet a common standard of excellent performance. Each state would have its uniform, objective definitions of what constitutes a vote. News organizations would exert necessary restraint in predicting election outcomes. Every jurisdiction and every official would obey the Voting Rights Act and other statutes that secure the franchise and prohibit discrimination. In all of this there would be a delicate balance of shared responsibilities between levels of government, and between officials and the voters they serve.

This report sets forth our recommendations for the next, immediate steps on the road to attainment of these goals.

## ★ ★   Policy Recommendation   ★ ★ ★     1

**Every state should adopt a system of statewide voter registration.**

1. The statewide computerized voter file should be networked with and accessible to every election jurisdiction in the state so that any level can initiate registrations and updates with prompt notification to the others. It should include provisions for sharing data with other states.

2. When a citizen either applies for a driver's license or registers to vote, each state should obtain residential address and other information, such as a digitized signature, in a form that is equally usable for both the motor vehicle and voter databases. The address information can then be linked to a statewide street index.

3. Each state's driver's license and voter registration applications should require applicants to provide at least the last four digits of their Social Security number. States should also ask applicants if they are registered in another state, so that that state can be notified of the new registration.

4. Each state's voter registration applications should require a separate and specific affirmation that the applicant is a U.S. citizen.

## ★ ★   Policy Recommendation   ★ ★ ★     2

**Every state should permit provisional voting by any voter who claims to be qualified to vote in that state.**

1. Provisional voting authorizes any person whose name does not appear on the list of registered voters, but who wishes to vote, to be issued a ballot. The ballot shall be counted only upon verification by election officials that the provisional voter is eligible and qualified to vote within the state and only for the offices for which the voter is qualified to vote.

2. Another option, for states with statewide computerized voting lists, would be to let a voter who is not on the list submit proof of identification and swear to or affirm an appropriate affidavit of eligibility to vote in that jurisdiction. This information could then be used as an application for voter registration and the voter list would be amended accordingly. If qualified, the voter could either be issued a regular ballot or, if the state preferred, be allowed to vote provisionally pending confirmation of the voter's eligibility.

★ ★ **Policy Recommendation** ★ ★ ★ <span style="float:right">**3**</span>

**Congress should enact legislation to hold presidential and congressional elections on a national holiday.**

1. Holding national elections on a national holiday will increase availability of poll workers and suitable polling places and might make voting easier for some workers.

2. One approach, which this Commission favors, would be to specify that in even-numbered years the Veterans Day national holiday be held on the Tuesday next after the first Monday in November and serve also as our Election Day.

★ ★ **Policy Recommendation** ★ ★ ★ <span style="float:right">**4**</span>

**Congress should adopt legislation that simplifies and facilitates absentee voting by uniformed and overseas citizens.**

1. Each state should designate a responsible official for absentee voting by uniformed and overseas citizens who are residents of that state. That official should become the single point of contact for the citizens of that state who are served by the Federal Voting Assistance Program, which helps such uniformed and overseas citizens.

2. In 1986 Congress passed the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) to help eligible members of the armed services and their families, and other citizens overseas, to vote. Utilizing standardized forms for voter registration and absentee ballot requests, all UOCAVA-covered residents from a home state should be authorized to mail these applications to the designated official for their state. If that state uses a statewide voter registration system networked to local jurisdictions, as we have recommended, the state official should be authorized to act directly on these applications or to forward them for action by the appropriate local jurisdiction. States should accept one absentee ballot application as a valid application for all subsequent elections being held by that state in that year.

3. The designated state official should be authorized to accept either a voted ballot being returned for any jurisdiction of that state or a standardized Federal Write-In Absentee Ballot that is an option for a UOCAVA-covered citizen. States should be obliged to accept and tally a Federal Write-In Absentee Ballot for those contests in which they determine the voter was eligible to vote.

4. Properly filed absentee ballots should be accepted if they have been received by the time the polls of that state have closed on Election Day. States and the Federal Voting Assistance Program should develop common standards for validation of ballots that have been voted and mailed on or before Election Day, even if they are received after that date.

★ ★ **Policy Recommendation**  ★ ★ ★                     **5**

**Each state should allow for restoration of voting rights to otherwise eligible citizens who have been convicted of a felony once they have fully served their sentence, including any term of probation or parole.**

★ ★ **Policy Recommendation**  ★ ★ ★                     **6**

**The state and federal governments should take additional steps to assure the voting rights of all citizens and to enforce the principle of one person, one vote.**

1. Federal and state governments should intensify efforts to enforce compliance with the several statutes guaranteeing the right to vote and prohibiting various forms of discrimination in voting and registration.

2. The methods for funding and administering elections—from investments in equipment through voter education to procedures at the polling place—should seek to ensure that every qualified citizen has an equal opportunity to vote and that every individual's vote is equally effective. No individual, group, or community should be left with a justified belief that the electoral process works less well for some than for others.

3. Federal and state governments should consider uses of technology, for example when developing voting equipment system standards, that will make it feasible to provide greater assistance to language minorities.

★ ★ **Policy Recommendation**  ★ ★ ★  **7**

> Each state should set a benchmark for voting system performance,
> uniform in each local jurisdiction that conducts elections.
> The benchmark should be expressed as a percentage of residual
> vote (the combination of overvotes, spoiled votes, and undervotes)
> in the contest at the top of the ballot and should take account
> of deliberate decisions of voters not to make a choice.

1. Benchmarks should consider the results obtained by best practices within that state, taking local circumstances into account. In general, we suggest that the benchmarks in the next election cycle should be set no higher than 2%, with the goal of further reductions in succeeding cycles.

2. Each state should require its election jurisdictions to issue a public report on the number of residual votes after every statewide election, including the probable causes of error, if any.

3. Each state should determine for itself how to hold its election jurisdictions accountable for achieving the benchmarks.

---

★ ★ **Policy Recommendation**  ★ ★ ★  **8**

> The federal government should develop a comprehensive
> set of voting equipment system standards for the benefit of
> state and local election administration.

1. Congress should grant statutory authority to an appropriate federal agency to develop such standards in consultation with state and local election officials.

2. The scope of the voting system standards should include security (including a documentary audit for non-ballot systems), procedures for decertification as well as certification of both software and hardware, assessment of human usability, and operational guidelines for proper use and maintenance of the equipment. The agency should maintain a clearinghouse of information about experience in practice.

3. Voters should have the opportunity to correct errors at the precinct or other polling place, either within the voting equipment itself or in the operational guidelines to administrators for using the equipment.

4. Each voting tally system certified for use should include, as part of the certification, a proposed statement of what constitutes a proper vote in the design and operation of the system.

5. New voting equipment systems certified either by the federal government or by any state should provide a practical and effective means for voters with physical disabilities to cast a secret ballot.

6. In addition to developing the voting system standards, the federal agency should provide its own certification and decertification of hardware and software, including components in voter registration systems. These federal certifications and decertifications, like the remainder of the standards, will be recommendations to states which they can adopt or not.

7. This federal service should include selection and oversight of a federally supervised set of independent testing authorities who will apply the standards in assessing equipment. After the federal agency develops and approves the relevant voluntary voting system standards in consultation with state and local administrators, this further, technical task should be delegated to the highly regarded and relatively independent National Institute of Standards and Technology (NIST) of the Department of Commerce.

★ ★  **Policy Recommendation**  ★ ★ ★     **9**

**Each state should adopt uniform statewide standards for defining what will constitute a vote on each category of voting equipment certified for use in that state. Statewide recount, election certification, and contest procedures should take account of the timelines for selection of presidential electors.**

1. Statewide standards for defining a vote in advance of an election should be uniform and as objective as possible.

2. Each state should reevaluate its election code to consider adopting a predictable sequence of: a) vote tabulation and retabulation; b) machine or manual recounts to encompass the entire jurisdiction of the office being recounted, triggered by whatever threshold the state may choose; c) certification of a final count; followed then by d) contests of the certification limited to allegations of fraud or other misconduct.

3. In such a sequence, each state should allow at least 21 days before requiring certification of the final count. But we recommend retention of a federal deadline under which the "safe harbor" for conclusive state determination of presidential electors will expire.

4. Each state should also develop a uniform design for the federal portion of the state ballot, for use in each of that state's certified voting equipment systems.

**News organizations should not project any presidential election results in any state so long as polls remain open elsewhere in the 48 contiguous states. If necessary, Congress and the states should consider legislation, within First Amendment limits, to protect the integrity of the electoral process.**

1. In practice, this would mean that news organizations would voluntarily refrain from projecting the outcomes of the presidential elections in any state until 11:00 p.m. Eastern Standard Time (8:00 p.m. Pacific Standard Time). Voluntary restraint is preferable to government action.

2. If news organizations refuse to exercise voluntary restraint, Congress and the states should consider prohibiting any public disclosure by government entities of official tallies in the race for president and vice-president at the precinct level and above until 11:00 p.m. EST (8:00 p.m. PST), where such regulations are consistent with existing provisions for public observation of the vote tabulation process.

3. If news organizations refuse to exercise voluntary restraint and other measures cannot protect the integrity of the electoral process, Congress should impose a plan for uniform poll closing hours in the continental United States for presidential elections.

4. National television broadcasters should provide, during the last thirty days of the presidential campaign, at least five minutes each night of free prime television time to each presidential candidate who has qualified for federal matching funds. They or their local affiliates should further make free time available for state and local election officials to provide necessary voter education.

star star **Policy Recommendation**  ★ ★ ★ **11**

> The federal government, on a matching basis with the
> governments of the 50 states, should provide funds that will add
> another $300–400 million to the level of annual spending on
> election administration in the United States. The federal share
> will require a federal contribution totaling $1–2 billion spread
> out over two or three years to help capitalize state revolving
> funds that will provide long-term assistance.

1. These responsibilities should be apportioned about 50–50 between the federal government and the states, so that the federal contribution has the effect of raising the annual federal and state level of spending on election administration by an added $150–200 million. This is a modest sum, lower than some other current estimates about what is needed.

2. The federal expenditures should be made in the form of matching grants to the states, and the states should directly administer the disbursement of funds for administration at the state, county, and local level.

3. Instead of planning on permanent expenditures of federal funds, Congress should instead consider leveraging temporary funding over a two- or three-year period in an amount, totaling perhaps $1–2 billion, that will be sufficient to capitalize the federal share of state revolving funds. These funds can leverage the initial federal contribution, after it has been matched by the states, to create a long-term source of federal and state support to election administration. The capitalization should be sufficient to sustain our proposed federal increment of $150–200 million of continued additional spending on election administration that, when matched by state contributions to the funds, will reach the $300–400 million annual nationwide target.

4. Such state revolving funds would be used to carry out flexible state programs, allowing the states to support a variety of election administration activities undertaken by state, county, and local governments and do so with a variety of financing options that can include grants, loans at or below market rates, loan guarantees, and other arrangements. States would assess relative needs among their election jurisdictions and be accountable for maintaining the fund.

5. Federal funds should be allocated among the states in proportion to the electoral votes that each state will cast in the presidential election of 2004. This reflects a slight per capita weighting toward rural states. Such a modest weighting is appropriate, given the greater average per capita cost of election administration in rural counties.

★ ★ **Policy Recommendation** ★ ★ ★ **12**

**The federal responsibilities envisioned in this report should be assigned to a new agency, an Election Administration Commission (EAC).**

1. The number of governing commissioners in this agency should be small; the members should be distinguished citizens with a reputation for integrity.

2. The commission should: a) develop federal voting system standards in consultation with state and local election administrators; b) oversee the implementation of these standards in conjunction with the National Institute of Standards and Technology; c) maintain a national clearinghouse of information on best practices in election administration; and d) administer the limited federal assistance program to the states.

3. Enforcement of other federal election laws should remain a separate function, centered in the Civil Rights and Criminal Divisions of the Department of Justice.

4. States that do not have them should also consider establishing nonpartisan election commissions.

★ ★ **Policy Recommendation** ★ ★ ★ **13**

**Congress should enact legislation that includes federal assistance for election administration, setting forth policy objectives for the states while leaving the choice of strategies to the discretion of the states.** The Commission as a whole takes no position on whether Congress should use the powerful incentive of conditional grants or instead establish requirements or mandates wholly independent of funding. A majority of the Commission members suggests the approach described below. However, a minority suggests a more direct federal role as detailed in an additional statement of views appended to this report.

1. Congress should enact legislation to create a new federal election administration agency, to facilitate military and overseas citizen voting, to address a national election holiday, to constrain—if necessary—premature official disclosure of presidential election results, and to appropriate federal assistance in election administration.

2. To be eligible for federal assistance, states shall:

   a. match the federal assistance with an added contribution of their own in the proportion fixed by Congress;

b. adopt legislation that will establish a statewide voter registration system networked to every local jurisdiction in that state, with provisions for sharing data with other states;

c. permit on-site provisional voting by every voter who claims to be qualified to vote in that state, or adopt an alternative that achieves the same objective;

d. set a uniform statewide benchmark for voting system performance in each local jurisdiction administering elections expressed as a percentage of residual vote in the contest at the top of the ballot, and require local jurisdictions to report data relevant to this benchmark;

e. either agree to comply with the federal voting system standards and certification processes or develop their own state voting system standards and processes that, at a minimum:

    i. give voters the opportunity to correct errors, either within the voting equipment itself or in the operational guidelines to administrators for using the equipment at a precinct or other polling place and

    ii. require that new voting systems should provide a practical and effective means for voters with physical disabilities to cast a secret ballot; and

f. adopt uniform statewide standards that define what will constitute a vote on each category of voting equipment certified for use in that state;

g. certify that they are in compliance with existing federal voting rights statutes.

3. Specific choices on how to comply with these conditions should be left to the discretion of the states.

4. States that qualify for federal assistance should have broad discretion in how they disburse this money, so long as the money is expended on: a) establishing and maintaining accurate lists of eligible voters; b) encouraging eligible voters to vote; c) improving verification of voter identification at the polling place; d) improving equipment and methods for casting and counting votes; e) recruiting and training election officials and poll workers; f) improving the quantity and quality of available polling places; and g) educating voters about their rights and responsibilities.

# The Commissioners

Gerald R. Ford
*Honorary Co-Chair*

Jimmy Carter
*Honorary Co-Chair*

Robert H. Michel
*Co-Chair*

Lloyd N. Cutler
*Co-Chair*

Slade Gorton
*Vice-Chair*

Kathleen M. Sullivan
*Vice-Chair*

Griffin Bell

Rudy Boschwitz

John C. Danforth

Christopher F. Edley, Jr.

Hanna Holborn Gray

Colleen C. McAndrews

Daniel Patrick Moynihan

Leon Panetta

Deval L. Patrick

Diane Ravitch

Bill Richardson

John Seigenthaler

Michael Steele



Polling place in Ashland, KY.

# I. The Goals
## *of Federal Election Reform*

In 2000 the American electoral system was tested by a political ordeal unlike any in living memory. From November 7 until December 12 the outcome of the presidential election was fought out in bitter political and legal struggles that ranged throughout the state of Florida and ultimately extended to the Supreme Court of the United States. Not since 1876–77 has the outcome of a national election remained so unsettled, for so long. That nineteenth century political crisis brought the United States close to a renewal of civil war. Fortunately no danger of armed conflict shadowed the country in this more recent crisis. The American political system proved its resilience.



Nonetheless, last year's election shook American faith in the legitimacy of the democratic process. The effect is measurable. In 1996, three-quarters of the population thought the election had been at least somewhat fair. After 2000 that proportion fell to about one-half. About three-quarters of Democrats doubted the fairness of the process. But this is not simply a story of happy Republicans and unhappy Democrats. In 1996 just 12% of Republicans thought the election was unfair. But that proportion doubled after 2000. Beliefs about fairness are influenced by whose candidate won, but people also become uneasy when the process begins to seem arbitrary. Among those who called themselves Independents, only 11% labeled the 1996 election as unfair, but in 2000 that number rose to more than 40%.[1]

President Jimmy Carter,
Commissioner Colleen
McAndrews, and Co-Chair
Robert Michel.

This is not the first time the United States has undergone an election crisis. But the great electoral crises of the nineteenth century arose from serious structural problems. The 1800 crisis led to prompt passage in 1804 of a constitutional amendment, the Twelfth. The 1824 crisis transformed the American political system, forging the Democratic Party and leading to near-universal adoption of direct popular election for presidential electors. In 1824 only 27% of eligible voters went to the polls. Four years later 56% of the electorate cast ballots for president. The 1876 crisis arose from the special circumstances of the post-Civil War reconstruction of the South.

In the electoral crisis of 2000, by contrast, the ordinary institutions of election administration in the United States, and specifically Florida, simply could not readily cope with an extremely close election. Every aspect of the election process was put under a microscope and viewed by an anxious nation that saw controversial ballot design; antiquated and error-prone voting machines; subjective and capricious processes for counting votes; rolls that let unqualified voters vote in some counties and turned away qualified voters in others; confusion in the treatment of overseas military ballots; and a political process subjected to protracted litigation.

Stepping back from Florida, the picture is no more encouraging. The chief election official of Georgia, Cathy Cox, testified to this Commission that: "As the presidential election drama unfolded in Florida last November, one thought was foremost in my mind: there but for the grace of God go I. Because the truth is, if the presidential margin had been razor thin in Georgia and if our election systems had undergone the same microscopic scrutiny that Florida endured, we would have fared no better. In many respects, we might have fared even worse." Across America, we have heard the same from other election officials.



President Gerald Ford

"There is probably no other phase of public administration in the United States which is so badly managed as the conduct of elections. Every investigation or election contest brings to light glaring irregularities, errors, misconduct on the part of precinct officers, disregard of election laws and instructions, slipshod practices, and downright frauds…. The truth of the matter is that the whole administration—organization, laws, methods and procedures, and records—are, for most states, quite obsolete. The whole system, including the election laws, requires a thorough revision and improvement." That judgment, by election expert Joseph Harris, was published in 1934.[2] In the previous decade voter turnout had sunk to a low never again equaled before or since. So the problem is hardly new.

But the character of the problem has evolved. In the second half of the century the federal government and federal courts established national voting rights, nationally defined. Permanent voter registration replaced the old pattern of requiring voters to re-register again and again. Election administration became more professionalized and non-partisan. Voting machines were introduced to gain greater efficiency and reduce the opportunities for the election fraud that had so frequently accompanied human vote counts. Yet, in much of the country, too many counts of that 1934 indictment remain valid.

*For Americans, democracy is a*
*precious birthright.*

But in a world of problems that often defy any solution, the weaknesses in election administration are, to a very great degree, problems that government actually can solve. In the last few years, and now spurred by the events last year, election reform has returned to the legislative agenda in many states. In much of the country cadres of able and dedicated election administrators are in place who can show what is possible and carry reforms into practice. To support these efforts already underway and to encourage immediate and significant state and federal action, we make the following recommendations.



President Jimmy Carter

When they choose the president, the vice president, and members of Congress, the American people should expect all levels of government to provide a democratic process that:

- Maintains an accurate list of citizens who are qualified to vote;

- Encourages every eligible voter to participate effectively;

- Uses equipment that reliably clarifies and registers the voter's choices;

- Handles close elections in a foreseeable and fair way;

- Operates with equal effectiveness for every citizen and every community; and

- Reflects limited but responsible federal participation.

For Americans, democracy is a precious birthright. But each generation must nourish and improve the processes of democracy for its successors. In the near-term, the next three to five years for instance, we envision a country where each state maintains accurate, computerized lists of who can vote, networked with local administrators. Using that system, qualified voters in our mobile society would be able to vote throughout their state without being turned away because of the vagaries of local administration. Using the system we recommend here, millions of

military and other overseas voters would find it easier to get and return their ballots. Election Day would be held on a national holiday, freeing up more people to serve as poll workers and making polling places more accessible. Voting machines would meet a common standard of excellent performance. Each state would have its own uniform, objective definitions of what constitutes a vote. News organizations would exert necessary restraint in predicting election outcomes. Every jurisdiction and every official would obey the Voting Rights Act and other statutes that secure the franchise and prohibit discrimination. In all of this there would be a delicate balance of shared responsibilities between levels of government, and between officials and the voters they serve.

This report sets forth our recommendations for the next, immediate steps on the road to attainment of these goals.



President Gerald Ford,
June 5, 2001





## II. The Federal Government
### *and the Federal Election System*

### The Constitution's Allocation of Authority

The conduct of federal elections is a federal function—as the Supreme Court reiterated just this year, states have no inherent or reserved powers over federal elections because federal elections only came into being when the United States Constitution was ratified.[3] Nonetheless, the framers of the Constitution foresaw a federal-state partnership in the administration of federal elections, and delegated to the states a substantial role in the conduct of those elections. Article 1, Section 4, of the U.S. Constitution states that: "The Times, Places and Manner of Holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators." And Article II, in conjunction with the Twelfth Amendment, provides that the states shall choose electors for the President and Vice President, but that "the Congress may determine the Time of chusing the Electors and the Day on which they shall give their Votes," and specifies rules by which the Congress might settle contested presidential elections.



Commissioners Christopher Edley and Colleen McAndrews

As Alexander Hamilton explained in Federalist No. 59, the Constitutional Convention deliberately chose to submit "the regulation of elections for the federal government" to local governments that, ordinarily, "may be both more convenient and more satisfactory." But the Constitution "reserved to the national authority a right to interpose, whenever extraordinary circumstances might render that interposition necessary to its safety." After all, Hamilton wrote, the national government should not subject its existence "to the pleasure of state governments."[4]

The federal courts have therefore long ruled that Congress has broad authority to regulate elections where candidates for Congress are on the ballot, either in a primary or a general election.[5] State power to set neutral rules for federal elections is limited to time, place, and manner, and the federal government may pass laws to supersede any of these rules.[6] Thus the National Voter Registration Act of 1993 was upheld by the courts even though it effectively told states exactly how they had to register voters in federal elections, right down to the layout of the registration form.[7] Though in theory, and occasionally even in practice, states have tried to mitigate such federal edicts by setting up separate systems for federal and state elections, none has found such bifurcated systems sustainable.

The federal power created by the Elections Clause is reinforced by the constitutional authority granted Congress to enforce the Equal Protection Clause of the Fourteenth Amendment and by other constitutional amendments prohibiting discrimination in voting. Because the Supreme Court's decision in *Bush v. Gore* found that differing definitions of a vote within Florida during the recount violated the Equal Protection Clause, Congress may well have authority under the Fourteenth Amendment to legislate to ensure greater uniformity within each state's voting procedures.[8]



## Presidential Elections and the Electoral College

The Constitution confided the choice of how to select presidential electors to the judgment of "[e]ach state". For a generation, most electors were chosen by the state legislatures without any popular vote. But by the 1820s almost every state had decided to move to direct election of presidential electors by popular vote. By the Civil War, the practice had become universal. The Constitution was not, however, amended to reflect this new custom.

From the outset this Commission decided that it would not make recommendations about whether or how the Constitution should be amended in order to do away with or refashion the choice of presidential electors, the institution generally called the Electoral College. We are aware of the critique that the Electoral College is an anachronism that can award an election to a candidate who did not win the majority of the popular vote and that it gives somewhat more proportional weight to the populations of small states.[9] The supposed disproportionate influence of small states may be counter-balanced by the "unit rule" adopted by 48 of the 50 states that allows the popular vote winner, whatever the margin, to claim all the state's electors.[10]

A member of the 54th Electoral College of Pennsylvania casts his ballot, December 18, 2000.

Yet the compromises embodied in the Electoral College are central to the organization of our republic. The basic political units of the country were the states; yet the president and vice president were to be elected by the entire nation. The Electoral College was a delicate compromise that solved one of the most difficult problems of the Constitutional Convention and did so in a way that

satisfied even most anti-Federalist critics of the new document.[11] James Madison put it well:

> The executive power will be derived from a very compound source. The immediate election of the President is to be made by the States in their political characters. The votes allotted to them are in a compound ratio, which considers them partly as distinct and coequal societies, partly as unequal members of the same society.… From this aspect of the government it appears to be of a mixed character, presenting at least as many federal as national features.[12]

Within the Commission there are different views about how to strike the balance of state and national "features" and we are reluctant to suggest refashioning such a fundamental balance unless our search for constructive answers compels us to do so. Fortunately, a strong and effective set of ideas for federal election reform is available that can satisfactorily address most of the problems that came into national view last year without reaching out to rewrite the Constitution.

Co-Chair Bob Michel and Commissioner Griffin Bell



### The Primary Role of State Governments

Even though the federal government has broad constitutional authority to mandate how the states conduct federal elections, we believe that state governments should have a primary role in the conduct of such elections for a simple reason: federal elections are, as a practical matter, conducted in conjunction with a vast array of state and local elections across widely varying conditions. The last presidential election involved more than 100 million voters casting ballots at more than 190,000 polling places, staffed by more than 1.4 million regular or temporary administrators and poll workers. The original constitutional premise, that state governments should oversee the conduct of elections, subject only to limited and necessary federal intervention, remains sound.

But we recommend that state governments should do far more to accept their lead responsibility for improving the conduct of elections, especially federal elections. Most congressional elections involve multiple local jurisdictions, and often more than one county. All presidential and senatorial elections are statewide contests in their states. State governments should ensure uniformity of procedures and standards within the state and provide the essential guidance for the consistent and constitutional conduct of these elections.

Thus the states are vital partners to the federal government in any plan for nationwide reform. They are also a necessary bridge between federal policy and local administration.

*State governments should ensure uniformity of procedures and standards within the state and provide the essential guidance for the consistent and constitutional conduct of these elections.*

# III. A Democratic Process

## that Maintains an Accurate List of Citizens Who Are Qualified to Vote

One of the most serious problems in America's elections is also one of the most basic—identifying who can vote. For some this is a problem of disfranchisement. For others this is a problem of the integrity of the voting system. The controversial effort to clean up voter rolls in Florida was itself a reaction to prior scandals, especially the 1997 election for mayor of Miami, an election invalidated by the courts due to widespread vote fraud.

The issue of voter lists now has well-drawn battle lines. Some argue that the "purging" of voter lists has been used to push minority voters off the rolls. Others maintain that "list maintenance" is essential to preventing fraud. A major development in this political struggle was the passage of the National Voter Registration Act of 1993, the "motor voter" law often referred to by its acronym, NVRA. This act strictly regulated the procedures that had to be followed before voters could be removed from lists and made such removals more difficult.

### The Problem of Accurate Voter Lists

State and local election administrators have testified to the Commission that they are generally comfortable with the NVRA and the Commission does not advocate making any changes to it. But, as a result of the law, administrators agree that their voter lists are now swollen with larger numbers of named voters who have moved, or died, or are no longer eligible to vote in the local jurisdiction where they are registered. Duplicate registration is also common. In Oklahoma, which gathers statewide data in its unitary election system, the number of inactive voters had averaged about 15% of the list.[13] After NVRA that percentage grew to 25%. As might be expected, a number of jurisdictions have compared their voter lists to census numbers and observed that they have thousands, sometimes tens of thousands, more registered voters than people.

**The issue of voter lists now has well-drawn battle lines.**

Some contend that swollen voter rolls are harmless, since the individuals have moved or died and therefore do not vote, and since poll worker scrutiny and signature verification can prevent fraud. We disagree:

- Significantly inaccurate voter lists add millions of dollars in unnecessary costs to already underfunded election administrators and undermine public confidence in the integrity of the election system and the quality of public administration.

- Significantly inaccurate voter lists invite schemes that use 'empty' names on voter lists for ballot box stuffing, ghost voting, or to solicit "repeaters" to use such available names. For generations these practices have been among the oldest and most frequently practiced forms of vote fraud. One of our Commissioners (President Jimmy Carter) has written a book mentioning his encounter with such practices early in his political career. The opportunities to commit such frauds are actually growing because of the trend toward more permissive absentee voting.[14]

- Significantly inaccurate voter lists often penalize poor or ill-educated voters. Among the most mobile citizens in the country, these voters find that even modest residential changes, within a state or county, will keep them from appearing on the list of eligible voters at their new residence.



Christopher Thomas, Michigan
Director of Elections

Although we recognize the problem of accurately establishing who is eligible to vote, we do not simply endorse more aggressive measures to prune voter lists within the existing system. Rather than take a side in the ongoing partisan arguments, we think the problem needs to be recast in terms that can break away from the old controversies over "purging." Instead we should look toward the more positive objective of accurately registering every eligible voter on lists that people can trust. To do that we need to step back for a moment and take a broader perspective of what has happened to voter registration in America.

…we do not simply endorse more aggressive measures to prune voter lists within the existing system. Instead we should look toward…accurately registering every eligible voter on lists that people can trust.

## Voter Registration, Past and Present

The U.S. Constitution does not provide a right to vote. It provides that state governments shall determine who is eligible to vote in either state or federal elections, though subsequent amendments offer guards against discrimination in the grant or denial of the franchise.[15] In the first half of the nineteenth century state governments established that they, not municipal governments, were the final arbiters of who could vote in the state.[16]

The registration of voters before Election Day was a more modern innovation, adopted in most states as a good government reform, especially for the growing cities, in the years after the Civil War. With most voter registration systems tied to local residence and set up for locally run elections, practically all these systems relied on local administration. Further, new registrations of voters were usually conducted every two or four years, requiring every voter to register anew at least that often—and more often if they had changed their address. What followed was a new decentralization of power to determine the eligibility of voters, devolving from state governments down to the local and county governments that managed this process and maintained the rolls. Those governments, in turn, often delegated the work directly to precinct officers. The results were various but, too often, dismally predictable. By the 1920s, voter turnout in the United States had reached an all-time low.[17]

Voter registration march, midway from Selma to Montgomery, Alabama, March 23, 1965.



The next wave of reform in voter registration concentrated on replacing periodic registration with permanent registration, to reduce costs and the opportunity for fraud. In subsequent decades almost every state adopted permanent registration. Meanwhile, voting rights laws and litigation of the 1960s reduced residency requirements and did away with some of the other more elaborate devices that were used by local officials to thwart registration and were used, in particular, against black Americans. The NVRA effectively forced every state to

offer voter registration in combination with the single civic act performed almost universally by American adults—obtaining a driver's license.

Thus we have created a system where voter registration is relatively easy and permanent but is still usually recorded and maintained in the separate files of the nearly 13,000 local election jurisdictions of the United States. There is no authoritative list of American citizens maintained by the federal government. Passport records cover only a fraction of the citizen population. Federal tax and social security records, whatever their value, are also insulated by law against inquiries from, or data sharing with, state and local election officials.

At the same time Americans have become a remarkably mobile society. About one-sixth of the population moves every year. The more local the database of permanently registered voters, the more likely it is that the voter will have moved into or out of it.[18]

### A Better Way: Statewide Voter Registration Systems

Our preference for permanent voter registration and our observation of constant voter mobility prompt this conclusion:

★ ★   Policy Recommendation   ★ ★ ★

Every state should adopt a system of statewide voter registration.

1.  The statewide computerized voter file should be networked with and accessible to every election jurisdiction in the state so that any level can initiate registrations and updates with prompt notification to the others. It should include provisions for sharing data with other states.

2.  When a citizen either applies for a driver's license or registers to vote, each state should obtain residential address and other information, such as a digitized signature, in a form that is equally usable for both the motor vehicle and voter databases. The address information can then be linked to a statewide street index.

3.  Each state's driver's license and voter registration applications should require applicants to provide at least the last four digits of their Social Security number. States should also ask applicants if they are registered in another state so that that state can be notified of the new registration.

4.  Each state's voter registration applications should require a separate and specific affirmation that the applicant is a U.S. citizen.

Eleven states and the District of Columbia have already implemented statewide registration systems that cover all their jurisdictions. Seven more states have adopted them and are in the process of implementing them; three more are close to adoption. A statewide registration system was part of the reform program adopted earlier this year in Florida. These 21 states and D.C. include 39.2% of the voting-age population in the United States. In its June 2001 report to Congress, the bipartisan Federal Election Commission, after consulting with state and local election officials, recommended that states "1) develop and implement a statewide computerized voter registration database; 2) insure that all local registration offices are computerized; and 3) link their statewide computerized system, where feasible, with the computerized systems of the collateral public agencies relevant to the NVRA (motor vehicle offices, public assistance offices, etc.)"[19]

With a sense of how voter registration has evolved over the past century, we believe four factors weigh heavily in favor of placing the core responsibilities for voter registration in the hands of state governments.

**The constitutional allocation of responsibilities.** Under the U.S. Constitution, voter qualifications are defined primarily by state governments. So it makes sense to center registration responsibility at this same level of government. Local issues and ballots may vary, but a resident of a given state, voting in a state or presidential election, will find the same voter eligibility rules and the same candidates at the top of the ballot anywhere within the state.

**The nature of the data.** The most important source of applications for new voter registration has become the application for a driver's license. This is already a statewide database, and it is estimated that 92% of all registered voters also have a driver's license. The most effective systems have made DMV (Department of Motor Vehicles) information congruent, and thus interoperable, with the voter information called for by the state's election code. When people move within a state, they are still in the database even if they are slow to get a new license. When they move from one state to another, one of the first—and perhaps the only—civic act they must accomplish is to get a driver's license valid for that state. DMV change-of-address information is thus considered even more comprehensive and reliable than the useful National Change of Address database maintained by the U.S. Postal Service.[20]

**Accuracy can mean access.** People are mobile, but more than three-quarters of all moves are within the same state. An effective statewide database can therefore be quite useful, including its capacity to address such common issues as the registration of in-state college students and people with second homes within a state. But perhaps the most important beneficiaries of statewide registration systems will be members of lower-income groups, who are more likely to move than higher-income groups

and, when they do move, are much more likely to move from one place to another within the same state. They are thus more likely to fall off local voter rolls and bear the burden of re-registration.

**Accountability**. A clear statewide registration system will be more transparent and accountable to outside scrutiny. Some advocates for disadvantaged groups are



uneasy about statewide registration proposals, fearing that these will turn into still more powerful tools for "purging." Yet one of the clearest findings from the U.S. Civil Rights Commission's investigation in Florida is that, with purely local administration of list maintenance, local variations on statewide guidelines can be critical yet difficult to track.

Beyond the general recommendation in favor of statewide registration systems, several specific policy issues deserve mention. One is the question of whether to require voters to display some proof of identification at the polls.

All states hope that precinct officials and poll watchers will have at least some familiarity with the residents of their precincts. Seven states, all but one of them rural, do nothing more. In the rest, the most common practice now is to require voters to sign their names in an official registry or on a ballot application. About a third of the states require poll workers to check signatures against those provided at registration. Fourteen states insist that voters produce some form of identification.[21]

Georgia Secretary of State Cathy Cox.

Most states that have histories of strong party rivalry or election fraud require signature verification or voter identification at the polls. Signature verification puts an extra burden upon administrators, and especially on often ill-trained poll workers practicing a very subjective, often impossible, task while voter lines lengthen. Also, many polling places lack the means to provide poll workers with accurate copies of the voter's actual signature (the one the voter used in order to register) and a signature may change over time.

One alternative, favored by several Commissioners, is to require those who are registering to vote and those who are casting their ballot to provide some form of official identification, such as a photo ID issued by a government agency (e.g., a driver's license). A photo ID is already required in many other transactions, such as check-cashing and using airline tickets. These Commissioners point out that those who register and vote should expect to identify themselves. If they do not have photo identification then they should be issued such cards from the government or have available alternative forms of official ID. They believe this burden is reasonable, that voters will understand it, and that most democratic nations recognize this act as a valid means of protecting the sanctity of the franchise.

A small percentage of adults, perhaps about 5 to 7%, do not possess a driver's license or other photo identification. They are disproportionately poor and urban (since they may use public transit rather than drive a car). Some Commissioners also object to requiring voters to produce a photo ID or some alternative form to verify their identity because some members of minority groups believe such a process can be used to intimidate voters or turn them away in a racially discriminatory fashion.



We believe that an assessment of how to strike the right balance between administrative burden and voter responsibility turns too much on the assessment of local conditions to be amenable to any categorical recommendation by this Commission. We do believe, however, that states should be able to verify a voter's identity.

In recommending the adoption of statewide voter registration systems, we looked at the experience of those states that have adopted them. The outstanding models appear to be Michigan and Kentucky. Michigan deserves particular scrutiny because it is the most populous state to have fully implemented such a system and it is also a state with a larger number of separate election jurisdictions, more than 1600, than any other. The Michigan system is new, having been put in place just in the last few years, and it passed the test of the 2000 election with flying colors. The software solution developed in Michigan has been inexpensive and is not exclusive to a particular vendor. Any state

Election Day, Gloucester, MA, November 7, 2000.

can copy it. A more complete description of the Michigan voter registration system is attached in Appendix B to this report.[22]

Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form.

An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier.[23] The Federal Election Commission has made the same recommendation.



Some states also seek added identifiers, such as information on the place of birth and prior residential address. We take no position on the value of having this added information, but we do believe that federal law and regulations should be amended over time where state experience provides evidence that a change is needed. Used cumulatively, this information could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida.

Our policy recommendation need not require any immediate amendment of the NVRA. The NVRA specifies how voters can be registered. In general, those provisions will benefit from and work much more effectively with a statewide registration system. The NVRA also specifies how voter lists should be maintained. We believe those provisions do not take adequate account of the kind of statewide voter registration system we recommend. But we see no need to amend the list of maintenance provisions of the NVRA either to add more safeguards or pare them back until more and wider experience with new systems can give us more evidence about just what is needed.

Commissioner John Seigenthaler

All states require voters to declare, by their signature, that they are U.S. citizens and meet other criteria for eligibility to vote. Twelve states require applicants at least to check a box specifically affirming they are a citizen, though most of these accept the national mail-in and NVRA forms that do not have such a box. Inability to verify citizenship is a weakness in every state's voter registration system. The problem is not hypothetical. Non-citizens do vote, albeit illegally.[24] We therefore recommend that a specific enforceable affirmation of citizenship be included in all voter registration applications. Combined with enforcement of the relevant state and federal vote fraud laws, this should be sufficient to contain this potential problem.

# IV. A Democratic Process

## that Encourages Every Eligible Voter to Participate Effectively

An especially infuriating barrier eligible voters can face is to show up on Election Day, believing (perhaps rightly) that they are qualified to vote, and then be turned away because the poll worker cannot find their name on the list of qualified voters. In every recent national election there are certainly hundreds of thousands, and possibly millions, of such frustrating encounters.

Sometimes it is the voter's fault. Americans change their residence often, and often they forget to re-register or do not know they need to do it. This mobility has the effect of taking much of the population back to the requirements of temporary, periodic registration that were so widespread early in the 20th century.



A reform movement starting in the 1920s and 1930s eventually led to adoption of permanent voter registration in every state. That reform now needs to be adapted to our still more mobile society. A statewide voter registration system can capture most of this social mobility.

Sometimes voters are turned away because of administrative errors. Poll workers may overlook their names or not match them up with a different spelling. The poll workers usually still work from printed lists of voters produced for each precinct—a process that must begin weeks before Election Day. Staff in the offices that produce those lists can make clerical errors. Motor vehicle departments or social service agencies that receive registration applications may fail to get them, get them in the wrong form, or fail to forward them quickly enough.

Encouraging motorists to vote, Savannah, GA, November 7, 2000.

The NVRA has also had the unanticipated effect of causing the disfranchisement of many thousands of the very people it sought to bring into the political process. Although the act does not require it, most states allow practically anyone to go out and register voters by taking and transmitting their mail-in applications. These people thus act in effect as deputy registrars. Election administrators we have encountered in every part of the country tell us of numerous cases where these unofficial registrars, often meaning well, mishandle or lose such applications.[25] The applicants, of course, rightly believe they have registered. Then they show up on Election Day and find out they are not on the list.[26]

### Provisional Voting

The NVRA tried to tackle the problem of frustrated voters who are not found on voter lists with a set of mandates on "fail-safe" voting. Though these provisions are complicated enough to confuse experts, our best summary of what the NVRA requires is this: let us suppose a voter does not show up on a voter list because the voter has moved, or perhaps the registrar erroneously thinks the voter had moved. The state must still let the voter cast some sort of ballot if the voter is registered in that jurisdiction and claims to have stayed in the same registrar's jurisdiction (usually a county). Such a fail-safe ballot must be made available whether or not the registrar has sent a mailing to confirm the voter's new address and whether or not the voter has replied to such a mailing, if the voter is willing to swear to or (in special circumstances) present evidence to verify the claim. States can decide whether the person should vote at their old or new polling place.[27]

State practice follows no set pattern. Some states have very broad provision for fail-safe voting. A provisional ballot was pioneered more than ten years ago by California and Washington state (where it is called a special ballot). Nineteen states use provisional ballots to comply with NVRA. Florida has just adopted the provisional ballot in its new election law. These states include a majority of the voting-age population of the United States. Other states have a wide variety of procedures to comply with NVRA. Several states do not appear to comply with the "fail-safe" provisions of the Act at all.[28]

The NVRA's fail-safe provisions are oriented to voter files held by counties and cities. We have recommended adoption of statewide voter registration systems that are networked to local election jurisdictions. Our vision of provisional balloting is connected to this different world in which there are more accurate state voter files. In both we are motivated by a consistent goal: No American qualified to vote anywhere in her or his state should be turned away from a polling place in that state.

**Every state should permit provisional voting by any voter who claims to be qualified to vote in that state.**

1. Provisional voting authorizes any person whose name does not appear on the list of registered voters, but who wishes to vote, to be issued a ballot. The ballot shall be counted only upon verification by election officials that the provisional voter is eligible and qualified to vote within the state and only for the offices for which the voter is qualified to vote.

2. Another option, for states with statewide computerized voting lists, would be to let a voter who is not on the list submit proof of identification and swear to or affirm an appropriate affidavit of eligibility to vote in that jurisdiction. This information could then be used as an application for voter registration and the voter list would be amended accordingly. If qualified, the voter could either be issued a regular ballot or, if the state preferred, be allowed to vote provisionally pending confirmation of the voter's eligibility.

The model for this recommendation is the provisional voting system used in the state of Washington. A provisional ballot is offered to defer resolution of arguments about eligibility, whether because people have moved, or claim they have no criminal record, or claim not to have received their absentee ballot, or because of other disputes. Washington also issues a "special ballot" to voters who have moved into a new county or have moved from another state. After the election, officials research the eligibility issue. If the voter is eligible to vote in another jurisdiction within the state, they mail the ballot there to be tallied. We think such an effort to relay ballots may not be possible in every state. That is why, instead, we have suggested counting such ballots as limited ballots, valid only for those races in which the voter was qualified to vote. California applies a similar law, but does so only within the counties.

In Washington's King County (with the city of Seattle) about 17,000 such special ballots were cast, about 2% of the total, and 78% were eventually found valid and tallied. In California's Los Angeles County more than 100,000 provisional ballots were cast, about 4% of the total, of which 61% were ultimately tallied either fully or in part (depending on the contests in which the voter was entitled to vote).

Provisional voting has three key advantages:

- Eligible voters are no longer turned away at the polls.

- Election administration is easier and more efficient. Poll workers have an easier option to handle angry, frustrated voters. These often ill-trained and low-paid temporary workers do not have to research or resolve cases on the spot, while other voters impatiently wait in line. Nor are more senior election officials tied down in resolving such questions during Election Day.

- Voter registration becomes more accurate. The process becomes another way to amend registrations for people who evidently wish to vote. Officials can catch and correct mistakes and the research process, by helping senior administrators notice which problems are causing the mistakes, thus can help many other current and potential voters.

Some caveats about this policy recommendation are in order, however. We certainly support county-wide provisional voting procedures. Our more ambitious recommendation of statewide provisional voting is linked to establishment of a statewide computerized voter file, networked to local jurisdictions, as we have also recommended. That networking can help local officials check voter eligibility and note whether and where the voter has voted.

Our recommendation also would penalize voter error. If a voter turns up in the wrong jurisdiction within the state, states should not have to require local jurisdictions to somehow provide a ballot tailored for the voter's proper home jurisdiction. In such cases the voter would, in effect, be receiving a limited ballot, in that officials would only count the choices the voter can mark and is eligible to make on the ballot that is offered in the place he or she has chosen to vote.[30]

Post-election research does take time and money, similar to the staff resources required for processing absentee ballots. Handling the 17,000 "special ballots" in Washington's King County occupied 15 staff for nine days. Commission staff directly observed how the process worked in the counting rooms of Los Angeles County, which included individual verification of signatures. There the easy ballots took 5–10 minutes, the hard ones up to an hour to reconcile, so that administrators estimate it takes 30 staff two weeks to count 12,000 provisional ballots.

Since provisional ballots can mean additional work, like absentee and overseas military ballots, some officials are reluctant to count them. In at least some local jurisdictions, such ballots are not even counted in a national election if they are not numerous enough to make any predictable difference in the outcome of the presidential race, or whatever race is at the top of the ballot. This little noticed practice is disturbing, partly because every vote should count and partly because those ballots might still make a difference in some of the less publicized 'down-ballot' contests. This is one reason why the Commission recommends that any provisional voting plan should require that all provisional ballots be counted and included in the certified results.

Like the growing use of absentee ballots, use of provisional ballots slows official election counts. Although jurisdictions that receive many such ballots have not yet encountered major problems, growing use of provisional ballots may oblige some states to extend their current deadlines for certification of elections.

*No person should be denied the right to vote*
*in a federal election just because that person has changed*
*his or her residence shortly before an election.*

### "Same Day" Registration?

Election day, or "same day" voter registration has been proposed as a way of making it easier for citizens to register and vote (or as a way to get an exemption from the strictures of the NVRA). As a result of court rulings and legislation, no state has either a registration deadline or a residency requirement that extends more than 30 days before an election. But "same day" voter registration, already the law in six smaller states, is being considered by others—even California.

We make no recommendation on the appropriate deadline for voter registration. There is some evidence that "same day" voter registration might have a modest (5–8%) effect in improving voter turnout. But that evidence was largely gathered in elections before voter registration was simplified around the country by adoption of NVRA. In 1996, the next presidential election after passage of NVRA, voter registration was up but voter turnout was down.[31] Nor is there much evidence on how durable such an added effect may be.

Even if there is a slight turnout benefit in allowing "same day" registration, that benefit must be substantial enough to outweigh the added administrative burden election officials would have to shoulder in states, especially large states, that strongly prefer to register voters in advance of Election Day so that they will not have to confront a deluge of new registrants at thousands of polling places. Another disadvantage of "same day" registration is the lost opportunity for voter education. Voters registered weeks before Election Day are often mailed information such as sample ballots, the location of their polling place, and a voter manual.

As a practical matter, large jurisdictions need a few weeks before Election Day in order to prepare and distribute the lists of voters to all the polling places. If registration deadlines are set shortly before an election, many voters will not be included in the printed lists. Their omission will thus dramatically increase the number of provisional votes to be counted on and after Election Day which, as we mentioned, takes time. This is one reason why veteran administrators believe that citizens can have "same day" voter registration in large states, or they can have "same day" election results, but they are unlikely to be able to have both.

Although we have not adopted a recommendation for "same day" registration, we do agree that states requiring advance registration need to make some allowance for citizens who have just moved to their new home. We have already noted repeatedly how mobile our population is, and a large number of these moves occurs in the month or two before a November election. No person should be denied the right to vote in a federal election just because that person has changed his or her residence shortly before an election.

This goal can be recognized within the allowance for provisional voting that we have recommended above. If a voter does not show up on the voter lists because the

voter has moved to the jurisdiction shortly before Election Day, we recommend that states allow such voters to cast a provisional ballot, especially if the voter is prepared to offer some type of proof that they have established such a new residence. In such cases, as in Michigan, the provisional or affidavit ballot can then also become a tool for registering a new voter and amending the statewide voter list accordingly.

## Improving Voter Participation

If we want to encourage eligible voters to turn out, a good place to start is to ask those citizens who did not vote, "Why?" After the 2000 election the Census Bureau posed this question to thousands of non-voters. Here are the top ten reasons that non-voters gave for not voting:

| | | |
|---|---|---|
| 1 | Too busy, conflicting work or school schedule | 22.6% |
| 2 | Illness or disability | 16.0% |
| 3 | Not interested, felt my vote wouldn't matter | 13.2% |
| 4 | Out of town or away from home | 11.0% |
| 5 | Didn't like candidates or campaign issues | 8.3% |
| 6 | Registration problems | 7.4% |
| 7 | Forgot | 4.3% |
| 8 | Inconvenient polling place or hours or lines too long | 2.8% |
| 9 | Transportation problems | 2.6% |
| 10 | Bad weather conditions | 0.7% |

Registration problems are relatively low on the list, and concerns about convenient access to polling places or the hours they are open are lower still.

We are concerned about whether our system does enough to welcome eligible, disabled voters to the polls. Allowing absentee voting is not a sufficient solution. We believe Americans with disabilities should have the same right as their fellow citizens to be able to vote at the polls on Election Day. Poll workers should be trained to respect this right.

This concern is not new. In 1984 Congress enacted the Voting Accessibility for the Elderly and Handicapped Act. Broader protections were adopted in 1990 in the Americans with Disabilities Act of 1990 (ADA). Courts have held that Title II of that Act applies to all elections and requires election jurisdictions to make adequate numbers of polling places accessible to voters with physical disabilities.[32] The General Accounting Office is completing a substantial study of voting and the disabled, to be published later in 2001, that we expect will shed much more light on the extent of compliance and noncompliance with the ADA. That law does create a right of private action to enforce its provisions, so pressure on governments to provide the required physical access may grow.

As that pressure grows, state and local officials face a difficult tradeoff. On the one hand they want to expand or maintain a large number of polling places. On the other hand, the only polling places they can often rely on to be accessible to Americans with disabilities are those in a relatively small number of public buildings, particularly in public schools. Rebuilding requirements should not be mandatorily

imposed on private buildings, like churches, just as a cost of being able to borrow them from time to time as polling places. So this issue seems to require very particular state and local assessments of what can be done, especially as more and more private buildings around the country become ADA-compliant. But we think the laws on the books are sufficient to encourage continued progress.

### Election Day Holiday

One way of addressing the shortage of accessible polling places, low voter turnout, and the challenge of recruiting poll workers is to move or redefine Election Day. There are calls to establish a national holiday on Election Day. Others have suggested turning Election Day into an Election Weekend or opening the polls for much longer portions of the day. However, many local jurisdictions already have difficulty finding qualified poll workers to staff current polling hours. There is also little evidence that longer hours would have much effect on voter turnout.

The idea of a national holiday is better founded. It would help working people vote without having to hire poll workers to staff added or longer shifts. Skeptics counter that many Americans will find other things to do with a holiday than go to the polls. Some election administrators who have experience with local elections held on weekends observe no particular benefit in voter turnout. Putting aside those clashing speculations about turnout, a holiday has other advantages for election administration. More public buildings, especially schools, would be available for use as polling places.[33] More, and better trained, poll workers might be available to staff polling places. Several encouraging programs have been created around the nation to engage civic-minded high school and college students to work at the polls on Election Day and a holiday from classes may release more students into the pool of potential candidates. Notably, at our Ann Arbor hearing we heard testimony

Political campaign workers, Pullman, WA, November 7, 2000.



National Commission on Federal Election Reform

from Congressman Steny Hoyer about his proposed 'Help America Vote' (HAV). HAV will make money available to colleges and universities across the United States to recruit and train students to be poll workers, helping to solve the poll worker shortage and, at the same time, helping to spark young people's interest and participation in elections. Similarly the nonpartisan effort to create a Youth Voter Corps is a promising idea for how to encourage and train school and election administrators to recruit and energize high school students as poll workers and poll watchers.

True, national holidays are very expensive, mainly to employers.[34] But these employers have already assumed the cost of a national holiday every year during the second week of November—Veterans Day. That leads us to an idea with considerable civic virtue as well as practical merit.

★ ★ **Policy Recommendation** ★ ★ ★

**Congress should enact legislation to hold presidential and congressional elections on a national holiday.**

1. Holding national elections on a national holiday will increase availability of poll workers and suitable polling places and might make voting easier for some workers.

2. One approach, which this Commission favors, would be to specify that in even-numbered years the Veterans Day national holiday be held on the Tuesday next after the first Monday in November and serve also as our Election Day.

Veterans Day honors those who have served in the armed forces and those who died in the service of this country. It originated as Armistice Day, set aside to commemorate the end of the First World War on November 11, 1918. After World War II it became a day of tribute to the veterans and those who lost their lives in that conflict as well. In 1954, after the Korean War, the date was officially designated as Veterans Day to honor those who served in all the nation's wars.[35] After being moved into October for several years, Veterans Day was moved back to November 11, but is generally observed on the second Monday of November.

Could Congress establish a national holiday on which elections were held? The Constitution grants Congress the power to set the date of congressional elections and the time at which presidential electors are chosen. A federal statute now places Election Day on the "Tuesday next after the first Monday in November."[36] And it would be a reasonable corollary to this power for Congress to declare Election Day a national holiday.

Whenever this proposal is mentioned, politicians tell us, almost as a reflex, that veterans groups may not like it. Certainly veterans groups will have a decisive say in any adjustment in the Veterans Day national holiday, and well they should. But such an automatic assumption about their views may underestimate the people who lead these groups, and the men and women who belong to them. Starting with our chairmen, we understand the perspectives of veterans. Gerald Ford is a combat veteran who served with the Navy in the Pacific Theater in World War II. Jimmy Carter is a graduate of Annapolis who served as a naval officer from 1946 to 1953. Bob Michel is a decorated combat veteran who served with the Army in the European Theater in World War II. Lloyd Cutler served during that conflict as well. So we would not endorse any idea that would dilute the significance of Veterans Day, and what it represents.

For many Americans, Veterans Day is a day for ceremony and remembrance, ceremonies often held at the gravesites of soldiers, sailors, and airmen. That is fitting. We reflected on the notion of holding the supreme national exercise of our freedom on the day we honor those who preserved it. On reflection, we found something very fitting about that too. There is time enough to do both these things, once every two years. Perhaps some veterans organizations may even encourage some of their members to serve again, at the nation's polling places, as one way to start or finish this day. We certainly hope that the private sector will permit and even encourage their employees to volunteer in this way. Many businesses are already setting a good example.

### Military and Overseas Voting

It is in this context that we turn to the problems encountered by servicemen and



women when they try to cast their own votes. Understandably, voter turnout among members of the armed forces is very high. So too is the level of frustration when their votes cannot be counted through no fault of their own. The most serious problems are:

- The time needed to apply for an absentee ballot, receive one, and return it, especially when each of these three steps requires a mailing to and from someone stationed overseas. This is not a new problem. One of our co-chairs, Bob Michel, recalls applying for an absentee ballot while moving with his unit across France well before the election of 1944, but not receiving it until he was trying to fight into Germany well after the election was over. He mailed it in anyway, sure that he wanted to vote though he was not so sure that anyone would count it.

- Numerous and varying local requirements for ballot return, registration deadlines, and ballot format.

Absentee ballots, Indianapolis, IN, October 26, 2000.

In 1986 Congress passed the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) to help eligible members of the armed services and their families, and other citizens overseas, to vote. The GAO estimates that UOCAVA covers more than six million U.S. citizens, including 2.7 million active military personnel and their relatives.[37]

We have already recommended adoption of statewide voter registration systems and new procedures for provisional voting. Those innovations can yield a further payoff here, allowing a more streamlined process for getting and voting absentee ballots from citizens living overseas. Overseas and military ballots should also be counted according to uniform statewide rules. We emphasize later, in Chapter VI, the importance of having foreseeable, objective, statewide standards for defining what constitutes a vote. That applies to absentee ballots too.

**Congress should adopt legislation that simplifies and facilitates absentee voting by uniformed and overseas citizens.**

1. Each state should designate a responsible official for absentee voting by uniformed and overseas citizens who are residents of that state. That official should become the single point of contact for the citizens of that state who are served by the Federal Voting Assistance Program, which helps such uniformed and overseas citizens.[38]

2. In 1986 Congress passed the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA) to help eligible members of the armed services and their families, and other citizens overseas, to vote. Utilizing standardized forms for voter registration and absentee ballot requests, all UOCAVA-covered residents from a home state should be authorized to mail these applications to the designated official for their state.[39] If that state uses a statewide voter registration system networked to local jurisdictions, as we have recommended, the state official should be authorized to act directly on these applications or to forward them for action by the appropriate local jurisdiction. States should accept one absentee ballot application as a valid application for all subsequent elections being held by that state in that year.

3. The designated state official should be authorized to accept either a voted ballot being returned for any jurisdiction of that state or a standardized Federal Write-In Absentee Ballot that is an option for a UOCAVA-covered citizen. States should be obliged to accept and tally a Federal Write-In Absentee Ballot for those contests in which they determine the voter was eligible to vote.[40]

4. Properly filed absentee ballots should be accepted if they have been received by the time the polls of that state have closed on Election Day. States and the Federal Voting Assistance Program should develop common standards for validation of ballots that have been voted and mailed on or before Election Day, even if they are received after that date.

## Early, Remote, and Internet Voting

We wish to comment on one final trend to encourage eligible voters to participate. It is a trend that troubles us, however. This is the increasing adoption of procedures that encourage "no excuse" absentee voting, early voting, and voting-by-mail. Though this trend is justified as promoting voter turnout, the evidence for this effect is thin.[41] Analysts have even noted the possibility that voter turnout in such states may eventually decline, as the civic significance of Election Day loses its meaning.

This trend is adopted in the name of voter turnout, but often seems to be motivated at least as much by considerations of administrative convenience and saving money. More votes by mail mean less need for polling places and poll workers.

The benefits of the new remote and early voting schemes should be weighed against some important costs and dangers:

■ Federal law states that presidential elections should be held on the same day throughout the nation.[42] Courts nonetheless have understandably been reluctant to invalidate state laws on this basis. But we believe the statutory plan offers wise guidance.

- Citizens should vote with a common base of information about candidates. If they vote over a period of weeks before Election Day, they vote based on the knowledge available on a scattering of different dates.

- Wherever possible, citizens should vote alone and in secret. The United States adopted the secret ballot a century ago in order to help voters resist pressure to disclose their choices, whether to relatives or to interested "friends." Permissive early voting threatens the hard won right to a secret ballot.

- The institution of a national Election Day is one of the only remaining occasions in which Americans come together as a nation to perform a collective civic duty. We think rituals and ceremonies do have a part in forming a nation's traditions and habits. We think this one should not be discarded lightly.

- Growing use of absentee voting has turned this area of voting into the most likely opportunity for election fraud now encountered by law enforcement officials. These cases are especially difficult to prosecute, since the misuse of a voter's ballot or the pressure on voters occurs away from the polling place or any other outside scrutiny.[43] These opportunities for abuse should be contained, not enlarged.

- Absentee ballots are often counted last. As their numbers rise, timely reporting of election results is more difficult. After Election Day 2000 California alone had more than a million absentee ballots waiting to be tallied over the following weeks.



Stuffing absentee ballots, county clerk's office, Omaha, NE, October 23, 2000.

We know how difficult it will be for states that have already adopted such practices to roll them back. We do hope to do what we can to undermine the hitherto largely uncritical acceptance of this "convenient" trend and discourage states that have not yet traveled down this problematical path.

Our concerns about early and remote voting plans are even stronger as we contemplate the possibility of Internet voting. In addition to the more general objections, the Commission has heard persuasive testimony that Internet voting brings a fresh set of technical and security dangers all its own.[44] This is an idea whose time most certainly has not yet come.

### Citizens with Criminal Records

We also considered the issue of felon disfranchisement. Almost all the states provide that citizens lose their right to vote, at least temporarily, if they are convicted of a felony. States vary in the crimes that trigger this disfranchisement. Also, in some states felons only lose the right to vote while they are in prison. In others they can petition for restoration of their voting rights. In others the loss of the franchise is permanent

and irrevocable. In states that enact a permanent loss of the right to vote, this feature combined with the demographics of the criminal justice system produces a significant and disproportionate effect on black citizens, to the extent that as many as one-sixth of the black population is permanently disfranchised in some states.

The practice of denying the vote to individuals convicted of certain crimes is a very old one that existed under English law, in the colonies, and in the earliest suffrage laws of the states. But these laws have evolved. Over the last forty years the most significant trends in the treatment of felons and voting have been that states have narrowed the list of relevant crimes, and more than 15 states have eliminated lifetime disfranchisement, making the loss temporary or creating some procedure that could allow restoration.[45]

Except in the rare case where a felon disfranchisement law was provably passed with the intent of disfranchising black voters, the courts have held that such laws are constitutional. The U.S. Supreme Court has specifically ruled that these laws do not violate the Equal Protection Clause, as there is language in Section 2 of the Fourteenth Amendment that appears to carve out a specific exception allowing denial of the right to vote "for participation in rebellion, or other crime." Taken together with the Qualifications Clause's grant to state governments of responsibility for determining eligibility to vote, we doubt that Congress has the constitutional power to legislate a federal prescription on this subject.[46]

We believe the question of whether felons should lose the right to vote is one that requires a moral judgment by the citizens of each state. In this realm we have no special advantage of experience or wisdom that entitles us to instruct them. We can say, however, that we are equally modest about our ability to judge the individual circumstances of all the citizens convicted of felonies.

Therefore, since the judicial process attempts to tailor the punishment to the individual crime, we think a strong case can be made in favor of restoration of voting rights when an individual has completed the full sentence the process chose to impose, including any period of probation or parole. In those states that disagree with our recommendation and choose to disfranchise felons for life, we recommend that they at least include some provision that will grant some scope for reconsidering this edict in particular cases, just as the sovereign reserves some power of clemency even for those convicted of the most serious crimes.

★ ★ **Policy Recommendation**   ★ ★ ★

> Each state should allow for restoration of voting rights to otherwise eligible citizens who have been convicted of a felony once they have fully served their sentence, including any term of probation or parole.

## Ensuring the Voting Rights of All Citizens

Voting rights in the United States have come a long way since the bloodshed and political strife of the 1960s. The Voting Rights Act and related legislation have outlawed and dramatically reduced most forms of voter discrimination and disfranchisement. There are still instances, however, where these laws are violated and not enforced. The Commission has heard testimony—as have Congress and others studying election reform—of instances where the election system did not work equally for all citizens or groups of citizens. In response to court decisions, Congress amended the Voting Rights Act to make clear that proof of racial animus or intent to discriminate is not necessary to find a violation of law. Practices that have a racially disparate impact can suffice if, based on the totality of circumstances, equal opportunity to participate in the political process has been abridged.

Moreover, it is critical that all Americans have confidence in our electoral system, and we should strive to eliminate any reasonable perception that the basic mechanisms of democratic participation favor some citizens over others. No voter should ever feel that the process of voting was intimidating or that there were improper barriers, either intentional or unintentional, that prevented the exercise of their right to vote.

A number of civil rights organizations have alleged that minority voters are discriminated against because of the greater use of inferior voting technologies in

heavily minority and low-income districts, perhaps in combination with such other factors as inadequate numbers of well trained poll workers in those same districts. For example, several studies and news accounts in the last several months point to poor technologies and other factors as possible explanations for the very troubling observation that the proportions of uncounted ballots are often higher, sometimes dramatically so, in precincts and counties with heavily minority populations. Nor is this just an issue of race. Elsewhere in this report we address the difficulties, some of them illegal, faced by voters with disabilities.

Voters and election administrators also told us that the provisions of the NVRA are not being followed or enforced as Congress intended. For example, in our task force work we heard many stories of public agencies that are responsible for offering and processing voter registration but do not offer registration as required, or do not complete the paperwork accurately, or do not transmit the applications in a timely manner to election administrators. When such agencies make these mistakes, voters often show up to the polls to find they are not on the voting list, and hence are denied the ability to vote. Some have alleged that such failures by these public entities have had a discriminatory impact. (Our recommendations concerning provisional ballots and state-wide voter lists will only help with some of these problems.)

Finally, one other area that should be closely watched is the level of service provided to language minority voters. Data from the 2000 Census show that our nation's ethnic minority populations have grown dramatically over the past decade, and the growth can be expected to continue. Many of our new citizens are not yet fluent in English and need ballots written in their native language. Many of them also come from countries that do not have a democratic tradition of voting, and they are unfamiliar with our election processes. They may also be unaccustomed to questioning or challenging a poll worker who has the trappings of official authority. Election administrators must ensure that language minority voters receive the assistance at the polls that is legally required—and wherever feasible go beyond that to provide what the voter actually needs—such as translators, bilingual poll workers, translated voter education materials, and assistance in the voting booth. Interest groups that represent language minority voters should work with their local elections administrators to assist in recruiting translators and bilingual poll workers to assist in polling places. Voter education is especially important for these citizens. Los Angeles, for example, tries to prevent many problems at the polls by providing translated sample ballots to voters before every election.

★ ★ **Policy Recommendation** ★ ★ ★

> **The state and federal governments should take additional steps to assure the voting rights of all citizens and to enforce the principle of one person, one vote.**

1. Federal and state governments should intensify efforts to enforce compliance with the several statutes guaranteeing the right to vote and prohibiting various forms of discrimination in voting and registration.

2. The methods for funding and administering elections—from investments in equipment through voter education to procedures at the polling place—should seek to ensure that every qualified citizen has an equal opportunity to vote and that every individual's vote is equally effective. No individual, group, or community should be left with a justified belief that the electoral process works less well for some than for others.

3. Federal and state governments should consider uses of technology, for example when developing voting equipment system standards, that will make it feasible to provide greater assistance to language minorities.

There are important opportunities to lower barriers by using emerging technologies, as we discuss in the next chapter. Specifically the newer, programmable ATM-like machines, can make translated ballots more readily available for a wider range of language minorities, on demand. The Commission saw a demonstration of equipment used in some southern California voting places that allows voters to choose a ballot in English, Cantonese, Japanese, Korean, Spanish, Tagalog and Vietnamese. The Voting Rights Act requires jurisdictions to provide various forms of language assistance when that language group exceeds a threshold population in the country. The statutory thresholds reflect a balancing of voter need and administrative burden. With shifting technology and accelerating demographic change, jurisdictions will have opportunities to consider, on a voluntary basis, striking a different balance. The same technologies offer potential advantages to people who are blind or visually impaired, because audio equipment can be readily incorporated.

Many of the problems that occur in elections are caused or exacerbated by poll workers who were not fully educated about the rights of voters. We heard testimony that the electoral system works most effectively when poll workers are

well educated about the rights of voters and the procedures for handling voters with special needs. Additionally, when all states implement the provisional balloting recommendation made by the Commission, no voter will ever need to be turned away from a polling place again.

Of course, administration of elections is likely to be more effective, and the effectuation of voting rights more complete, if voters understand both their rights and their obligations. The Commission heard witnesses describe the importance of educating voters about how the process works. We heard abut the lack of effective civics education in our schools, which should be providing the bedrock of citizens' knowledge about the electoral process, as well as providing some inoculation against the civic cynicism that leads too many citizens to opt out of democratic participation. Election officials should continue their efforts to educate voters through the use of sample ballots, voter pamphlets, demonstration equipment, and public outreach in a broad and diverse range of settings.

No one should believe, however, that poll worker training and voter education alone will eliminate the disparities in the performance of election systems across communities. Nor can campaigns to promote voter awareness, especially when framed as obligations of the individual voter, substitute for concerted efforts by officials to obey the law.

# V. A Democratic Process

## which Uses Equipment that Reliably Clarifies and Registers the Voter's Choices

In the 2000 presidential election, more than two million voters went to the polls but did not have any vote counted in the race for president. Specialists call these votes in which no choice is counted "residual votes." These millions of voters either spoiled their ballots by overvoting (appearing to vote for more than one candidate), or by undervoting, i.e., they marked their choice in a manner that could not be counted, or they marked no choice at all—accidentally or intentionally.

In addition to those two million voters, some further, unknown number of voters may have had their votes counted, but voted for a different candidate than the one they were trying to choose. No one can know how often this happens. But some initial research disturbingly suggests that a significant number of voters commit errors simply because some voting systems are badly designed.[47] In addition, large numbers of disabled individuals encounter difficulty in using certain kinds of voting equipment at all, or cannot do so without disclosing their vote to others.

Every analyst of voting equipment agrees that the number of residual votes and the rate of voter error is greatly affected by the kind of equipment that is used. An important precept in "human usability engineering" (to use a technical term) is that predictably high levels of user error are evidence of system failure, just as constant complaints that people cannot seem to "follow instructions" are usually symptoms of flawed instructions or faulty system design.[48]



President Harry Truman with Election Day edition of the *Chicago Tribune,* November 4, 1948.

These effects matter. They matter in principle, since the choice of voting equipment should not be the reason why hundreds of thousands of votes will not be counted. They also matter in practice, since elections are frequently very, very close.



## Very Close Elections Happen— Often

Some might wonder if the extraordinary closeness of the 2000 vote in Florida was just a unique anomaly in American politics. But elections where the margin of error is as little as one percent or less are common.

In presidential elections since 1948, nearly half of all the states have had at least one occasion when the winner of their electoral votes was decided by less than one percent of the vote. In 1948 Truman carried California and Illinois each by margins of less than 1%; had he lost both states the election would have gone to the House of Representatives for decision. In 1960 the winner in six states was decided by this tiny margin, more than enough to have changed the outcome.[49] In 2000 the winners in four other states, in addition to Florida, was decided by less than 1% of the vote.[50] In a given election, past experience indicates a 90% chance that at least one state will have a presidential election decided within such a 1% technological margin of error. Very close elections are also common in elections for other federal offices or for governor. Since 1948 half of the states have had at least one senatorial race decided by less than 1% of the vote; some have had as many as three such narrowly decided senatorial races.

## Benchmarks, Not Mandates

Voting equipment is generally selected by local election jurisdictions, usually counties. Different kinds of systems are therefore used all over the country. There are five basic kinds of systems. In order of the percentage of people using them in 2000, they are:

| | |
|---|---|
| Punch Card | 34.4% |
| Marksense (Optical Scan) | 27.5 |
| Lever | 17.8 |
| Electronic (DRE) | 10.7 |
| Paper Ballots | 1.3 |
| Mixed (within county) | 8.1 |

During the last twenty years the biggest technological trend has been the shift away from lever machines toward newer electronic equipment, specifically optical scan types and the Direct Read Electronic (DRE, or touch-screen, ATM-like) machines. Punch card usage has held steady.[51] Various fixes have been proposed for improving voting equipment. One of the most popular is the idea of abolishing or buying out punch card voting machines.

We do not think, however, that the federal government can effectively pick winners and losers in rapidly evolving competition among private sellers of voting equipment. Nor do we think one size will fit all—for several reasons:



- The performance of voting systems is affected by several inputs that go beyond the equipment. Some of the most important are ballot design, voter education, and the skill and training of poll workers. Some administrators believe, with cause, that they can get more improvements, dollar for dollar, from voter education and poll worker training than they can from investments in new equipment.

- Punch card systems sometimes serve specific local needs. With a punch card machine, each voter just needs a blank punch card. With an optical scan machine, each voter needs a separate ballot. In Los Angeles County, with its 4 million voters, long ballots with many offices and propositions, and requirement to offer ballots in seven different languages (soon to be ten), punch cards thus make much more sense than optical scanners—at least unless enough money can be found to upgrade to high quality DRE (touch screen) machines.

- Punch card systems can be very different. The Datavote system, for instance, seems to have a much better performance record than the Votomatic-style systems most familiar from the television coverage of the Florida election.[52]

- Optical scan systems and DRE (touch-screen) systems can also be quite different. The different brands of optical scan systems vary, especially between those that are centrally counted and the precinct count systems that allow voters to correct errors. The earliest DRE systems had relatively high rates of voter error, which are now apparently being significantly reduced by more modern hardware and more sophisticated software designs that improve the user interface.[53]

These considerations lead us to favor a strategy of focusing on outputs rather than inputs for measuring improvements in the accuracy with which votes are counted. A benchmark expressed as a maximum acceptable percentage of residual votes would allow each state to set a standard for reliable performance and require election jurisdictions to disclose and be accountable to the public for how they did. This strategy lets state and local managers decide how they want to tackle the problem but gives citizens and their elected representatives a clear standard for judging the results.

★ ★ **Policy Recommendation** ★ ★ ★

**Each state should set a benchmark for voting system performance, uniform for that state in each local jurisdiction that conducts elections. The benchmark should be expressed as a percentage of residual vote (the combination of overvotes, spoiled votes, and undervotes) in the contest at the top of the ballot and should take account of deliberate decisions of voters not to make a choice.**

1.  Benchmarks should consider the results obtained by best practices within that state, taking local circumstances into account. In general, we suggest that the benchmarks in the next election cycle should be set no higher than 2%, with the goal of further reductions in succeeding cycles.

2.  Each state should require its election jurisdictions to issue a public report on the number of residual votes after every statewide election, including the probable causes of error, if any.

3.  Each state should determine for itself how to hold its election jurisdictions accountable for achieving the benchmarks.

In considering an appropriate benchmark, officials must make allowance for the voters' right to choose no one at all. Some portion of the residual vote number comes from such intentional undervotes, which can vary considerably from place to place along with local culture and traditions.

Scholars have made progress, however, in suggesting how often this practice occurs. Survey questions from the National Election Studies indicate that on average, between 1980 and 2000, about three-quarters of 1% of voters (0.73%) deliberately made no choice in the presidential race. Exit polling data from the Voter News Service allows another check on this estimate. In 1992, the only year of sufficient data on this point, again about three-quarters of 1% of voters (0.77%) said they had chosen not to cast a vote for president. The number of candidates on the ballot and the availability of straight ticket voting appear to make no difference in these numbers. Voters are more likely to pass on the presidential contest when there is a senatorial or governor's race on the ballot, or when the presidential race was not competitive in that state. Based on this data, ethnic and partisan differences were

unimportant, but older and poorer voters were more likely to skip a presidential race. Even where intentional undervotes were more frequent, the rate was still under 1%.[54]

Another way of bounding the problem is to look at the same jurisdictions as they move from one voting technology to another. Where, as in Detroit, the rate of



invalid presidential ballots goes from 3.1% in 1996 to 1.1% in 2000, after a shift from punch card to precinct-count optical scan technology, observers can see that machines make a difference. A broader study of many counties across the country that changed from lever machines to other technologies between 1988 to 2000, after controlling for several variables, indicates that the underlying residual vote rate, the percentage unrelated to the type of technology, is no higher than 2%.[55]

Since there is bound to be some understandable variation in local conditions, we are reluctant to mandate any single federal benchmark. States should set their own standards. We encourage states (and their citizens) to judge performance at four levels. Residual vote rates at or below 1% should be considered good. Residual vote rates between 1 and 2% can be viewed as adequate, but citizens should consider local circumstances and decide what is possible. Rates between 2 and 3% should be viewed as worrying. Rates higher than 3% should be considered unacceptable.

Ballots are taken for recount, Miami-Dade County, FL, December 9, 2000.

## Benchmarks Applied— The Forty Most Populous Counties

For a concrete illustration of how transparency and accountability can work, we apply this scale below to the forty most populous election jurisdictions in the United States. In judging performance it is better to assess particular counties or cities, rather than look at statewide averages that wash out the differences between jurisdictions that are using different types of machines. This list is ranked by percentages of residual vote in the 2000 election, from lowest to highest.[56]

### Good  Zero to 1%

| | |
|---|---|
| Hennepin County, Minnesota (Minneapolis) | 0.3% |
| City of Milwaukee, Wisconsin | 0.3 |
| St. Louis County, Missouri (St. Louis) | 0.3 |
| Dallas County, Texas (Dallas) | 0.4 |
| King County, Washington (Seattle) | 0.7 |
| Oakland County, Michigan | 0.7 |
| Suffolk County, New York | 0.7 |
| Bergen County, New Jersey | 0.7 |
| Franklin County, Ohio (Columbus) | 0.8 |
| Orange County, California | 0.8 |
| Bexar County, Texas (San Antonio) | 0.9 |
| Fairfax County, Virginia | 0.9 |
| Riverside County, California | 0.9 |
| Middlesex County, Massachusetts | 1.0 |

### Adequate  1–2%

| | |
|---|---|
| Clark County, Nevada (Las Vegas) | 1.1% |
| Nassau County, New York | 1.2 |
| Wayne County, Michigan (Detroit) | 1.3 |
| Alameda County, California (Oakland) | 1.5 |
| Tarrant County, Texas (Fort Worth) | 1.6 |
| Erie County, New York (Buffalo) | 1.7 |
| Maricopa County, Arizona (Phoenix) | 1.7 |
| Sacramento County, California (Sacramento) | 1.7 |
| Santa Clara County, California (San Jose) | 1.8 |
| Westchester County, New York | 1.9 |
| San Bernardino County, California | 2.0 |
| San Diego County, California (San Diego) | 2.0 |

### Worrying  2–3%

| | |
|---|---|
| Pinellas County, Florida (St. Petersburg) | 2.1% |
| Harris County, Texas (Houston) | 2.2[57] |
| Broward County, Florida (Fort Lauderdale) | 2.5 |
| Cuyahoga County, Ohio (Cleveland) | 2.7 |
| Los Angeles County, California (Los Angeles) | 2.7 |

### Unacceptable  Above 3%

| | |
|---|---|
| Manhattan County, New York | 3.2% |
| Queens County, New York | 3.5 |
| Kings County, New York (Brooklyn) | 4.0 |
| Miami-Dade County, Florida (Miami) | 4.4 |
| Bronx County, New York | 4.7 |
| Cook County, Illinois (Chicago) | 6.2 |
| Palm Beach County, Florida | 6.4 |

Philadelphia County, Pennsylvania (Philadelphia) and Allegheny County, Pennsylvania (which includes Pittsburgh) did not report total voter turnout.

This table highlights only forty out of the hundreds of counties in the United States. It also lists only urban counties, yet some of the most serious residual vote problems are in rural counties that are often especially short of resources. There are many counties in the United States with double-digit percentages of residual votes.

Setting benchmarks always has a downside. People may try hard to meet them. Sometimes they try too hard and create new problems. For instance, legislators will need to be more careful to be sure the data they receive is accurate. They should be watchful for any efforts that discourage less capable voters from attempting to cast a ballot. Officials will also have a strong incentive to count every vote. That is good.

But, given that incentive, it is vital to be sure that election jurisdictions in a state share common, reasonably objective definitions of just what constitutes a vote—an issue we will take up in Chapter VI of this report.

### Standards for More Effective and Accessible Voting Technology



Jim Dickson, American Association of People with Disabilities.

As computer technology was used more and more in voting, the FEC's small Office of Election Administration prepared a set of Voting System Standards, approved in 1990, to guide the certification of machines by state and local administrators. The standards have been adopted by 32 states. The National Association of State Election Directors chooses independent testing authorities (ITAs) to examine systems and determine whether they meet the federal standards. Implementation of the standards through the ITAs has been going on since 1995. The FEC is now preparing an updated set of standards for adoption this year.

This system provides a good foundation. But every aspect of it needs to be built up. Overhauling and simplifying the system is vital to encouraging innovation in the research and development of voting technology. Indeed, an able task force made up exclusively of state and local election administrators, organized under the auspices of the Elections Center, took "an unprecedented leap in recommending a more active federal involvement in developing standards for the processes involved in conducting elections." "[W]ith some trepidation" this task force of administrators decided in favor of "a major departure from an historic 'hands-off' attitude toward the federal government" and called for active federal involvement "in development and maintenance of, not only vote counting system standards, but operational standards and guidelines as well."[58] We agree.

**The accessibility of voting technology by disabled individuals is a serious problem.**

★ ★ **Policy Recommendation**   ★ ★ ★

> **The federal government should develop a comprehensive set of voting equipment system standards for the benefit of state and local election administration.**

1. Congress should grant statutory authority to an appropriate federal agency to develop such standards in consultation with state and local election officials.

2. The scope of the voting system standards should include security (including a documentary audit for non-ballot systems), procedures for decertification as well as certification of both software and hardware, assessment of human usability, and operational guidelines for proper use and maintenance of the equipment. The agency should maintain a clearinghouse of information about experience in practice.

3. Voters should have the opportunity to correct errors at the precinct or other polling place, either within the voting equipment itself or in the operational guidelines to administrators for using the equipment.

4. Each voting tally system certified for use should include, as part of the certification, a proposed statement of what constitutes a proper vote in the design and operation of the system.

5. New voting equipment systems certified either by the federal government or by any state should provide a practical and effective means for voters with physical disabilities to cast a secret ballot.

6. In addition to developing the voting system standards, the federal agency should provide its own certification and decertification of hardware and software, including components in voter registration systems. These federal certifications and decertifications, like the remainder of the standards, will be recommendations to states which they can adopt or not.

7. This federal service should include selection and oversight of a federally supervised set of independent testing authorities who will apply the standards in assessing equipment. After the federal agency develops and approves the relevant voluntary voting system standards in consultation with state and local administrators, this further, technical task should be delegated to the highly regarded and relatively independent National Institute of Standards and Technology (NIST) of the Department of Commerce.

Our recommendation does not just expand the scope of the standards. We stress the importance, borne out in practice, of insuring that systems permit second-chance voting in some suitable form. We note that voting equipment designers should place on the record their assumption about what should be tallied as a vote under their system.

The accessibility of voting technology by disabled individuals is a serious problem. In an earlier section of the report we discussed the issue of physical access to polling places. Here we address the issue of whether voting machines are accessible to those who can actually get to them. Of particular concern is access for the millions of people who are blind or visually impaired. Our solution, in point five of this recommendation, is modeled on the Texas statute signed into law by then-Governor Bush in 1999. Senior election officials in Texas are satisfied so far with this statute, as are advocates for the blind and disabled.

Like the Texas law, this recommendation for accessible voting technology will tend to promote the future acquisition of DRE (touch-screen) electronic systems equipped with an audio feedback device. Such systems are already on the market. Local jurisdictions can also opt to buy just one such system for each polling place, although that may be administratively inconvenient. The standard can be met with marksense (optical scan) or even lever machines, but the adaptation is not easy.[59]

Finally, and very important to the reform of the research and development system in voting technology, we think the federal government should offer to relieve each state of the burden of performing a separate testing and certification of whether a system meets the guidelines, which in principle can require a system to be tested again and again and force dozens of individual states to acquire the technical expertise to oversee such a process. Now this task is coordinated by the National Association of State Election Directors. We recommend instead that a technically expert institution of the federal government perform this service capably and transparently. Many states may find this service extremely helpful. Private firms may also prefer this simpler and more expeditious process. Other states need not heed the federal conclusions and can run their own testing and certification processes. But citizens and their representatives may then ask proper questions about why or how their election administrators were persuaded to buy systems that NIST-supervised testers found unacceptable.



## VI. A Democratic Process
### that Handles Close Elections
### in a Foreseeable and Fair Way

Everyone who observed the 2000 election crisis was struck by the sheer unreadiness of every part of the system to deal with a close election. Recount and contest laws were not designed for statewide challenges. The relevant state deadlines did not mesh well with the federal schedule. Each county made its own decisions about what, when, or whether to recount. In performing the recounts the definition of a vote varied from county to county, and from official to official within the counties. Lawsuits materialized across Florida, urging judges to construct law that would overcome the alleged deficiencies of the statutes. The principal television networks also found themselves unready to deal with a very close election. Unable to handle extremely close results carefully and accurately, they dealt with them negligently and inaccurately—and loudly too—erring assertively again and again during the course of Election Night and thereby affecting the course of the very history they were supposedly only trying to report.

### Objective Vote Definitions
### and Foreseeable Post-Election Procedures

A major part of the problem in Florida was that the vote counting process was so subjective and variable. The Supreme Court of the United States found such a standardless process to be unconstitutional, a violation of the Equal Protection Clause of the Constitution. Florida is not alone. Most state statutes do not specify a legal standard for election officials to follow in recounting votes. Amorphous statutory references to the "intent of the voter" invite still more divinations.

To the maximum extent possible, partisans on either side should be able to foresee, before a recount, how a vote will be defined by the recounters. In other words, the definition of a vote should be as objective as possible and spelled out in clear language before Election Day.[60]

**Everyone who observed the 2000 election crisis was struck by the sheer unreadiness of every part of the system to deal with a close election.**







Three disputed ballots,
Palm Beach County, FL,
November 28, 2000.

---

★ ★ **Policy Recommendation** ★ ★ ★

**Each state should adopt uniform statewide standards for defining what will constitute a vote on each category of voting equipment certified for use in that state. Statewide recount, election certification, and contest procedures should take account of the timelines for selection of presidential electors.**

1. Statewide standards for defining a vote in advance of an election should be uniform and as objective as possible.

2. Each state should reevaluate its election code to consider adopting a predictable sequence of: a) vote tabulation and retabulation; b) machine or manual recounts to encompass the entire jurisdiction of the office being recounted, triggered by whatever threshold the state may choose; c) certification of a final count; followed then by d) contests of the certification limited to allegations of fraud or other misconduct.

3. In such a sequence, each state should allow at least 21 days before requiring certification of the final count. But we recommend retention of a federal deadline under which the "safe harbor" for conclusive state determination of presidential electors will expire.

4. Each state should also develop a uniform design for the federal portion of the state ballot, for use in each of that state's certified voting equipment systems.

---

The Florida Election Reform Act of 2001 rewrote the rules for manual recounts of ballots. Its approach to the problem of statewide definitions of a vote, if there is a manual recount, was to start with a sound general principle, to count a vote if there is "a clear indication on the ballot that the voter has made a definite choice." The Department of State is then commanded to adopt specific rules for each certified voting system prescribing what will constitute such clear indications. The law provides two boundaries for such rulemaking. On the one hand, the Department of State may not "exclusively provide that the voter must properly mark or designate his or her choice on the ballot." On the other, the rules may not "contain a catch-all provision that fails to identify specific standards, such as 'any other mark or indication clearly indicating that the voter has made a definite choice.'"[61]

In other words, the Florida law requires that some allowance be made for at least some voter errors that nonetheless indicate a clear choice, while it also warns that the varieties of voter error that will be tallied in a manual recount must still be specified, and specified statewide, before such a recount begins. This strikes us as a reasonable and necessary balance that states should endeavor to find in drafting their own standards, either in statute or in published administrative rules.

In examining the procedures for recounts and contests, we are struck—like practically all others who have taken such inventories—by the bewildering variety of procedures, criteria, and deadlines found around the country. We are opposed to any uniform federally imposed system. But in our mobile society, with national elections and media scrutiny, we think some rudimentary consistency of approach from one state to another may make the workings of an inherently contentious process more foreseeable and understandable.[62]

Our evaluation of best practices envisions the following model sequence:

- Initial machine tabulation (and retabulation) of ballots, including the tabulation of all absentee and provisional ballots. Given our recommendation of greater use of provisional ballots and the time line for counting overseas votes, we think that at least 14 days should be allocated for this process, even if states call for more immediate transmission of unofficial machine tabulations.

- Manual recounts, triggered by criteria set by each state (Florida's new law has a suggestive set), that should extend throughout the area in which the contest was on the ballot. These recounts would be guided by the uniform statewide standards mentioned above. The U.S. Supreme Court decision in Bush v. Gore appears to require this reform. Nonpartisan appointees should supervise them. We believe at least 7 days should be allocated for this process, especially if the recount is statewide.



A ballot during manual recount, DeLand, FL, November 12, 2000.

- Certification of the final vote count. In large election jurisdictions, at least 21 days should be allowed before requiring certification. But at this point all issues regarding the tabulation of votes should be settled.

- Contests. These contests would concede the accuracy of the count, hence they are different from recounts. In a contest the argument should instead be that the votes that were counted should be invalidated because of fraud or other misconduct in the electoral process. Under Florida's old law, and the law of thirteen other states, the distinction between recounts and contests is blurred by allowing a contest for any reason that casts the election outcome in doubt. Florida has now adopted the distinction we recommend. Since contests can involve extensive litigation and taking of evidence about possible misconduct, however, we think the contest phase should clearly be separated from the vote count and certification process itself.

Congress has established a deadline of December 12, about five weeks after the election, by which states should resolve controversies about the appointment of a state's electors if they want their resolution to be binding on the Congress's own consideration of the dispute.[63] That due date allows enough time for counting and

recounting ballots and some time for resolution of contests as well. The December 12 date was adopted at a time when presidents were not inaugurated until March of the following year. Presidents are now inaugurated on January 20, as a result of the 20th Amendment to the Constitution. Though we do not recommend pushing the "safe harbor" deadline even earlier than December 12, we also do not recommend setting this date any later. A new president needs a decent opportunity to get the minimally necessary elements of a new administration into place.

## Media Projections of Election Results

On Election Night 2000 the major television news organizations (ABC, CBS, NBC, CNN, and Fox) and Associated Press made a series of dramatic journalistic errors.



While polls were still open in Florida's panhandle, they projected that Vice President Gore had won the state. They later had to retract this projection. They also projected that Bush had won Florida and, with it, the presidency. Gore then moved to concede the election, beginning with a call to Governor Bush. He then had to retract that call, and the news organizations had to retract theirs. (Associated Press did not; it had not made the second error.) The first set of errors may have influenced voters in Florida and in other states where the polls were still open. The second set of errors irretrievably influenced public perceptions of the apparent victor in the election, which then affected the subsequent controversy over the outcome in Florida.

These problems are not new and are not limited to close elections. Early projections of Johnson's victory in 1964 came well before the polls closed in the West. The same was true in 1972. In 1980, as a result of the media projections, President Carter felt obliged to concede his defeat while polls were still open in the West. In all these cases candidates

Report on the presidential race, November 8, 2000.

further down the ballot felt the effect. In 1980 the estimated voter turnout was about 12% lower among those who had heard the projections and not yet voted when compared with those who had not heard them.

For decades, public opinion surveys have disclosed abiding irritation with early projection of election results by the news media—and that was when the news organizations projections were accurate. Then came the 2000 election. The media projection errors on Election Night 2000 highlight a foolish race for momentary bragging rights and a tiny ratings advantage.

The Commission condemns the controversial practice by which national news networks declare a projected winner in the presidential election before all polls close within the contiguous 48 states of the United States.

This practice demeans democracy. It discourages citizens from participating in the most basic and enriching aspect of self-government—voting. It robs candidates, from the White House to the state house to the courthouse, of votes they have a right to expect. It mocks the most salient lesson of the November election—that every vote is important and should be counted.

The assertion by network executives that it would be dangerous or wrong to delay calling the outcome of the presidential election until all polls close at 11:00 p.m.

**… as a result of the erroneous news reporting in Florida on the night of November 7, the networks now voluntarily have agreed to withhold calling the projected presidential winner in states with two time zones until all polls have closed in those states.**

(EST) is disingenuous and dishonest. In fact, the networks in the last several presidential elections voluntarily have withheld calling the projected presidential winner in Eastern Time Zone states until after 7:00 p.m. (EST). In addition, as a result of the erroneous news reporting in Florida on the night of November 7, the networks now voluntarily have agreed to withhold calling the projected presidential winner in states with two time zones until all polls have closed in those states. Networks contend there is no evidence that early reporting of a presidential winner deters voters from going to vote or remaining in line at the precincts. As the decisions recited above clearly indicate, they know better. The networks' refusal to adopt a national policy to withhold declaring a presidential winner until all polls close is knowingly inconsistent and discriminates against citizens and candidates in much of the nation.



*St. Petersburg Times* headline declares winner on, November 8, 2000.

Government cannot prohibit news organizations from irresponsible political reporting. It cannot bar the exit polls on which networks largely rely for their early calls of a projected winner. The Commission notes the body of evidence that has mounted since November documenting the unreliability of exit polls. The networks now know, from their internal investigations and from studies by their paid consultants that exit polling is seriously flawed. The dirty little secret of the last campaign was that exit polls conflicted with the actual final results in many states—and in five specific instances by as much as seven to sixteen percent.

Network officials acknowledge that these exit polls have become more fallible over the years as more and more voters have refused to participate in them. The Commission was shocked by reports that network interviewers at polling precincts have offered tawdry inducements, such as small sums of money or cigarettes, as enticements to citizens to participate in exit polling. Such conduct cheapens journalism and creates an unhealthy polling place environment. The Commission strongly encourages citizens not to participate in exit polling. If candidates, political parties and election officials actively encouraged voters not to participate in the exit polling game, it could further erode the credibility of exit polls and network reliance on them.

At the same time, Congress and the states may not be completely powerless in making it difficult for the networks to call prematurely a projected winner in presidential elections. In addition to exit polls, networks rely for their early projections on official vote tallies from carefully selected precincts across a state and preliminary raw vote tallies from the state as a whole. Government officials need not be so cooperative. Statutes prohibiting public disclosure of official presidential election tallies until all polls close could limit the news media's ability to project an early winner and be consistent with the First Amendment. At the very least, withholding official vote tallies would leave the networks relying on unreliable exit polls.

**News organizations should not project any presidential election results in any state so long as polls remain open elsewhere in the 48 contiguous states. If necessary, Congress and the states should consider legislation, within First Amendment limits, to protect the integrity of the electoral process.**

1. In practice, this would mean that news organizations would voluntarily refrain from projecting the outcomes of the presidential elections in any state until 11:00 p.m. Eastern Standard Time (8:00 p.m. Pacific Standard Time). Voluntary restraint is preferable to government action.

2. If news organizations refuse to exercise voluntary restraint, Congress and the states should consider prohibiting any public disclosure by government entities of official election tallies in the race for president and vice-president at the precinct level and above until 11:00 p.m. EST (8:00 p.m. PST), where such regulations are consistent with existing provision for public observation of the vote tabulation process.

3. If news organizations refuse to exercise voluntary restraint and other measures cannot protect the integrity of the electoral process, Congress should impose a plan for uniform poll closing hours in the continental United States for presidential elections.

4. National television broadcasters should provide, during the last thirty days of the presidential campaign, at least five minutes each night of free prime television time to each presidential candidate who has qualified for federal matching funds. They or their local affiliates should further make free time available for state and local election officials to provide necessary voter education.

---

Government cannot prohibit exit polls, or even do very much to constrain them. But the First Amendment does allow government to control what its own officials do.



Voters in Chubbock, ID, November 7, 2000.

Even if the states do not act on their own, we believe Congress may be able to legislate directly in the limited fashion we have suggested under the Elections Clause (protecting the integrity of congressional elections by insuring that turn-out is not depressed by announcements of results for the top of the ballot). Or Congress can rely on Article II, Section I's power to set the "the time of choosing" electors and the Spending Clause. The networks could still discuss their polls, as they do before an election, but their capacity to call elections—already somewhat shaken—will erode still further.

These legislative remedies are not a sure cure. Deprived of or constrained in getting official tallies, the news organizations—through the Voter News Service—might choose to redouble their exit polling efforts. That source has become more fragile, though, as survey response rates fall and the prevalence of early and absentee voting rises. Nevertheless, by doubling or tripling or quadrupling the polling effort, VNS might offset some of this lost data. This approach would shift the burden in

spending from media projections right back to where it belongs—to the television industry that hopes to profit from making them.

The most popular idea for discouraging media projection of presidential election results is to adopt a plan of uniform poll closing times. This Commission cannot summon much enthusiasm for this approach. For such a law to work, polls must stay open later in the East or close earlier in the West. Several problems arise. Extending poll closing hours can be very costly, especially if polls must remain open for 15 hours (currently true in New York). If polls end up being open longer in the East, Western voters could complain about the differential treatment. Closing polls earlier in the West is a bad option; many Western voters turn out in the hours between 6 and 8 p.m. local time. Obtaining conformity of poll closing times in the Central and Mountain time zones is also no easy task. Some bills call for easing this burden by setting up special daylight savings time arrangements that would operate in presidential election years. This approach seems too complicated and disruptive.

In general, uniform poll closing time proposals would make voters and financially strapped counties pay the price because the television industry prefers to chase an ephemeral ratings edge. However, it may be the final option available to Congress as a last resort if voluntary restraint or prohibiting disclosure of tallies fails to protect the integrity of the electoral process.

# VII. A Democratic Process
## that Reflects Limited but Responsible Federal Participation

### A Pattern of Neglect

Election administration gets so few resources from American governments that we do not even know how much is spent. The sums are literally too trivial to merit national accounting. The smallest general expenditure category listed in the Census of Government for the Statistical Abstract of the United States is garbage disposal



(solid waste management), on which the many units of government spend a total of about $14 billion. The Caltech/MIT Voting Technology Project has worked this year to figure out how much money is spent on running elections. Their best estimate, for operating expenditures just by counties, comes to a nationwide total of only about $1 billion. As we reflect that the general election of 2000 alone involved more than 100 million voters going to more than 190,000 polling places staffed by 1.4 million poll workers, we can hardly be surprised that there are problems. It is amazing, and a tribute to dedicated professional election administrators and many poll workers who practically volunteer their time, that the system works as well as it does.

The costs of election administration are borne almost entirely by the level least able to afford them: county and city governments. These elections compete for funding every day against police and fire protection or solid waste management. The election infrastructure of democracy loses. It is commonplace to find local budgets that spend ten times more on parks and recreation, or on solid waste, than on running elections.

Lever voting machine like those that have been used in New York since the 1950s.

Thinly populated rural counties are even harder pressed. They must build and staff far-flung polling places. Measured simply as a rule of thumb against 2000 presidential voter turnout, the national average of county operating expenditures for elections, per capita, is about $10. Rural counties (less than 25,000 in population) spend anywhere from $2–32 per voter—a large proportion spends more than $15–20 per voter to provide the needed service.

Thanks again to the Caltech/MIT work, we can estimate that about a third of the operating costs of administering elections goes to voter registration, another third goes to administrative overhead, and the remainder is split about equally between equipment costs and actually running the elections on Election Day.

These numbers begin to let us put the costs of modernization into context. Recall that we are estimating average operating expenditures of about $10 per voter who turned out in the 2000 presidential election. The cost to buy modern DRE electronic (touch screen) voting equipment is about $20–$25 per voter, or more than double an average county's entire operating budget for elections. Marksense (optical scan) machines cost less up front ($8–10 per voter) but add more to operating expenditures each year because of the extra ballot printing costs. These costs can be spread out

and financed over time. But since the operating budgets are so low, even an increment of $1–2 per year is a 10–20% increase in the continuing budget that these low priority agencies can rarely claim.

The products of the election equipment industry have recently received considerable attention. Seldom in the course of human events have so many expected so much from such a small group of firms. As the Caltech/MIT scholars have observed, with annual revenues of about $150–200 million per year the election equipment industry is less than one-tenth the size of, say, the residential lawnmower business.

### Estimating and Allocating the Costs of Improvement

The good news is that relatively modest public investments can effect significant improvements. But there is no objective methodology to spell out how much is needed. A few principles nonetheless stand out:

- Costs should be calculated on a long-term basis, either in the financing or leasing of capital equipment, or in added operating expenditures.
- The system has been chronically underfunded for a very long time.
- State governments should assume a major responsibility in election administration.
- The national government should become a limited partner in financing our federal election system.

Local, county, and state governments presently run congressional and presidential elections for the benefit of the national government. As they do so they must comply with a variety of unfunded federal mandates that instruct them on who can vote, how voters should be registered, how certain kinds of votes can be cast, which polling places are suitable, and other topics. There are no hard estimates of what factor these costs play as a total of local election expenditures. One thoughtful official put together a personal calculation that placed the federally imposed share of his costs at about twenty percent of the total.[65]

Our rough estimate is that overall spending on election administration nationwide should rise by about $300–400 million per year, or about a 30–40% increase above current levels. We reach this figure in the following way:

- With the creation of statewide registration systems, much of the cost of voter registration should shift to the state level, or about $50–75 million per year above current state spending on this problem. Some economies of scale will be achieved but new (though relatively inexpensive) capital purchases will be needed that, again spread over time, may cost another $15–20 million per year, especially when the costs of networking local jurisdictions into the system is taken into account.

- Net county expenditures on election administration should increase by about 10%, or about $100 million per year. States relieving counties of some of the burden of building and operating voter registration can free up more operating funds for necessary tasks like voter education and poll worker recruitment and training that can yield large payoffs in public satisfaction. But, in addition, counties need to make added investments in handling their end of maintaining and updating accurate voter files, handling an increase in provisional voting, and improved training of increasingly nonpartisan and professional officials.

- Purchases of new voting equipment, spread over time and averaged across the country, should cost about another $150 million per year. This increased spending should remain constant as systems are regularly renewed and the focus of spending evolves more to software improvements and service support for relatively inexpensive computer hardware.

- The federal government will need to build up the agency that develops and oversees voting system standards and the national clearinghouse of election administration information. This still should be a modestly-sized national institution, with an annual budget of about $5–10 million per year.

If all levels of American government together were to spend about $1.4 billion on election administration each year, and if this represented an addition of about $300–400 million to the current spending level, what are the appropriate shares of the state and federal governments? We believe those two levels of government should furnish all of the added spending.

★ ★   Policy Recommendation   ★ ★ ★

**The federal government, on a matching basis with the governments of the 50 states, should provide funds that will add another $300–400 million to the level of annual spending on election administration in the United States. The federal share will require a federal contribution totaling $1–2 billion spread out over two or three years to help capitalize state revolving funds that will provide long-term assistance.**

1. These responsibilities should be apportioned about 50–50 between the federal government and the states, so that the federal contribution has the effect of raising the annual federal and state level of spending on election administration by an added $150–200 million. This is a modest sum, lower than some other current estimates about what is needed.

2. The federal expenditures should be made in the form of matching grants to the states, and the states should directly administer the disbursement of funds for administration at the state, county, and local level.

3. Instead of planning on permanent expenditures of federal funds, Congress should instead consider leveraging temporary funding over a two or three-year period in an amount, totaling perhaps $1–2 billion, that will be sufficient to capitalize the federal share of state revolving funds. These funds can leverage the initial federal contribution, after it has been matched by the states, to create a long-term source of federal and

state support to election administration. The capitalization should be sufficient to sustain our proposed federal increment of $150–200 million of continued additional spending on election administration that, when matched by state contributions to the funds, will reach the $300–400 million annual nationwide target.

4. Such state revolving funds would be used to carry out flexible state programs, allowing the states to support a variety of election administration activities undertaken by state, county, and local governments and do so with a variety of financing options that can include grants, loans at or below market rates, loan guarantees, and other arrangements. States would assess relative needs among their election jurisdictions and be accountable for maintaining the fund.

5. Federal funds should be allocated among the states in proportion to the electoral votes that each state will cast in the presidential election of 2004. This reflects a slight per capita weighting toward rural states. Such a modest weighting is appropriate, given the greater average per capita cost of election administration in rural counties.

## The Federal Institutional Role

Some legislation now pending in Congress calls for creation of a federal blue-ribbon investigatory commission as well as a new federal administrative agency. We do not see the need for another blue-ribbon commission or task force. Several bodies are providing a wealth of information and ideas to the Congress. If another year is spent deliberating what can be done, little or nothing will happen that can benefit voters who will go to the polls in 2002 or 2004.

But overall responsibility for the federal aspect of national election administration needs a better home. It is currently lodged in the Office of Election Administration in the Federal Election Commission. This office, with a staff of about five people, does a good job with what it has. But a new and larger entity is needed.

★ ★  **Policy Recommendation**  ★ ★ ★

> The federal responsibilities envisioned in this report should be assigned to a new agency, an Election Administration Commission (EAC).

1. The number of governing commissioners in this agency should be small; the members should be distinguished citizens with a reputation for integrity.

2. The commission should: a) develop federal voting system standards in consultation with state and local election administrators; b) oversee the implementation of these standards in conjunction with the National Institute of Standards and Technology; c) maintain a national clearinghouse of information on best practices in election administration; and d) administer the limited federal assistance program to the states.

3. Enforcement of other federal election laws should remain a separate function, centered in the Civil Rights and Criminal Divisions of the Department of Justice.

4. States that do not have them should also consider establishing nonpartisan election commissions.

## Structuring Federal Legislation and Financial Assistance

Although we agree on the merits of what should be done, we have also disagreed about how or even if Congress should try to make these things happen. We considered several broad approaches.

- Rely entirely on state action. Though we have endorsed state primacy in rhetoric and substance throughout this report, all members of the Commission have concluded that at least some limited federal role is appropriate given the mixed, interdependent character of the federal election system. Having already required services (the election of federal officers) and issued mandates, the federal government does have a responsibility to help pay the bill.

- Rely on conditions attached to federal grants. Some members of the Commission believe that in return for accepting federal funds states should be required to adopt a limited number of critical reforms.

- Rely more heavily on federal requirements. Some members of the Commission believe that with respect to some critical reforms, greater uniformity and certainty are needed. Yet the day-to-day field work of election administration will remain at more local levels.

- Defer the hard choices to federal administrative rulemaking. This view would announce broad goals but leave the exact specification of conditions for federal assistance to be developed by the responsible federal agency in a rulemaking process. We believe that, if there are to be conditions, they should be clear, general, and imposed directly by Congress.

We therefore have struck a careful balance among mandates, conditional assistance, and voluntary standards.

★ ★   **Policy Recommendation**   ★ ★ ★

**Congress should enact legislation that includes federal assistance for election administration, setting forth policy objectives for the states while leaving the choice of strategies to the discretion of the states.** The Commission as a whole takes no position on whether Congress should use the powerful incentive of conditional grants or instead establish requirements or mandates wholly independent of funding. A majority of the Commission members suggests the approach described below. However, a minority suggests a more direct federal role as detailed in an additional statement of views appended to this report.

1. Congress should enact legislation to create a new federal election administration agency, to facilitate military and overseas citizen voting, to address a national election holiday, to constrain—if necessary—premature official disclosure of presidential election results, and to appropriate federal assistance in election administration.

2. To be eligible for federal assistance, states shall:

   a. match the federal assistance with an added contribution of their own in the proportion fixed by Congress;

b. adopt legislation that will establish a statewide voter registration system networked to every local jurisdiction in that state, with provisions for sharing data with other states;

c. permit on-site provisional voting by every voter who claims to be qualified to vote in that state, or adopt an alternative that achieves the same objective;

d. set a uniform statewide benchmark for voting system performance in each local jurisdiction administering elections expressed as a percentage of residual vote in the contest at the top of the ballot, and require local jurisdictions to report data relevant to this benchmark;

e. either agree to comply with the federal voting system standards and certification processes or develop their own state voting system standards and processes that, at a minimum:

   i. give voters the opportunity to correct errors, either within the voting equipment itself or in the operational guidelines to administrators for using the equipment at a precinct or other polling place and

   ii. require that new voting systems should provide a practical and effective means for voters with physical disabilities to cast a secret ballot; and

f. adopt uniform statewide standards that define what will constitute a vote on each category of voting equipment certified for use in that state;

g. certify that they are in compliance with existing federal voting rights statutes.

3. Specific choices on how to comply with these conditions should be left to the discretion of the states.

4. States that qualify for federal assistance should have broad discretion in how they disburse this money, so long as the money is expended on: a) establishing and maintaining accurate lists of eligible voters; b) encouraging eligible voters to vote; c) improving verification of voter identification at the polling place; d) improving equipment and methods for casting and counting votes; e) recruiting and training election officials and poll workers; f) improving the quantity and quality of available polling places; and g) educating voters about their rights and responsibilities.

In most of our policy recommendations, we have suggested specifics for possible policy design. But we have deliberately set conditions on assistance that are general, not detailed. The federal legislation should give states room to adapt to local circumstance, remaining open to managerial and technical possibilities that future developments and experience may suggest.

# Endnotes

## to the report

1. The data is from the American National Election Studies for 1996 and 2000, with interviews completed in November and December of the election year, along with the Comparative Study of Electoral Systems. For more details, see the Background Papers prepared for this Commission by its Task Force on the Federal Election System.

2. Joseph P. Harris, Election *Administration in the United States* (Washington, DC: Brookings Institution, 1934), p. 1.

3. *Cook v. Gralike*, 531 U.S. 510 (2001)

4. Alexander Hamilton, Federalist No. 59 [1788], in *The Federalist Papers*, ed. Clinton Rossiter (New York: Penguin, 1961), pp. 362–63.

5. The major cases are *Ex Parte Siebold*, 100 U.S. 371 (1879); *Ex Parte Yarbrough*, 110 U.S. 651 (1884); *Smiley v. Holm*, 285 U.S. 355 (1932); *United States v. Classic*, 313 U.S. 299 (1941); and *Foster v. Love*, 522 U.S. 67 (1997). For a fuller discussion, see the Background Papers prepared for this Commission by its Task Force on Legal and Constitutional Issues; see also U.S. General Accounting Office, *Elections: The Scope of Congressional Authority in Election Administration*, GAO-01-470 (Washington, DC: GAO, 2001).

6. On the limits of state power over federal elections see, most recently, *Cook v. Gralike*, 531 U.S. 510 (2001). In *Foster v. Love* the Supreme Court considered it settled that Congress could override state regulations, if it wished, "by establishing uniform rules for federal elections, binding on the States." 522 U.S. at 69.

7. Michigan, California, and Illinois, among other states, refused at first to comply with the NVRA. Their refusals were struck down in *ACORN v. Miller*, 129 F.3d 833 (6th Cir. 1997); *Voting Rights Coalition v. Wilson*, 60 F.3d 1411 (9th Cir. 1995), *cert. denied*, 516 U.S. 1093 (1996); and *ACORN v. Edgar*, 56 F.3d 791 (7th Cir. 1995).

8. *Bush v. Gore*, 125 S.Ct. 525, 529 (2000). The landmark cases establishing congressional authority to legislate on state as well as federal voting practices using the authority of the 14th and 15th Amendments were *South Carolina v. Katzenbach*, 383 U.S. 301 (1966) and *Katzenbach v. Morgan*, 384 U.S. 641 (1966). Again, for a fuller discussion see the Background Papers prepared for this Commission by its Task Force on Legal and Constitutional Issues.

9. Current calls to amend the Electoral College system mainly argue that it does not adequately mirror the population or the popular vote. For an articulate presentation of the critique, see the testimony of Stanford University historian Jack Rakove to the Commission in the transcript of its March 26 hearing in Atlanta.

10. Recognizing this point, a group of smaller states actually attempted to bring a case contesting the constitutionality of the Electoral College, but the Supreme Court held that it did not have jurisdiction to hear such a complaint. *Delaware v. New York*, 385 U.S. 895 (1966).

11. The compromise was crafted late in the Convention by Pierce Butler, one of South Carolina's delegates. For a concise summary see Forrest McDonald, *The American Presidency: An Intellectual History* (Lawrence: University Press of Kansas, 1994), pp. 160–91.

12. Federalist No. 39, in *The Federalist Papers*, Rossiter ed., p. 244; see also Hamilton's comments in Federalist No. 68.

13. Political professionals hire private firms to produce winnowed voter lists so that, unlike governments, they do not waste money trying to contact nonexistent voters. According to information supplied to the Commission, these private lists tend to show that an average of 16% of the names on all state rolls are "deadwood."

14. Vote fraud is difficult to discover and prosecute. But, for illustrations of ghost voting and "repeater" schemes, see *United States v. Olinger*, 759 F.2d 1293 (7th Cir.), *cert. denied*, 474 U.S. 839 (1985); *United States v. Morado*, 454 F.2d 167 (5th Cir.), *cert. denied*, 406 U.S. 917 (1972). For an example of how ballot box stuffing is done with absentee ballots, see *United States v. Boards*, 10 F.3d 587 (8th Cir. 1993). For the closely related practice of "nursing home" fraud (obtaining and voting the ballots of mentally incompetent individuals), see *United States v. Odom*, 736 F.2d 104 (4th Cir. 1984).

15. The Qualifications Clause of Article I states that "the Electors in each state [for congressional elections] shall have the Qualifications requisite for Electors of the most numerous branch of the State Legislature."

16. The main effect of the power shift was to lower the barriers to voting that had been erected by many cities. "Almost everywhere, between 1790 and the 1850s, state suffrage laws and municipal suffrage laws became identical. Behind this convergence were two important, and related, shifts in law. The first was the early nineteenth-century deterioration and then collapse of the notion that municipal charters were inviolable. The second was the ascent of a broad concept of state supremacy, the idea that municipalities legally ought to be regarded as administrative creatures of the state, rather than as separate sovereignties of any type.... One of its implications was that state legislatures could set the franchise in municipal elections and compel cities and towns to adopt the same suffrage provisions as the state." Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* (New York: Basic Books, 2000), p. 31.

17. Some other countries, notably Canada, chose systems early in the 20th century that do not rely on voters to initiate registration. Instead the federal government registers voters as part of a nationwide census. Beyond that, however, Canada's successful list maintenance practices are analogous to those recently adopted in Michigan, and discussed below.

18. For the most recent report on population mobility, see U.S. Census Bureau (Jason Schachter), "Geographical Mobility: March 1999 to March 2000," Current Population Reports P20-538, May 2001. The data is reaffirmed by responses on residential duration in separate studies of voting behavior conducted as part of the Census Bureau's Current Population Surveys after the 1996 and 1998 elections.

19. More information on the various voter registration systems is collected and can be found in the Background Papers prepared for this Commission by its Task Force on the Federal Election System. The National Conference of State Legislatures (NCSL) is also an invaluable source of up-to-date information on practices and pending legislation in the different states. On the problem of agency data exchange see also the idea of developing a common Election Markup Language discussed in the next note, note 20.

20. State governments are also better positioned to solve the sometimes difficult problems that have arisen in trying to exchange accurate data on deaths, felony convictions, and the like within a state. It is promising that the international Organization for the Advancement of Structures Information Standards (OASIS), which creates industry specifications for structured information processing, has formed an Election and Voter Services Technical Committee to develop Election Markup Language (EML), based on XML (extensible markup languages). Such an innovation will facilitate interchange of data among the agencies with information relevant to voter eligibility. Establishment of an open industry standard, independent of any particular vendor, will help states modernize their systems more effectively at a lower cost and lower the barriers of entry to possible software developers.

21. For more details on state identification practices, see the Background Papers prepared for this Commission by its Task Force on the Federal Election System.

22. According to Michigan officials it cost seven and a half million dollars to develop their system. That figure includes hardware and software for the local jurisdictions, building a network, and building the street index (which the state now also uses for many other useful tasks). Because the local offices are not tethered to the state in a traditional internet network, there was a higher cost in providing the 400 counties with the necessary hardware. It was also necessary to build a special server for Detroit. The system cost the state only $1.5 million a year in operating expenditures. The system opens up new opportunities. Michigan is now working on an online database where voters can check their information, use a mapping program to get directions to the polling place, and even take a virtual tour of the polling place and its machines.

23. The Privacy Act prohibits most states from requiring voter applicants to provide a full SSN. It does not keep states from requesting that voters provide this information (which may be in the voter's own interest) and it does not preclude either a request or a requirement that applicants provide the last four digits of the SSN. Michigan does not need to request any SSN data because it uses the individual's driver's license number, which is different from the SSN, as a separate numeric identifier.

24. Some evidence was presented on this problem in the state and congressional investigations of the contested 1996 election in California's 46th Congressional District in which Loretta Sanchez defeated Robert Dornan by 984 votes. Both investigations concluded that the number of verifiably illegal votes was fewer than 984; hence Congresswoman Sanchez retained her seat. She defeated Dornan by more than 14,000 votes in a 1998 rematch. The evidence indicated that, just in Orange County, about a thousand prospective jurors whose names were drawn from the voter list are excused from jury service every year because they are not citizens. The evidence also included records seized from an immigrant advocacy organization showing that 61% of the voters this organization had registered were aliens. More than 300 of these new Orange County voters had voted in the contested election.

25. Political professionals also believe that some unofficial deputy registrars solicit registration applications and then discard those which have come in from voters whom they think will not support their party or candidate. This is illegal, of course.

26. States that experience disfranchisement caused by the negligence or misconduct of unofficial third-party voter registrars should be able to establish a system for licensure of deputy registrars, analogous to the licensure and accountability of notaries public. Any private individual qualified to register voters under NVRA should be able to receive a license as a deputy registrar. Such a license could be revoked on proof to the local election supervisor of negligent performance or other specified misconduct. If necessary to permit states to consider this option, Congress should amend the NVRA.

27. See Federal Election Commission, *Implementing the National Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples* (1994), Chapter Six. None of these problems apply in the same way to the six states that allow voters just to register on election day at the polling place or have no registration of voters at all. These states, to which the NVRA does not apply, are Idaho, Minnesota, New Hampshire, North Dakota, Wisconsin, and Wyoming.

28. For more detail, see the discussions of this issue in both the Background Paper prepared for this Commission by the Task Force on the Federal Election System and the Background Paper prepared by the Task Force on Legal and Constitutional Issues.

29. Michigan utilizes a version of this alternative, requiring photo identification as well as an affidavit, and then issuing a regular ballot. Illinois uses an analogous yet less satisfactory alternative, in which the voter executes an affidavit of eligibility, in some cases with a supporting affidavit, but no photo ID is required and, lacking a statewide registration system, the voter list may not be corrected.

30. It is possible that, as electronic voting technology evolves, voting machines may be able to display the appropriate ballot for the local jurisdiction where the voter is registered, regardless of where in the state the voter chooses to cast that ballot.

31. A useful summary of the scholarship is Michael W. Traugott, "Why Electoral Reform Has Failed: If You Build It, Will They Come?," in *After 2000: The Politics of Election Reform*, ed. Ann N. Crigler and Marion R. Just (forthcoming).

32. On the relative significance of the ADA requirements, see the discussion of this law in the Background Papers prepared for this Commission by its Task orce on Legal and Constitutional Issues.

33. Some local jurisdictions are reluctant to use schools as polling places while school is in session. Some officials, usually privately, cite concerns about the security and liability issues presented when large numbers of adults shuttle in and out of areas being used by schoolchildren.

34. Holidays could be very costly to hourly workers who lack benefits that include paid holidays. But many of these workers are in retail and service jobs and will be asked to help keep these businesses open on the holiday anyway. Depending on their employment agreements, employers may be obliged to shoulder the extra cost of paying them overtime.

35. In 1968 Veterans Day was moved to the 4th Monday of October. In 1975 it was moved back to November 11. 5 U.S.C. § 6103. The United States also sets aside Memorial Day to honor those who sacrificed their lives in the nation's wars. This holiday originated after the Civil War, when May 30 was designated for honoring the graves of the war dead. Most states now conform to the federal practice, adopted in 1971, of observing the holiday on the last Monday of May.

36. 2 U.S.C. §§ 1, 7.

37. Testimony of David Walker, Comptroller General of the United States, before the House Armed Services Committee, May 9, 2001.

38. Under Executive Order 12642 (1988), the Secretary of Defense is the agent responsible for implementing UOCAVA and handling the federal responsibilities under that Act. The Director of the Federal Voting Assistance Program administers this program for the Secretary of Defense.

39. Military personnel should not lose their residency in a state if they are living elsewhere under orders, regardless of whether the person intends to return to that state.

40. States should permit provisional voting, and the effective waiver of a prior registration deadline (such as 30 days), if the service member (or relative) has recently moved through separation from the service 60 days or less before the election.

41. The weight of the evidence leans toward a conclusion that early voting and vote-by-mail have slightly increased turnout among committed partisan voters or in low interest local elections. Unrestricted absentee voting probably has not increased turnout at all. See the Background Papers prepared for this Commission by its Task Force on the Federal Election System.

42. "The Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." Article II, Section 1.

43. For recent illustrations, see *United States v. Cole*, 41 F.3d 303 (7th Cir. 1994); and *United States v. Salisbury*, 983 F.2d 1369 (6th Cir. 1993).

44. See, for example, the testimony of David Jefferson, chair of the California Secretary of State's Internet Voting Task Force, in the transcript of the Commission hearing in Simi Valley, California on April 12.

45. To trace the evolution of laws disfranchising criminals between 1790 and 1920, see Tables A.7 and A.15 in Keyssar, *The Right to Vote*. On current practice, see ibid., pp. 302–03 and the Background Paper of this Commission's Task Force on the Federal Election System.

46. The Supreme Court case was *Richardson v. Ramirez*, 418 U.S. 24 (1974). For further discussion, see the Background Paper of this Commission's Task Force on Legal and Constitutional Issues.

47. In one experimental study, 15% of the voters committed errors in casting their ballots. Poor ballot design and punch-card voting technology appeared to be the source of many of the errors. Susan King Roth, "Disenfranchised by Design: Voting Systems and the Election Process," *Information Design Journal,* vol. 9 (1998).

48. This point was made to us by representatives from the Committee on Communications and Information Policy of the Institute of Electrical and Electronics Engineers (IEEE).

49. Nixon won his home state of California by less than 1%. But Kennedy won Hawaii, Illinois, Missouri, New Jersey, and New Mexico by this thin margin (with 63 total electoral votes in an election where his margin of electoral victory was 33).

50. They were Iowa, New Mexico, Oregon, and Wisconsin—all of which were carried by Gore, thus making Florida so pivotal for Bush.

51. The data is from the helpful Caltech/MIT Voting Technology Project, "Residual Votes Attributable to Technology: An Assessment of the Reliability of Existing Voting Equipment," Version 2, March 30, 2001. The data does not distinguish between the voting equipment used at polling places and the voting equipment used in counties for absentee ballots.

52. Using relatively reliable data for all of California from the Secretary of State's office and the University of California's Statewide Database, Henry Brady and Gray Chynoweth (in an informal report provided to the Commission) found a mean spoiled vote of only 0.85% for communities using the Datavote punch card system, while the Votomatic-style systems had spoiled vote rates of 1.83% (Pollstar), 2.36% (Votomatic), and 2.23% (mix of Votomatic and Pollstar).

53. For more detail on the varieties and issues related to the different technologies, see the initial report of the Caltech/MIT Voting Technology Project, *Voting: What Is, What Could Be,* July 2001.

54. Stephen Knack and Martha Kropf, "Roll Off at the Top of the Ballot: Intentional Undervoting in American Presidential Elections," April 2001 (unpublished manuscript made available to the Commission).

55. On Detroit, see "Technology Slashes Detroit Voting Error," Washington Post, April 5, 2001; the broader study of underlying residual vote is the Caltech/MIT report, "Residual Votes Attributable to Technology." That study concludes, in essence, that new machines in counties should be expected to have no more residual votes than they had experienced in recent elections with their older lever machines. This equated to "a performance standard in practice—an average residual vote *not in excess* of 2 percent of total ballots cast," (emphasis added).

56. Data provided by the Caltech/MIT Voting Technology Project, gathered from state election sources.

57. Harris County decided in 2001 to change its voting system from punch cards to a DRE electronic model.

58. Report of the Election Center's Task Force on Election Reform (2001).

59. For explanation of how these alternatives can work, see sections 81.56 and 81.57 of the Texas Administrative Code (2000).

60. In this context, we mean objective both in the sense of a physical fact that exists regardless of anyone's attitude about it, and objective in the sense that—to the maximum extent possible—the judgment of what physical markings constitutes a vote should not depend on the stance, feelings, or opinions of the individual observers. See generally John R. Searle, *The Construction of Social Reality* (New York: Free Press, 1995). p. 66.

61. Section 42 of the Florida Election Reform Act of 2001, adding new subsection (5) to section 102.166 of the Florida Statutes.

62. On the variety of state schemes, see the paper on "Recounts and Contests" prepared for this Commission by its Task Force on Legal and Constitutional Issues. On the desirability of some standardization across states, see the report of the Subcommittee on Governance and Administration in the Report of the Election Center's Task Force on Election Reform (2001).

63. See 3 U.S.C. § 5 and *Bush v. Palm Beach County Canvassing Bd.,* 121 S.Ct. 471, 474 (2000).

64. Our recommendation does not adequately address the concerns of the 0.6% of the voting age population that lives in Alaska and Hawaii, where the polls close another two hours later. But it would allow presidential election results to be reported on Election Night while adding to the integrity of the election process for the 52.4% of the electorate who live in the Central, Mountain, and Pacific time zones.

65. See the transcribed testimony of Ernest Hawkins, Clerk and Registrar of Sacramento County, California, at the Commission's June 7 hearing in Ann Arbor, Michigan.

66. The June 2001 report of the Governor of New York's bipartisan election modernization task force has recommended state capitalization of such a fund in that state, to be called an "Election Modernization Fund," with an initial investment of $25 million.

67. A successful precedent is the State Revolving Fund administered by the Environmental Protection Agency. Created by the 1987 Amendments to the Clean Water Act, this system effectively replaced a long-running but often unsatisfactory federal grants-in-aid program.

# Additional Statement

## Concurring in Part and Dissenting in Part
## by Christopher Edley,
## Joined by Leon Panetta, Deval Patrick, Bill Richardson,
## John Seigenthaler, and Kathleen Sullivan

### Federal Requirements and Enforcement

The quality of our democracy's infrastructure should not depend on class or color, on party or precinct. "One person, one vote" is not a principle for local officials to trade off against potholes or jails, nor should it be conditioned on the willingness of Congress to appropriate an incentive in any given budget cycle. Finally, Congress is honor bound—perhaps in this field as in no other—to ensure that the promises it makes through law to the American people will indeed be kept. For these reasons we must offer additional views on the Commission's recommendations and report.

The Commission majority declined to endorse a limited number of specific federal requirements for the administration of elections for federal office, trusting that the states will adopt vital reforms to fulfill conditions, or as quid pro quo, for receiving new federal grants. While we largely agree with the policy goals adopted by the Commission for federal legislation, certain reforms are fundamental enough to stand on their own as requirements, independent of any federal largesse.

We have several concerns with the incentive or "conditionality" approach. First, will the carrot be enticing enough? Even if Congress passes legislation to authorize a grant program, Congress may, after another bruising political battle, decline to appropriate the money, or enough of it. As the memory of 2000 fades, election financing could easily become just another game piece in the perennial battle over taxes and spending. Then some states may decline to take the bribe out of reluctance to pay the required 50-50 match, or because the federal funding may be too little to dissolve objections to all the strings and inevitable regulations. Second, if a state breaks or bends the conditions, experience teaches that the federal government will only slowly initiate enforcement and almost never press all the way to a meaningful sanction, like cutting off funds or seeking a court injunction. Third, if the funding will be limited in time, as the Commission proposes, then so will the conditions and the rights the legislation purports to ensure.

Our fourth and final concern is the most important. With the experiences of November 2000 fresh in mind, many Americans consider election reform a moral imperative because confidence in the fairness of our democracy must be made as deep and widespread as possible. At their core, these reforms are intended to vindicate our civil and constitutional rights. They are too fundamental to be framed as some intergovernmental fiscal deal, bargained out through an appropriations process.

What requirements should Congress insist upon, regardless of funds granted? We suggest at least the following, drawn from the Commission's recommendations to state officials:

1. **Residual votes or "spoiled" ballots.** Voting technologies and administrative practices should produce low rates of uncounted ballots, as the Commission argues in its Recommendation 6 and Chapter V. The right to vote means little if there is no right to have your vote counted. Therefore, at least for federal offices, Congress or the new agency should establish a maximum level of spoiled ballots considered acceptable, including overvotes and an estimate of unintended undervotes. Each state should be required to pick and achieve a benchmark, applicable in every precinct, no greater than the federal maximum. By federal law, states should be required to make every effort to make every vote count.

2. **Statewide provisional voting.** No voter who believes he or she is registered in the state should be denied a ballot at the polling place. Federal law should require all polling places to offer a provisional ballot to any voter who believes he or she is registered in that jurisdiction. Election officials should adopt procedures to count such ballots, after confirming the voter's registration status, before they certify the vote count. This requirement should be implemented regardless of whether a state has developed a statewide voter registration list, although that would make implementation easier.[1]

3. **Accessibility.** Congress should insist that states purchase and use voting technologies that are accessible to voters with disabilities, that are readily adaptable to non-English speakers, and that permit all voters, including those who are illiterate or visually impaired, to cast a secret ballot.[2]

4. **Basic voter information.** very jurisdiction should provide every voter, in advance of the election, a sample ballot and basic information about voting procedures. This should include an understandable description of rights and responsibilities, and of how to make a complaint. (The Voting Rights Act already requires that whenever a jurisdiction subject to the

---

1. The National Voter Registration Act, or "Motor Voter", already mandates a "fail safe" balloting procedure as a protection against erroneous purging of registration lists. It is focused on problems of disputed changes of address, and applies only to voters who move within a county. It is burdensome to the voter and has not proven very workable. The Commission's proposal, Recommendation 2, is broader.

2. The 1975 amendments to the 1965 Voting Rights Act include certain protections for non-English speaking voters in counties above a population trigger. (Congress extended those provisions in 1982 for a period of ten years and in 1992 for fifteen years). Reports of jurisdictions failing to carry out the necessary procedures for complying with these provisions are widespread, and whether this is a matter of intent or negligence is unclear. However, in addition to enforcement difficulties, current law does not require technologies that will allow a secret ballot for voters needing assistance because they are illiterate or visually impaired. Nor is a secret ballot required by the Voting Accessibility for the Elderly and the Handicap Act. In practice, jurisdictions often comply with current law by forcing voters with disabilities to use absentee ballots.

act's language provision distributes sample ballots or other information, it must do so in all languages necessary for compliance.)

In elections for the Senate and House of Representatives, the Constitution provides Congress full authority to demand that these goals be honored. The Framers recognized the practical need to rely on local administration and state oversight. But they assigned ultimate authority in such matters to tCongress because they foresaw dangers in leaving the mechanisms of national governance utterly at the mercy of state politics and peculiarities. The recent election should have made clear to everyone that the basic fairness and effectiveness of federal elections should not be left to local accident or parochial preference. Furthermore, the Supreme Court's reasoning in Bush v. Gore suggests that there may be a compelling interest and constitutional authority for the Congress to impose certain requirements for non-federal elections as well, lest a state deny its residents the equal protection of the laws by having materially inferior elections systems for some voters or communities in comparison with others. Nevertheless, we recommend only that the legislation formally apply these requirements to elections for Congress, putting this urgent legislation beyond constitutional dispute. As a practical matter, of course, states will likely adopt the same processes and technology for their votes on presidential electors and on state and local matters.

Some will view these federal requirements as a heavy-handed imposition on state and local governments, but we believe they represent a limited and respectful assertion of Congress's responsibility under the Constitution to safeguard the election of federal officeholders, and a measured corrective for all too commonplace violations of the most fundamental of civil rights.

———————

The Commission's Recommendation 8, calling for intensified efforts to enforce existing antidiscrimination statutes, is important. Combined with the new obligation that states certify their compliance with those laws (see Recommendation 13), the Report gives much needed voice to legitimate frustrations felt by many. Congress made promises in the 1965 Voting Rights Act, and extended those promises in a series of statutes over the decades. Yet, after all these years, violations continue.

This leaves us all with a difficult but deeply important question: What is wrong with current laws that has made it possible for so many violations to continue, and why should our citizens feel confident that this time the promises Congress makes will be kept? What, in actual practice, will make the new promises truly enforceable?

No laws have perfect compliance. We take the Commission's report and the Commission's very existence, however, to mean we all agree more needs to be done. It is no answer to say that the U.S. Department of Justice (DOJ) will try harder, because it is inconceivable that any plausible increase in appropriations will give DOJ the resources to do its job at an acceptable level relative to the need. Surely the decades have taught us that. Therefore, we urge Congress to consider a range of possibilities for new legislation, including:

    i)  ensure that private individuals, not just DOJ, can bring private actions to enforce all relevant voting rights and anti-discrimination laws with the absolute minimum of technical legal barriers, such as restrictions (other than any required by the Constitution) on who may bring suits, on class actions, and on remedies;

    ii)  reverse the judicial misinterpretations of earlier statutes whereby courts have imposed restrictions on attorneys fees, making it more difficult for aggrieved voters to find capable lawyers and experts;

    iii) provide grants to state attorneys general to support new efforts on their part to enforce antidiscrimination laws in registration and voting; and

    iv) provide grants to community-based organizations to investigate and if necessary litigate, as the Department of Housing and Urban Development has long done to support fair housing and combat housing discrimination.

---

The Commission's report points the way forward with many sound recommendations and much useful analysis. Strong legislation is vitally important now because many of our citizens feel their confidence in our election system at a low ebb. America's challenges and America's increasing diversity should make us redouble our efforts to include people in the basic process of democracy. We cannot do that in the face of news accounts of precincts where 20 percent of ballots are not counted in an excruciatingly close presidential election. We cannot do it when voters are turned away because their names are inexplicably missing from some computer print out and the phone lines to county offices are busy for hours on end. We cannot do it when citizens with poor eyesight cannot track the columns of complex ballots, when citizens with disabilities are faced with barriers or humiliation, or when proud new citizens are made to feel second class in their own, new land.

# Additional Statement

## Concurring, by Colleen C. McAndrews, Joined by Slade Gorton and Leon Panetta

We in the West have experienced first hand the effects of premature network election projections on voter turnout in down ballot races as well as the presidential race. Respect for the First Amendment, shared by all Commissioners, caused caution in our recommendations to Congress to address this controversial practice. No unanimity was achieved for a radical approach such as federal legislation to ban outright early projections until such time as the polls had closed in all the contiguous 48 states.

We do not urge this approach immediately. We support the Commission's incremental steps as set forth in Policy Recommendation 10. We also are wary of First Amendment challenges if an outright ban on network projections were attempted.

However, we wish to bring to the attention of Congress a line of legal reasoning that holds that a carefully crafted direct ban might withstand constitutional challenge. The Supreme Court has recognized some limitations on free speech in connection with elections in a line of cases culminating in Burson v. Freeman, 504 U.S. 191 (1992), which upheld a zone free of campaigning and electioneering within 100 feet of a polling place. The Court held that this intrusion on free speech was narrowly tailored to serve a compelling government interest in preventing intimidation and election fraud. The Court grappled with "a particularly difficult reconciliation: that accommodation of the right to engage in political discourse with the right to vote—a right at the heart of our democracy." Id. At 198. The Court cited earlier cases in which it "upheld generally applicable and even-handed restrictions that protect the integrity and reliability of the electoral process itself," and found these to be "indisputable compelling interests". Id at 191 (citing to Anderson v. Celebrezze, 460 U.S. 780, 788, n.9 (1983); Eu v. San Francisco Cty. Democratic Central Comm., 489 U.S. 214, 228–229 (1989)).

If the broadcast media are merely delayed for a short period of time (no more than three hours) from projecting election results, it may be that the courts would agree that such restrictions on the networks' speech from 8 p.m. EST to 8 p.m. PST is outweighed by the need to protect the integrity of federal elections. These limits do not involve discourse on issues or limitations on particular viewpoints but only a practical delay of the announcement of the aftermath of the campaign, the networks' educated guessing about who won or lost the horse race.

The polling place campaign free zone in Burson passed the Court's test of strict scrutiny by comparing the exercise of free speech rights with another fundamental right, the right to cast a ballot in an election free from intimidation. Id. At 211. Perhaps the Court would view the early projections of a presidential race as intimidation or suppression of West coast voters who believe their votes no longer count.

# Additional Statement

## Concurring in Part and Dissenting in Part
## by John Seigenthaler, Joined in Part by Griffin Bell

On Point 2 of Policy Recommendation 10. The Commission's proposal for a law is wrongheaded and unrealistic. I dissent on three grounds. First, local election officials certainly have a First Amendment right to engage in political speech—and discussing election results clearly is political speech. I cannot believe that the Congress should or would seek to make a law that gags local officials from giving citizens and the news media—in their communities or in their state—presidential or Congressional election returns the moment they are available. Second, such a law, if enacted, surely would result in news media lawsuits challenging government action to directly and blatantly interfer with the First Amendment right of journalists to gather and report the news when it is news.

The legal theory on which some of my colleagues rely ignores the constitutional protection a free press enjoys to report without government interference news of great moment. They know it is a stretch. Their well-intended effort to protect West Coast voters from early presidential election projections is a bluff that the news media will call. It is a wasted effort.

Finally, the First Amendment aside, the bluff won't work. It is impractical and unrealistic. The relationship between local election officials at the precincts, and at places where votes are counted and reported, is long-standing and mutually beneficial. Elected and appointed local election officials feel a duty to get returns to the public—their constituents who elect them and pay their salaries—at the earliest possible moment on election night. Members of the news media are their allies in fulfilling this duty. In many polling and vote-counting places news media representatives serve dual journalistic roles: they collect the returns and report them to their news organizations, and also serve as monitors on the integrity of the process.

The Commission is proposing a law that will never be enforceable. Election officials will be working to let voters—again, their constituents—know the outcome of races for governor, mayor, state legislator, and city council seats, etc. At the same time the Commission would gag them from reporting who won the congressional seat in their district and the U. S. Senate race in their state. They will be pressured by voters to release that information as soon as possible and to let local citizens know, as well, how their state and congressional districts voted in the presidential election. This stratagem won't intimidate the news media. The Commission should not pretend that this is a serious recommendation.

At the same time, the news media's reliance on exit polling is seriously flawed, as the Commission accurately states. Only about half the voters asked to participate at polling places now agree to do so. That percentage is too low to assure exit poll

reliability. Only twenty percent of absentee and early voters agree to participate in telephone "exit" poll interviews. If the Commission wishes to halt early network projections in the presidential race, based on exit polls, it should urge Secretaries of State, political parties and civic groups sharing that concern to engage in voter education programs advising citizens that they contribute to possible election night chaos by participating in exit polling, either in person or by telephone.

**On Point 4 of Policy Recommendation 10.** I concur. This would be a great public service by the networks. They should voluntarily provide the time. The Commission is indebted to President Carter for urging the Commission to adopt it. I would oppose a law requiring the networks to provide time as volatile of the First Amendment.

---

## Griffin Bell does not join in the following portion of John Seigenthaler's statement.

**On Point 1 of Policy Recommendation 11.** We are seeking to reform a serious ill in the most basic aspect of self-governance. The vitality and credibility of our democracy is at risk. Our funding proposal should be described as "adequate," not "modest." We can only hope that the $2 billion we recommend (hardly a modest sum) is sufficient to restore faith in the system.

**On Policy Recommendation 13.** The Commission recommends the establishment of a new federal agency that will provide grants and oversight to states receiving this $2 billion in funding. The federal dollars are to be matched by the states. Our recommendation falls far short of requiring strict accountability as to how the funding is expended. Nothing in our policy recommendation here bars, for example, states and local governments from diverting funds simply to defray costs created by the federal government's madating Motor-Voter registration; nothing requires ongoing reporting statements from local and state election officials receiving money; nothing requires any prioritization of state reform efforts. Indeed, Part 4 of this policy recommendation "grants broad discretion to the states" with no suggestion that there will be strict accountability. If we are to ask Congress to give states $2 billion in federal money, to restore trust in the system, taxpayers are entitled to know that the new federal agency will demand accountability on every dollar spent. The fuzzy nature of this policy recommendation will invite abuse, diversion of funds, partisan favoritism and the risk of fraud. Not a word here suggests what sanctions will result if states fail to keep faith with the spirit of reform. And nothing gives the new agency the needed power to enforce the law we ask Congress to pass.

**The Electoral College Controversy.** From the outset, members of our Commission agreed that we would not wade into this constitutional quagmire. The Commission's commentary in this section violates our agreement. In effect, it states the Founders got it right at the Constitutional Convention by creating the Electoral College. For all their wisdom and vision, the Founders got it wrong in the convention by ignoring George Mason's plea for a Bill of Rights and by creating a chaotic situation as to the selection of a vice president. Within a decade, both of those flaws of the Founders were corrected. Public opinion polls tell us that a majority thinks the Founders got it wrong with the Electoral College. In my view, the Commission should have not so obviously taken sides on a matter we agreed to avoid.

**On Motor-Voter Registration.** The majority of the Commission agreed to leave this issue without critical comment. Readers certainly will find the commentary here as negative comment on this subject. In fact, Motor-Voter registration has added many thousands of legitimate, qualified voters to the rolls. We should acknowledge that the complaint that Motor-Voter registration has added millions of dollars in "unnecessary costs" comes, for the most part, from local governments unhappy that Congress mandated the Motor-Voter system without funding it. We should acknowledge that Motor-Voter registration has brought significantly more citizens into the system.

**On Early Voting.** The Commission did not look with favor on a policy recommendation that restricts early voting now effective in fourteen states. Nor did we take a position against relatively new and more permissive absentee voting procedures. Our rhetoric suggests that we are opposed to both early and absentee voting. Many states, including my own of Tennessee, report positive experiences with the early voting experiment. Nothing the Commission has heard from those states—or from Oregon, where in the last election all voters were "absentee"—justifies our statement that early voting "threatens the right to a secret ballot." In my view, we should commend efforts by local election officials who have sought to eliminate crowding and confusion at the polls on Election Day.

In this report we and our colleagues offer
very specific recommendations on what should be done.
In other words, Americans can and should expect
their electoral system to be a source of national pride
and a model to all the world.



President Gerald Ford and Jimmy
Carter at the first of three televised
debates in October 1976.

# About

## The National Commission on Federal Election Reform

The National Commission on Federal Election Reform was organized in early 2001 by the Miller Center of Public Affairs at the University of Virginia and The Century Foundation. The goal of the Commission is to formulate concrete proposals for election reform that will help ensure a more effective and fair democratic process in elections to come.

Presidents Jimmy Carter and Gerald Ford are honorary co-chairs of the Commission, and former White House Counsel Lloyd Cutler and former Senator Howard Baker initially served as co-chairmen. When Senator Baker was named Ambassador to Japan, former House Minority Leader Robert Michel assumed his position as co-chairman. The members of the Commission are:

### Honorary Co-Chairs




President Gerald R. Ford        President Jimmy Carter

### President Gerald R. Ford

Gerald R. Ford served as the 38th President of the United States. In 1948 he was elected to the U.S. House of Representatives and was reelected twelve times by his district in Michigan.

### President Jimmy Carter

Jimmy Carter served as the 39th President of the United States. He served in the Georgia Senate and was elected governor of Georgia in 1971.

### Co-Chairs

#### Robert H. Michel

Robert Michel served in the United States House of Representatives as a congressman from Illinois from 1956 to 1994. He currently works as senior adviser for corporate and governmental affairs at the Washington, D.C., law firm of Hogan & Hartson.

Michel served as Republican House leader from 1980 to 1994 and also as minority whip from 1975 to 1980. He began his political career as administrative assistant to Congressman Harold Velde, also of Illinois, who held office from 1949 to 1956. Michel entered military service in 1942 as a private in the U.S. Army. He was discharged in 1946 as a disabled veteran after serving as combat infantryman in England, France, Belgium, and Germany, earning two Bronze Stars, a Purple Heart, and four Battle Stars.



#### Lloyd N. Cutler

Lloyd Cutler served as the White House counsel for Presidents Carter and Clinton and was special counsel to President Carter on the ratification of the SALT II Treaty. He is a founding partner of the Washington, D.C., law firm Wilmer, Cutler and Pickering and maintains an active practice in several fields that include international arbitration and dispute resolution, constitutional law, appellate advocacy, and public policy advice.

Cutler has served on numerous government commissions and committees. He served as senior consultant on the President's Commission on Strategic Forces (the Scowcroft Commission) from 1983 to 1984, and as the President's Special Representative for Maritime Resource and Boundary Negotiations with Canada from 1977 to 1979.



Robert H. Michel
Lloyd N. Cutler

### Vice-Chairs

#### Slade Gorton

Slade Gorton was a United States Senator from Washington state for eighteen years. Gorton began his political career in 1959 as a member of the Washington House of Representatives. He served in this capacity until 1969 and held the post of majority leader from 1967 to 1969.

Gorton was elected attorney general of Washington state in 1968. During his tenure, he argued fourteen cases before the Supreme Court. He held this position until 1981, when he was elected to the Senate. Gorton served in the United States Army and was in the Air Force Reserve with the rank of colonel from 1956 to 1981.

#### Kathleen M. Sullivan



Kathleen Sullivan was named dean of the Stanford Law School in 1999 and is nationally known for her work in constitutional law. She began teaching at Harvard Law School in 1984 and has been a member of the Stanford faculty since 1993. Sullivan received her J.D. from Harvard in 1981 and then clerked for Judge James L. Oakes, U.S. Court of Appeals, Second Circuit, from 1981 to 1982. Sullivan practiced constitutional appellate law from 1982 to 1984.

She is co-author with Gerald Gunther of the 14th edition of Constitutional Law, the leading casebook in the field. Her other books include First Amendment Law, also with Gunther, and New Federalist Papers: Essays in Defense of the Constitution.



Slade Gorton
Kathleen M. Sullivan

### Commission Members

#### Griffin Bell

Griffin Bell was attorney general of the United States from 1977 to 1979. He is senior partner at the law firm of King & Spalding in Atlanta. In 1961, President Kennedy appointed him to serve as a United States circuit judge on the Fifth Circuit Court of Appeals, a position he held until 1976.

Following his tenure as attorney general, he returned to King & Spalding. A principal focus of his law practice in recent years has been corporate crime.

Bell has served on numerous government commissions and committees for both Democratic and Republican administrations. From 1985 to 1987, Judge Bell served on the U.S. secretary of state's Advisory Committee on South Africa, and in 1989, he was appointed vice chairman of President Bush's Commission on Federal Ethics Law Reform. During the Iran-Contra investigation, he was counsel to President Bush.

#### Rudy Boschwitz



Rudy Boschwitz was a United States Senator from Minnesota from 1978 to 1991. In the Senate, he was a member of the Agriculture, Foreign Affairs, Budget, Small Business, and Veterans Committees. In 1991, he was President Bush's Emissary to Ethiopia, where he negotiated Operation Solomon—the airlift of the Ethiopian Jewish community to Israel—a project that in turn helped bring an end to the Ethiopian civil war. President Bush awarded him the Citizen's Medal for his achievements in the Horn of Africa.

Senator Boschwitz is a businessman and is Chairman of Home Valu Interiors, Inc., a company he founded in 1963. The company retails remodeling materials for interiors of homes throughout the Middle West.

Rudy Boschwitz

#### John C. Danforth

John Danforth was elected to the United States Senate from Missouri in 1976 and served until he retired from the Senate in 1994. Currently, he is a partner at the firm of Bryan Cave, LLP in St. Louis and practices in the areas of international real estate development, construction, and project finance.

Danforth began his career practicing law at the firm of Davis, Polk, Wardwell, Sunderland & Kiendl in New York. He returned to Missouri and joined the firm Bryan, Cave, McPheeters and McRoberts as a partner from 1966 to 1968. Danforth was elected to serve as attorney general of Missouri in 1969, a position he held until 1976. In 1999, he led the independent investigation into the federal government's actions during the 1993 siege of the Branch Davidian compound in Waco, Texas. Danforth is an ordained deacon and priest in the Episcopal Church.

#### Christopher Edley, Jr.



Christopher Edley

Professor Christopher Edley has taught at Harvard Law School since 1981. He is the founding co-director of The Civil Rights Project at Harvard, a multidisciplinary think tank on racial justice policy and law, and a member of the U.S. Commission on Civil Rights. He was a domestic policy aide in the Carter White House, a part-time member of The Washington Post editorial board, vice chairman of the Congressional Black Caucus Foundation, and national issues director in the 1988 Dukakis presidential campaign. In the Clinton White House, he served as Associate Director for Economics and Government at the Office of Management and Budget, and then as Special Counsel to the President. He led the White House review of affirmative action, described in his book, Not All Black & White: Affirmative Action, Race and American Values. He is also the author of a treatise on administrative law.

### Hanna Holborn Gray

Hanna Holborn Gray is President Emeritus of the University of Chicago. She is a specialist in the history of humanism, political and historical thought, and European history. She joined the history faculty at Chicago in 1961 and taught there until 1972, when she became dean of the College of Arts and Sciences at Northwestern University.

In 1974, Gray was named provost of Yale University and was acting president there from 1977 to 1978, when she became president of the University of Chicago, a position she held for fifteen years. She is the chair of the board of trustees of the Howard Hughes Medical Institute, one of the nation's largest philanthropic organizations, as well as chair of the board of the Andrew W. Mellon Foundation.

### Colleen C. McAndrews



Colleen McAndrews

Colleen McAndrews practices political and election law at the firm of Bell, McAndrews, Hiltachk & Davidian in California. She was appointed a commissioner on the California Fair Political Practices Commission in 1977, serving in that position for six years.

McAndrews has served as legal counsel and treasurer to state and local political action committees, as well as candidates and ballot measure committees. She served as an official United States observer of the Russian elections in 1993. She also trained emerging political parties in Kazakhstan and the Kyrgyz Republic prior to their first democratic elections. She recently concluded service on the Speaker's Commission on the California Initiative.

### Daniel Patrick Moynihan



Leon Panetta

Daniel Patrick Moynihan served as a United States senator from New York from 1977 to 2000. He is now at the Woodrow Wilson International Center in Washington, D.C. He served as U.S. ambassador to India from 1973 to 1975 and as U.S. representative to the United Nations from 1975 to 1976.

In 1966, Moynihan became director of the Joint Center for Urban Studies at the Massachusetts Institute of Technology and Harvard University. He was also a professor of government at Harvard and other universities and has served in the Department of Labor. Prior to his service in the Senate, he was a member of Averell Harriman's staff in his campaign for governor of New York in 1954 and served on the governor's staff in Albany until 1958.

### Leon Panetta

Leon Panetta currently codirects the Leon & Sylvia Panetta Institute for Public Policy, based at California State University, Monterey Bay. In 1993, President Clinton asked him to serve as director of the Office of Management and Budget, and in 1994, he was appointed White House chief of staff, a position he held until 1997.

Panetta won a seat in the U.S. House of Representatives in 1977 and served sixteen years. During this period, he served four years as chairman of the Budget Committee. He has worked as chief legislative aide to the minority whip of the U.S. Senate and then as director of the U.S. Office for Civil Rights. In 1971–72, he served as Executive Assistant to the Mayor of New York City. From 1971 to 1976, he practiced law at the firm of Panetta, Thompson and Panetta in Monterey, California.

### Deval L. Patrick



Deval Patrick

Deval Patrick is executive vice president and general counsel of The Coca Cola Company. Prior to this he was vice president and general counsel of Texaco, Inc., where he had been since 1999. He served as assistant attorney general of the United States and chief of the U.S. Justice Department's Civil Rights Division from 1994 until 1998.

From 1983 to 1986, Patrick was a staff attorney with the NAACP Legal Defense Fund, following service as a law clerk on the U.S. Court of Appeals for the Ninth Circuit in Los Angeles. He also has taught at the Harvard School of Law and served as a visiting professor at the Stanford School of Law in 1997.

### Diane Ravitch

Diane Ravitch is a historian of American education and a Research Professor of Education at New York University. She holds the Brown Chair in Education Policy at the Brookings Institution, where she is a senior fellow and edits the Brookings Papers on Education Policy. From 1991 to 1993, she was assistant secretary of education, responsible for the Office of Educational Research and Improvement in the Department of Education.



She is a member of the National Assessment Governing Board, to which she was appointed by Secretary of Education Richard Riley in 1997 and reappointed in 2000. Before entering government service, she was adjunct professor of history and education at Teachers College, Columbia University.

### Bill Richardson

Bill Richardson held the post of secretary of the Department of Energy beginning in 1998. Prior to this, Richardson served as U.S. ambassador to the United Nations from 1997 to 1998, where he focused his work especially on securing the release of hostages and prisoners in Croatia, Burma, Cuba, Iraq, North Korea, and Sudan.

Diane Ravtich

Richardson served New Mexico's 3rd Congressional District in the U.S. House of Representatives for eight terms. In Congress, he served as chief deputy whip, one of the highest ranking posts in the House Democratic leadership. He served as chairman of the Congressional Hispanic Caucus and on the Subcommittee on Native American Affairs. He also was a member of the Resources Committee, the Permanent Select Committee on Intelligence, and the Helsinki Commission on Human Rights.



### John Seigenthaler

John Seigenthaler is the founder of the First Amendment Center at Vanderbilt University. A former president of the American Society of Newspaper Editors, Seigenthaler served for forty-three years as a journalist for The Tennessean in Nashville, where he began as a cub reporter and retired as editor, publisher, and CEO.

In 1982, Seigenthaler became founding editorial director of USA Today and served in that position for a decade, retiring from both the Nashville and national newspapers in 1991. He served in the U.S. Justice Department while Robert F. Kennedy was attorney general. Seigenthaler's work in the field of civil rights led to his service as chief negotiator with the governor of Alabama during the Freedom Rides.

Bill Richardson

### Michael Steele

Michael Steele is the first African-American chairman of Maryland's Republican Party. He works as a corporate securities attorney and is president of A Brighter Future Educational Foundation. Currently he serves on the Republican National Committee's Executive Committee and is also a member of Prince George's County Chapter of the NAACP and the Johns Hopkins Society of Black Alumni. He is a former member of the Johns Hopkins University Board of Trustees and a current member of the Board of Directors of the Hospice of Prince George's County.

He has recently led successful bipartisan grassroots efforts in Prince George's County to maintain term limits and to retain the county's property tax cap and was a delegate to the 2000 Republican National Convention in Philadelphia.

## Senior Staff of the Commission

### Philip D. Zelikow

Philip Zelikow, Executive Director of the Commission, is director of the Miller Center of Public Affairs and White Burkett Miller Professor of History at the University of Virginia. Initially a trial lawyer in Texas, he served as a career diplomat in the Department of State, and worked on the staff of the National Security Council in the George H.W. Bush White House. He was a professor at Harvard University's John F. Kennedy School of Government from 1991 until 1998.

### John Mark Hansen

John Mark Hansen, coordinator of the Task Force on the Federal Election System, is a professor of political science at the University of Chicago. From the fall of 2001, he will be a professor of government at Harvard University.

### David King

David King, coordinator of the Task Force on Election Administration, is an associate professor of public policy at Harvard University's John F. Kennedy School of Government.

### Daniel Ortiz

Daniel Ortiz, coordinator of the Task Force on Legal and Constitutional Issues, is the John Allan Love Professor of Law and Joseph C. Carter, Jr. Research Professor at the University of Virginia School of Law.


## Senior Advisor to the Commission

### Richard Leone

Richard Leone is president of The Century Foundation. From 1988 to 1994, he was commissioner, and then chairman of the Port Authority of New York and New Jersey. In the 1980s, Leone was the president of the New York Mercantile Exchange and then a managing director at the investment banking firm of Dillon Read & Co., Inc. He has served in federal and state government, including a term as New Jersey's state treasurer. He earned his Ph.D. and served on the faculty at Princeton University.

# Organizing and Sponsoring Institutions

### The University of Virginia's Miller Center of Public Affairs

The Miller Center is a nonpartisan research center founded in 1975 whose mission is to study, inform and influence the national and international policymaking of the United States—past, present, and future—with a special emphasis on the American presidency. It is directed by Philip Zelikow. This Commission is the ninth in a series of nonpartisan national commissions. The earlier commissions offered advice on: The Separation of Powers (1998); The Selection of Federal Judges (1996); The Vice Presidential Selection Process (1992); The Presidency and Science Advising (1989); Presidential Disability and the 25th Amendment (1988); Presidential Transitions and Foreign Policy (1986); The Presidential Nominating Process (1982); and The Presidency and the Press (1981).

### The Century Foundation

The Century Foundation (formerly the Twentieth Century Fund), founded in 1919, endowed by Edward A. Filene and now directed by Richard C. Leone, is a research foundation that undertakes timely and critical analyses of major economic, political, and social institutions and issues. A not-for-profit, nonpartisan institution based in New York City, with an additional office in Washington, DC, it works to bridge the gap between the world of ideas and the world of affairs. It concentrates on four primary areas of research: the aging of America; governance, politics and the media; inequality and other economic issues; and American foreign policy. The Century Foundation produces books, reports, papers and websites, and convenes task forces of citizens and experts all with an eye toward finding fresh approaches to address the major issues of the day.

Miller Center of Public Affairs, University of Virginia



## The following three foundations are the financial sponsors for the National Commission on Federal Election Reform

### The William and Flora Hewlett Foundation

was established by the Palo Alto industrialist William R. Hewlett, his late wife, Flora Lamson Hewlett, and their eldest son, Walter B. Hewlett. The Foundation's broad purpose is to promote the well-being of mankind by supporting selected activities of a charitable nature, as well as organizations or institutions engaged in such activities. The Foundation concentrates its resources on activities in education, performing arts, population, environment, conflict resolution, family and community development, and U.S.-Latin American relations.

### The David and Lucile Packard Foundation

is a private family foundation created in 1964 by David Packard, co-founder of the Hewlett Packard Company and Lucile Walter Packard. The Foundation provides grants to nonprofit organizations in the following broad program areas: conservation; population; science; children, families, and communities; art; and organizational effectiveness and philanthropy. The foundation makes grants at the national and international level, and also has a special focus on the Northern California counties of San Mateo, Santa Clara, Santa Cruz, and Monterey.

### The John S. and James L. Knight Foundation

was established in 1950 as a private foundation independent of the Knight brothers' newspaper enterprises. It is dedicated to furthering their ideals of service to community, to the highest standards of journalistic excellence, and to the defense of a free press. In both their publishing and philanthropic undertakings, the Knight brothers shared a broad vision and uncommon devotion to the common welfare. The Knight Foundation's trustees have elected to focus on two signature programs, Journalism and Knight Community Partners, each with its own eligibility requirements. In a rapidly changing world, the Knight Foundation remains flexible enough to respond to unique challenges, ideas and projects that lie beyond its identified programs areas, yet would fulfill the broad vision of its founders.

# Appendix A

## Contributors to the Commission's Work

The following individuals directly contributed their expertise to the work of this Commission. Forty-eight of these individuals testified at one of our four public hearings. Others participated in the work of the task forces. Still more offered written submissions to our work. We acknowledge them below.

The Commission wishes to express its gratitude to these experts, as well as to the hundreds of citizens from across the country who, in the democratic tradition, generously contributed their opinions for this report.

For those individuals who testified in a public session of the Commission, we have noted the date and place of their testimony so that interested researchers can locate the transcripts of what they said. All of the hearing transcripts are available at www.reformelections.org.





Congressman Roy Blunt (R-MO)
William Boone

**Jim Adler**
VoteHere.net

**Kim Alexander**
California Voter Foundation
Ronald Reagan Library, April 12, 2001

**Howard Allen**
Southern Illinois University

**R. Michael Alvarez**
California Institute of Technology
Ronald Reagan Library, April 12, 2001

**John Anderson**
Center for Voting and Democracy
written submission

**Stephen Ansolabehere**
Massachusetts Institute of Technology

**Peter Argersinger**
Southern Illinois University

**Tim Augustine**
Maryland State Board of Electors

**Larry Bartels**
Princeton University

**Robert Bauer**
Perkins Coie LLP

**Chris Beem**
Johnson Foundation

**Robert Bell**
Democrats Abroad Canada
written submission

**William Boone**
Clark Atlanta University
The Carter Center, March 26, 2001

**Kimball Brace**
Election Data Service, Inc.

**Henry Brady**
University of California, Berkeley

**Bill Bradbury**
Oregon Secretary of State
Ronald Reagan Library, April 12, 2001

**Philip Breen**
United States Department of Justice

**Polli Brunelli**
Federal Voting Assistance Program

**Walter Burnham**
University of Texas

**Dianne Byrum**
Michigan State Senator
written submission

**David Capozzi**
The United States Access Board

**Jo-Anne Chasnow**
Human SERVE Campaign

**David Chaum**
SureVote, Inc.





Henry Cuellar
Rodolfo de la Garza

**Ryan Chew**
Office of the County Clerk,
Cook County, Illinois

**Charlotte Cleary**
Registrar, Arlington, Virginia

**Jennifer Collins-Foley**
Los Angeles County, Registrar-
Recorder/County Clerk

**Cathy Cox**
Georgia Secretary of State
The Carter Center, March 26, 2001

**Gary Cox**
University of California, San Diego

**Kristen Cox**
National Federation of the Blind

**Paul Crafts**
Florida Department of State

**Charles Crawford**
American Council of the Blind

**Henry Cuellar**
Texas Secretary of State
LBJ Library, May 24, 2001

**Alan Davidson**
County Clerk, Marion County, Oregon

**Donetta Davidson**
Colorado Secretary of State

**Michael Davidson**
The Constitution Project

**Rodolfo de la Garza**
University of Texas
LBJ Library, May 24, 2001

**Alan Dechert**
University of California, Berkeley
written submission

**Daniel DeFrancesco**
New York City Board of Elections
written submission

**Karen Delince**
American Civil Liberties Union
written submission

**Jim Dickson**
American Association
of People with Disabilities
Gerald R. Ford Library, June 5, 2001

**Christopher Dodd**
United States Senator
for the State of Connecticut
Gerald R. Ford Library, June 5, 2001

**Craig Donsanto**
United States Department of Justice,
Election Crimes Branch

**John Dowlin**
Elections Division, Hamilton County, Ohio

**Jennie Drage**
National Conference of State Legislatures

**Maria Echaveste**
Democratic National Committee
LBJ Library, May 24, 2001

**David Elliott**
Office of the Washington Secretary of State

**Kathy Fairley**
District of Colombia Board of Elections
and Ethics

**Margaret Fung**
Asian-American Legal Defense
and Education Fund

**Curtis Gans**
Committee for the Study of the
American Electorate

**James Gashel**
National Federation for the Blind
LBJ Library, May 24, 2001

**James Gimpel**
University of Maryland

**Rosalind Gold**
National Association of Latino Elected
and Appointed Officials (NALEO)
Ronald Reagan Library, April 12, 2001

**Stephen Gold**
Disabilities Law Project

**Ralph Goldman**
Center for Party Development
written submission

**Lance Gough**
Chicago Board of Election Commissioners

**Gary Greenhalgh**
Election Systems and Software
written submission

**Michele Grgich**
General Accounting Office

**Kenneth Gross**
Skadden Arps Slate Meagher & Flom LLP

**Scott Harshbarger**
Common Cause
LBJ Library, May 24, 2001

**David Hart**
Hart InterCivic

**Ernest Hawkins**
National Association of
County Recorders and Clerks
Gerald R. Ford Library, June 5, 2001

**Jeffrey Hayes**
Market Strategies

**Kris Heffron**
City of Los Angeles Elections Division

**Andrew Hernandez**
Southwest Voter Registration
Education Project

**Hendrik Hertzberg**
Center for Voting and Democracy
LBJ Library, May 24, 2001

**Steny Hoyer**
Member of the United States Congress for
the Fifth District of Maryland
Gerald R. Ford Library, June 5, 2001

**Zoe Hudson**
The Constitution Project

**J. Kenneth Huff, Sr.**
AARP
LBJ Library, May 24, 2001

**Asa Hutchinson**
Member of the United States Congress for
the Third District of Arkansas
The Carter Center, March 26, 2001

**Bob Irvin**
Georgia General Assembly
The Carter Center, March 26, 2001

**Maxine Issacs**
John F. Kennedy School of Government,
Harvard University

**John Jackson**
University of Michigan

**Gary Jacobson**
University of California, San Diego

**Alvin Jaeger**
North Dakota Secretary of State

**David Jefferson**
California Internet Voting Task Force/
Compaq Systems Research Center
Ronald Reagan Library, April 12, 2001

**Carolyn Jefferson-Jenkins**
League of Women Voters
LBJ Library, May 24, 2001

**William Jenkins**
General Accounting Office

**Kathy Johnson**
The United States Access Board

**Bill Jones**
California Secretary of State
Ronald Reagan Library, April 12, 2001

**Pamela Karlan**
Stanford Law School
LBJ Library, May 24, 2001

**Stephen Kaufman**
Smith Kaufman LLP

**Kevin Kennedy**
Wisconsin Elections Board





J. Kenneth Huff, Jr.
Bob Irvin

Alexander Keyssar
**Duke University**
The Carter Center, March 26, 2001

Brad King
**Office of the Minnesota Secretary of State**

Jean-Pierre Kingsley
**Elections Canada**
Gerald R. Ford Library, June 5, 2001

Stephen Knack
**American University**

Joan Konner
**Columbia University Graduate School of Journalism**
Gerald R. Ford Library, June 5, 2001

Jon Krosnick
**The Ohio State University**

Linda Lamone
**Maryland State Board of Electors**

Richard LaVallo
**Advocacy Inc.**

Jan Leighley
**Texas A&M University**

R. Doug Lewis
**The Election Center**
Gerald R. Ford Library, June 5, 2001

Matt Lilly
**Danaher Controls**

Keith Long
**Hart InterCivic**

Susan MacManus
**University of South Florida**
The Carter Center, March 26, 2001

Ruth Mandel
**Eagleton Institute of Politics**
The Carter Center, March 26, 2001

Sheilah Mann
**American Political Science Association**

Jeff Manza
**Northwestern University**

Mitch McConnell
**United States Senator for the State of Kentucky**
written submission

Conny McCormack
**Los Angeles County, Registrar-Recorder/County Clerk**
Ronald Reagan Library, April 12, 2001

Gary McIntosh
**Office of the Washington Secretary of State**

Leigh Middleditch, Jr.
**McGuire Woods**

Alice Miller
**District of Colombia Board of Elections and Ethics**

Julie Moore
**Elections Operations, King County, Washington**

John Mott-Smith
**Office of the California Secretary of State**

Michael Neblo
**University of Chicago**

Peter Neumann
**SRI International**

Bob Ney
**Member of the United States Congress for the Eighteenth District of Ohio**
written submission
Gerald R. Ford Library, June 5, 2001

Stephen Nickelsburg
**Hunton & Williams**

Colm O'Muircheartaigh
**National Opinion Research Center**

Norman Ornstein
**American Enterprise Institute for Public Policy Research**
LBJ Library, May 24, 2001





Carolyn Jefferson-Jenkins
Joan Konner







Sharon Priest
Hilary Shelton
Scott Thomas

**Lee Page**
**Paralyzed Veterans Association**

**Robert Pastor**
**Emory University**
Gerald R. Ford Library, June 5, 2001

**R. Hewitt Pate**
**Hunton & Williams**

**Cathy Pearsall-Stipek**
**Auditor, Pierce County, Washington**

**Carol Petersen**
**General Accounting Office**

**Katherine Pettus**
**Columbia University**

**Deborah Phillips**
**Voting Integrity Project**
The Carter Center, March 26, 2001

**Trevor Potter**
**Caplin & Drysdale**

**G. Bingham Powell**
**University of Rochester**

**Sharon Priest**
**Arkansas Secretary of State**
LBJ Library, May 24, 2001

**Mark Pritchett**
**Collins Center for Public Policy, Inc.**
The Carter Center, March 26, 2001

**Cameron Quinn**
**State Board of Elections,**
Commonwealth of Virginia

**Wendy Rahn**
**University of Minnesota**

**Jack Rakove**
**Stanford University**
The Carter Center, March 26, 2001

**Joseph Rich**
**United States Department of Justice,**
**Civil Rights Division**
LBJ Library, May 24, 2001

**Eric Riedel**
**University of Minnesota**

**Ron Rivest**
**Massachusetts Institute of Technology**

**Susan Roth**
**The Ohio State University**
Ronald Reagan Library, April 12, 2001

**Eric Royal**
**United Cerebral Palsy**

**Janet Ruggiero**
**Office of the Rhode Island Secretary of State**

**Larry Sabato**
**University of Virginia**
The Carter Center, March 26, 2001

**Roy Saltman**
**Independent Elections Consultant**
written submission

**Anthony Salvanto**
**University of California, Irvine**

**Paul Schumaker**
**University of Kansas**

**Ted Selker**
**Massachusetts Institute of Technology**

**Hilary Shelton**
**National Association for the Advancement**
**of Colored People**
LBJ Library, May 24, 2001

**W. Phillips Shively**
**University of Minnesota**

**Howard Silver**
**Consortium of Social Science Associations**
**(COSSA)**
written submission

**Margaret Sims**
**Federal Election Commission**

**Liz Smith**
**Furman University**







Michael Traugott
Lance Ward
Admiral Stephen Yusem, Ret.

Richard Soudriette
**International Foundation for Election Systems**
Gerald R. Ford Library, June 5, 2001

Alfred Speer
**State of Louisiana House of Representatives**

Martin Stephens
**State of Utah House of Representatives**

Eliot Spitzer
**New York Attorney General**
written submission

Ralph Tabor
**National Association of Counties**

Clyde Terry
**New Hampshire Developmental Disability Council**

Abigail Thernstrom
**United States Commission on Civil Rights**
written submission

Christopher Thomas
**Michigan Department of State Bureau of Elections**
Gerald R. Ford Library, June 5, 2001

Rosita Thomas
**Thomas Opinion Research**

Scott Thomas
**Federal Election Commission**
Gerald R. Ford Library, June 5, 2001

Daniel Tokaji
**American Civil Liberties Union Foundation**

Mischelle Townsend
**Registrar of Voters, County of Riverside, California**
Ronald Reagan Library, April 12, 2001

Michael Traugott
**University of Michigan**
Gerald R. Ford Library, June 5, 200

Fran Ulmer
**Alaska Lieutenant Governor**
written submission

James Villiesse
**City Clerk of New London, Wisconsin**

Lance Ward
**Oklahoma State Election Board**
LBJ Library, May 24, 2001

Tracy Warren
**The Constitution Project**

Geraldine Washington
**Los Angeles NAACP**

Maxine Waters
**Member of the United States Congress for the Thirty-Fifth District of California**
Ronald Reagan Library, April 12, 2001

Martin Wattenberg
**University of California, Irvine**

Bob Williams
**United Cerebral Palsy**

Brit Williams
**Kennesaw State University**

Raymond Wolfinger
**University of California, Berkeley**

Stephen Yusem
**Rear Admiral, (Ret.), Reserve Officers Association of the United States**
Gerald R. Ford Library, June 5, 2001

Bob Zeni
**Voting Experience Redesign Initiative**
written submission

# Appendix B

## The Michigan Qualified Voter File:
## A Brief Introduction

A new era in the administration of elections has been opened in Michigan through the realization of the state's Qualified Voter File (QVF) project. While the QVF project was originally conceived as a response to the inefficiencies of the state's highly decentralized voter registration system (Michigan's voter registration files are managed by nearly 1,700 local officials), the implementation of the National Voter Registration Act (NVRA) greatly heightened the need for such an initiative. Mandated under Public Act 441 of 1994 and placed into operation for the 1998 election cycle, the QVF links election officials throughout the state to a fully automated, interactive statewide voter registration database to achieve a wide variety of significant advantages including:

- The elimination of duplicate voter registration records in the system.
- The streamlining of the state's voter registration cancellation process.
- The elimination of time consuming record maintenance activities.
- The elimination of registration forwarding errors and duplicative tasks.
- Sizable cost gains on the local level.

The QVF was populated with every registered elector appearing in the voter registration files held by the state's city and township clerks. The local voter registration files were electronically matched with the Department of State's driver license/personal identification card file. This process assigned driver license numbers to voter registration files. The system then removed the older record wherever duplicate registration records were found. It is important to note that a voter does NOT have to have a Michigan driver license or personal identification card. When a voter registration record does not match any driver license record, the system generates an identification number. For voter registration purposes, the identical number is for internal use and is not issued to the voter. Data on the voters is maintained on a UNIX-based computer located in Lansing.

Beyond the voter registration file management functions of the QVF, the system offers Michigan's election officials a full array of election management features including components created to assist with absent voter ballot processing; petition and candidate tracking; election planning; and election inspector tracking. The election management components, designed in consultation with a special task force of county and local officials, have introduced a new level of convenience to the administration of elections in Michigan. The election management components have also worked to standardize many of the election related forms and procedures employed throughout the state.

All counties, cities and townships play a role in the QVF program and all will enjoy ongoing benefits through the project's implementation. Michigan's 83 county clerks and the clerks of all local jurisdictions with a voting age population over 5,000 were provided with the hardware and software needed to establish a direct link with the QVF. Smaller cities and townships (i.e., those with a voting age population under 5,000) have either purchased the hardware and software needed for a direct link with the QVF or access the QVF through the local county clerk's office. In addition, jurisdictions with a voting age population under 5,000 were reimbursed for their assistance with the data validation process. (Each jurisdiction eligible for the reimbursement program received $.45 multiplied by the jurisdiction's voting age population)

# Michigan's Qualified Voter File System

**Transmitting Voter Registration Data to Local Clerks Instantly and Efficiently**

## 175 Secretary of State Branch Offices

electronically enter all "motor/voter" voter registration transactions (approximately 85% of all voter registration transactions in state). The electronic data is transferred daily and is immediately available to the local clerks. The hard copy voter registration application form signed by the voter is forwarded by mail within a week.

## County, city and township clerks

electronically enter all other voter registration transactions such as registrations submitted by mail or in person at the clerk's office.

## Qualified Voter File

6.8 million voter registration records

## 83 counties

## 363 cities and townships

(VAP > 5,000) online
(approximately 80% of Michigan's voting age population).

## 1,151 cities and townships

(VAP<5,000) share QVF resources available at county level (approximately 20% of Michigan's voting age population).

## Additional Details
### QVF System Components

The QVF System comprises three primary components:

Lansing file server: The heart of the QVF system is the file server located in Lansing, the state capitol. The file server holds the voter registration database for the entire state. It also holds all system software (QVF application software and Oracle database software). The file server exchanges information with the driver file database (new registrations originating in branch offices) through a series of "server processes" (automated computer programs). The file server exchanges information with local system users through the replication process.

County/Local QVF installations: All of Michigan's 83 counties and 246 of Michigan's largest cities and townships (voting age population over 5,000) were provided with QVF installations at state expense. One hundred seventeen additional cities and townships opted to purchase QVF installations at their own expense. A total of 545 PC's and 512 printers are employed by the 446 counties and local jurisdictions on-line with the QVF server in Lansing. (Multiple PC's and printers are employed by the state's major cities.)

Telecommunications network: The QVF system uses the Internet as its telecommunications network. Each QVF jurisdiction was provided with an Internet account (Merit is the Internet provider) and Internet software (Netscape Communicator) which includes e-mail and web searching capabilities. To initiate the replication process, the local QVF users simply establish an Internet connection. Replication updates the Lansing server with new information provided by the local jurisdiction and updates the local jurisdiction with new information provided by the file server (usually branch office transactions). An average replication takes 20–60 minutes and is generally initiated two or three times per week.

### QVF Data

The QVF is administered through the Department of State's Qualified Voter File Division. The Qualified Voter File Division is organized under the Department's Bureau of Elections. The staff members employed with the Qualified Voter Division work in four general areas:

Data entry: The data entry staff are responsible for entering data received from Michigan's city and township clerks into the QVF database as needed to build the QVF file. The data entry staff is also responsible for entering "problem records" received from the branch offices.

Data reconciliation: The data processing staff is in the final phase of completing the data reconciliation processes which had to be accomplished to implement the QVF. Over 1,500 cities and townships submitted voter registration records to the state for inclusion in the QVF database. Those records submitted electronically were matched against the driver file. Matching discrepancies (generally address or birth date conflicts) are resolved during this procedure.

Street index reconciliation: The QVF street index ensures that each voter is assigned to his or her proper precinct and voting districts. If there is not a street index entry for a voter's address, an error report is created. The data processing staff adds or changes street index entries to ensure that any errors are corrected. While the bulk of this work has taken place during the data reconciliation process, this will be an ongoing function of the Qualified Voter File Division.

## QVF Help Desk

The Qualified Voter File Division maintains a Help Desk to assist the county and local clerks throughout the state with any questions they have regarding the operation of the QVF. The Help Desk offers assistance in the following areas:

**Replications:** The replication process involves the transfer of data between the QVF server in Lansing and the remote QVF installations throughout the state. If there is a problem with the replication process, it generally stems from a user error, an equipment failure or a network failure. The Help Desk is able to trace such problems, find the source and offer corrective measures.

**Equipment problems:** The Help Desk troubleshoots all equipment related problems. In some cases, a contract vendor is sent to the site. In other cases, the Help Desk staff members pick up the equipment for in-house problem solving.

**Training:** The Help Desk provides training and on-site consultations to QVF users throughout the state. The Help Desk is also responsible for updating all user guides and training materials.

**Software support:** The Help Desk offers QVF users advice and instruction on using the QVF software and documents requests for QVF software enhancements. The majority of all inquiries received by the Help Desk involve questions over the operation and functions of the QVF software.

## Additional Information

Further information on Michigan's Qualified Voter File project can be obtained by contacting the Department of State's Bureau of Elections.

Michigan Department of State
Bureau of Elections
Qualified Voter File Division

208 North Capitol Avenue, Third Floor
Lansing, MI 48918-1591

Telephone: 517-373-2542
QVF Help Desk: 800-310-5697
Fax: 517-241-1591

—June 5, 2001

## Photo credits

3   AP/Wide World Photo, Rick Field
4   AP/Wide World Photo, Michael Conroy
16  John Flavell, *The Daily Independent,* Ashland, KY
17  Margaret Edwards
18  Margaret Edwards
19  Annemarie Poyo
20  Margaret Edwards
21  AP/Wide World Photo, Rick Field
22  Margaret Edwards
23  AP/Wide World Photo, Dan Loh
24  Annemarie Poyo
27  Margaret Edwards
28  AP/ Wide World Photo
31  Annemarie Poyo
32  AP/ Wide World Photo
33  Ave Bonar
34  AP/Wide World Photo, Stephen Morton
40  AP/Wide World Photo, Anne Dobrish
42  AP/Wide World Photo, Michael Conroy
44  AP/Wide World Photo, Natti Harnik
50  AP/Wide World Photo, Byron Rollins
51  Margaret Edwards
52  AP/Wide World Photo
54  AP/Wide World Photo
56  Margaret Edwards
59  AP/Wide World Photo
61  AP/Wide World Photo
62  AP/Wide World Photo
63  AP/Wide World Photo
64  AP/Wide World Photo
65  AP/Wide World Photo
66  AP/Wide World Photo
68  AP/Wide World Photo
86  AP/Wide World Photo
87  Courtesy Gerald R. Ford Library, Margaret Edwards
88  Margaret Edwards, Tom Cogill
89  Tom Cogill
90  Ave Bonar, Annemarie Poyo
91  Margaret Edwards
92  Tom Cogill, Margaret Edwards
94  Tom Cogill
96  Margaret Edwards
96  Ave Bonar
98  Ave Bonar, Margaret Edwards
99  Ave Bonar, Margaret Edwards
100 Ave Bonar, Margaret Edwards
101 Margaret Edwards, Ave Bonar

## Colophon

Design
Anne Chesnut

Typefaces
Galliard and Gill Sans

Paper
Warren, 80# Lustro Dull

Printing
Good Printers, Inc.

Digital separation
Photoworks, Inc.

