UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                                      Case No. 1:25-cv-1148

v.

                                      Hon. Hala Y. Jarbou

JOCELYN BENSON and the STATE OF
MICHIGAN,

     Defendants.
_____/

## OPINION

     This is one of over two dozen lawsuits that the United States has recently brought seeking voter registration data from states and localities.  This particular case arose after the United States Department of Justice (DOJ) requested that the State of Michigan turn over its electronic statewide voter registration list.  Michigan turned over a partial list that omitted certain fields containing voters' personal information.  The United States subsequently brought this lawsuit to compel disclosure of the full list, citing its authority under provisions of the Help America Vote Act (HAVA), 52 U.S.C. § 21083, the National Voter Registration Act (NVRA), 52 U.S.C. § 20507, and the Civil Rights Act of 1960 (CRA), 52 U.S.C. § 20703.  The Court has allowed the Michigan Alliance of Retired Americans and two individuals to intervene as defendants in this action.  (*See* ECF No. 46.)

     Before the Court are two motions to dismiss for failure to state a claim: one filed by Defendants Secretary of State Jocelyn Benson and the State of Michigan (ECF No. 38), and the other filed by the Intervenor-Defendants (ECF No. 47).  As explained below, the Court concludes that (1) HAVA does not require the disclosure of any records, (2) the NVRA does not require the

disclosure of voter registration lists because they are not records concerning the implementation of list maintenance procedures, and (3) the CRA does not require the disclosure of voter registration lists because they are not documents that come into the possession of election officials. Thus, the Court will grant the motions to dismiss.

## I. BACKGROUND

This case arises out of the DOJ's July 21, 2025, request for voter records from Michigan. (Compl. ¶ 35, ECF No. 1.)  Michigan, like other states, maintains an electronic list of every person registered to vote in the state.  *See* 52 U.S.C. § 21083(a)(1)(A).  The DOJ sought, among other things, "a list of the election officials who are responsible for implementing Michigan's general program of voter registration list maintenance," "a description of the steps that Michigan has taken in furtherance of" voter registration list maintenance, and "a current electronic copy of [Michigan's] computerized" voter registration list.  (Compl. ¶ 35.)  The DOJ indicated that this information was necessary to determine whether Michigan was complying with its obligations under the NVRA and HAVA.  (*Id.* ¶ 43.)  As to the voter registration list, the DOJ requested the following information that Michigan maintains about voters: their "full name, date of birth, residential address, and either their state driver's license number or the last four digits of their Social Security number."  (*See id.* ¶ 66.)  On September 9, 2025, Michigan informed the DOJ that it would provide only the public voter registration list, which omits dates of birth, driver's license numbers, and social security numbers (SSNs).  (*Id.* ¶ 46.)  Michigan asserted that this sensitive information was exempt from disclosure under Michigan law, *see* Mich. Comp. Laws §§ 15.243, 168.509gg, as well as provisions of the federal Privacy Act, 5 U.S.C. § 552a, and the Driver's Privacy Protection Act, 18 U.S.C. § 2721.  (Compl. ¶ 48; *see also* ECF No. 39-6.)  In response, the United States brought this lawsuit seeking a declaratory judgment and an order requiring Michigan to disclose its full voter registration list.

2

## II. LEGAL STANDARD

A complaint may be dismissed for failure to state a claim if it does not "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  *Id*. (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

When considering a motion to dismiss under Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017).  The court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to  defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

### III. ANALYSIS

**A. The Help America Vote Act (HAVA)**

The United States first argues that it can obtain Michigan's voter registration list under HAVA, a federal statute enacted in 2002 that regulates state election administration. HAVA requires states to maintain, "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list" containing the names of all registered voters and their pertinent personal information. 52 U.S.C. § 21083(a)(1)(A). It also requires states "to ensure that voter registration records in the State are accurate and are updated regularly," and to implement "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.* § 21083(a)(4)(B). Further, states must "make[] a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* § 21083(a)(4)(A). HAVA also provides that "[t]he Attorney General may bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief . . . as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under section[] . . . 21083." *Id.* § 21111.

The United States argues that HAVA authorizes it to obtain Michigan's voter registration list, though it acknowledges that HAVA lacks any provision related to disclosure. Rather, the United States contends that it may seek the voter registration list "through the ordinary discovery process necessary to prosecute its [HAVA] claim." (Pl.'s Resp. 15, ECF No. 53.) But the United States does not state a HAVA claim because it does not allege any violations of HAVA's substantive provisions. For example, the United States does not allege that Michigan has failed to conduct proper list maintenance; it merely claims that the DOJ needs "to determine Michigan's compliance with the voter list maintenance requirements of . . . HAVA." (Compl. ¶ 46.) There is

4

simply no basis in the Federal Rules of Civil Procedure for the United States's suggestion that it

can file a HAVA claim, allege no violations of HAVA, and obtain information to support its (as-

yet-nonexistent) claim via discovery.  *See Curney v. City of Highland Park*, No. 11-12083, 2012

WL 1079473, at *5 (E.D. Mich. Mar. 30, 2012) ("Plaintiff cannot allege a . . . claim hoping that

discovery will reveal facts to support the claim."); *Iqbal*, 556 U.S. at 678–79 ("[O]nly a complaint

that states a plausible claim for relief" can "unlock  the doors of discovery.")  Thus, the Court will

dismiss the HAVA claim.

### B. The National Voter Registration Act (NVRA)

The United States also seeks disclosure of Michigan's voter registration list under the

NVRA.  Enacted in 1993, the NVRA requires states to take various measures related to the

management of voter rolls.  For instance, states must "ensure that any eligible applicant is

registered to vote in an election," prevent the removal of people from voter rolls except under

limited circumstances, and "conduct a general program that makes a reasonable effort to remove

the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. § 20507(a)(1),

(3), (4).  Relevant here, the NVRA also contains the following public disclosure provision:

> (1) Each State shall maintain for at least 2 years and shall make available for public
> inspection and, where available, photocopying at a reasonable cost, all records
> concerning the implementation of programs and activities conducted for the
> purpose of ensuring the accuracy and currency of official lists of eligible voters,
> except to the extent that such records relate to a declination to register to vote or to
> the identity of a voter registration agency through which any particular voter is
> registered.
>
> (2) The records maintained pursuant to paragraph (1) shall include lists of the names
> and addresses of all persons to whom notices described in subsection (d)(2) are
> sent, and information concerning whether or not each such person has responded to
> the notice as of the date that inspection of the records is made.

*Id.* § 20507(i).  Either the Attorney General or a private individual can bring a lawsuit to enforce

the NVRA.  *Id.* § 20510(a)–(b).

The United States argues that Michigan violated § 20507(i) by refusing to disclose its full voter registration list.  Michigan contends that while its voter list is subject to disclosure under § 20507(i), it can omit sensitive voter information.  Although no court in the Sixth Circuit has addressed this issue, it appears that every out-of-circuit court to do so has concluded that § 20507(i) does not require states to disclose voters' sensitive information.  *See Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012); *Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 902–03 (5th Cir. 2012); *Tex. Democratic Party v. Bettencourt*, Civ. A. H–08–3332, slip op. at 16–18 (S.D. Tex. July 16, 2009); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 729 (S.D. Miss. 2014); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1345 (N.D. Ga. 2016); *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 562 n.3 (M.D. Pa. 2019); *Pub. Int. Legal Found. v. N.C. St. Bd. of Elections*, 996 F.3d 257, 267 (4th Cir. 2021); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022); *Greater Birmingham Ministries v. Merrill*, Civ. A. No. 2:22cv205-MHT, 2022 WL 5027180 at *4 (M.D. Ala. 2022), *reversed in part on other grounds*, 105 F.4th 1324 (11th Cir. 2024); *United States v. Weber*, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807, at *12 (C.D. Cal. Jan. 15, 2026).

The Court agrees that § 20507(i) does not require public disclosure of voters' sensitive personal information.  Interpreting § 20507(i) to require such disclosure would contradict the NVRA's objective of increasing voter participation, *see Voter Reference Found.*, 160 F.4th at 1079, because the risk of having one's personal information misused will deter people from registering to vote, *see Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010); *Sturgeon v. Frost*, 587 U.S. 28, 51 (2019) (interpreting statute to avoid conflict between

6

specific provisions and general purposes).  Such an interpretation would also fly in the face of other federal statutes protecting private information; Congress could not have intended § 20507(i) to "create a gaping hole in the statutory landscape whereby personal, otherwise protected information would lose its protection once a citizen registered to vote." *True the Vote*, 43 F. Supp. 3d at 735.  This interpretation of § 20507(i) would also undermine HAVA's requirement that people submit their driver's license number or the last four digits of their SSN to register to vote.[1] 52 U.S.C. § 21083(a)(5)(A)(i).  Requiring the submission of this information, which is used for "verification" of a person's identity, *id.* § 21083(a)(5), would serve little purpose if the very act of submitting this information made it public.  The provision of personal information can establish someone's identity because that information is only possessed by that individual; if everyone has access to the information, it can no longer be used to verify that a person is who they claim to be.

Finally, interpreting § 20507(i) to require public disclosure of all private information submitted for voter registration purposes would potentially cause the statute to impose an unconstitutional burden on the right to vote guaranteed by the First Amendment.  *See Norman v. Reed*, 502 U.S. 279, 288 (1992) (right to vote "derives from the First and Fourteenth Amendments").  In *Greidinger v. Davis*, the Fourth Circuit held that a state law impermissibly burdened the right to vote when it required people to subject their SSNs to public disclosure as part of the voter registration process.  988 F.2d 1344 (4th Cir. 1993).  Given that "courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional," *United States v. Davis*, 588 U.S. 445, 463 n.6 (2019), the Court is disinclined to read § 20507(i) as requiring public disclosure of all personal information provided by prospective voters.

---

[1] There is an exception for people who do not have a driver's license or SSN.  *See* 52 U.S.C. § 21083(a)(5)(A)(ii).

All this to say, the Court concurs with prior courts insofar as they have reasoned that § 20507(i) does not authorize members of the public to obtain voters' sensitive information. But ruling out this interpretation does not necessarily indicate what the *correct* interpretation is. And here this Court diverges from prior courts, which have generally invented an ad hoc exception to § 20507(i) that allows states to redact voters' private information. *See, e.g.*, *Bellows*, 92 F.4th at 56 ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File."). This widely adopted approach suffers from a simple flaw: there is no privacy exception in § 20507(i)'s text. To the contrary, § 20507(i) requires disclosure of "all records" within its scope. Perhaps it would have been prudent for Congress to include a personal information exception, similar to the exception in the Freedom of Information Act (FOIA) for "files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). But § 20507(i) lacks any such exception, and courts "do not—[and] cannot—add provisions to a federal statute." *Alabama v. North Carolina*, 560 U.S. 330, 352 (2010).

Other courts have relied on statutes like FOIA to port in an analogous privacy exception to § 20507(i), reasoning that § 20507(i) "must be read in conjunction with the various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain governmental agencies." *N.C. St. Bd. of Elections*, 996 F.3d at 264. However, it is hard to see how the inclusion of privacy exceptions in other federal statutes that do *not* apply here would evince an intent by Congress to impose an implicit privacy exception here. Arguably, the opposite is true: "Where limiting language present in earlier statutes is not included in later legislation, it can be presumed that the omission was intentional." *Schwenk v. Hartford*, 204 F.3d 1187, 1202 n.12 (9th Cir. 2000). Even if it seems plausible that Congress would want to exclude sensitive

information from disclosure, "[t]he Court may not 'replace the actual text with speculation as to Congress' intent.'" *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (quoting *Magwood v. Patterson*, 561 U.S. 320, 334 (2010)). "Rather, the Court 'will presume more modestly' that 'the legislature says what it means and means what it says.'" *Id.* (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017)).

In short, there is no plausible reading of § 20507(i) that gives rise to a privacy exception, nor is there any legal basis for the Court to impose an exception ungrounded from statutory text. But the analysis does not end there. There *is* a plausible interpretation of § 20507(i) that is rooted in the text and does not require states to disclose voters' sensitive information. Under this reading, which the Court adopts, § 20507(i) does not require the disclosure of voter registration lists or any other voter-specific information. This conclusion follows from the premise that a voter registration list is not a "record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Rather, a natural reading of that language encompasses only records about the process that a state uses to maintain their voter list—not the underlying list itself. And if § 20507(i) does not require disclosure of voter registration lists (or other information regarding individual voters), then there is no need to graft on an atextual privacy exception.

The Court acknowledges that several courts have rejected this interpretation of § 20507(i) and adopted a broader reading under which any documents related to the maintenance process— including voter registration lists—must be disclosed. *See Long*, 682 F.3d at 335; *Bellows*, 92 F.4th at 49; *Voter Reference Found.*, 160 F.4th at 1087; *True the Vote*, 43 F. Supp. 3d at 723; *Kemp*, 208 F. Supp. 3d at 1341; *Ill. Conservative Union v. Illinois*, No. 20 C 5542, 2021 WL 2206159, at *5 (N.D. Ill. June 1, 2021); *N.C. St. Bd. of Elections*, 996 F.3d at 266; *Greater Birmingham Ministries*,

105 F.4th at 1329; *Matthews*, 589 F. Supp. 3d at 941; *Pub. Int. Legal Found., Inc. v. Knapp*, 749 F. Supp. 3d 563, 568–69 (D.S.C. 2024).  But these cases are not binding, and the Court is not persuaded by their analyses.  Congress could easily have specified that § 20507(i) applies to voter registration lists.  Instead, it referred only to records *concerning the implementation of programs*, which would be an extremely circuitous way to describe the underlying lists.  It is more plausible that Congress intended to capture only records describing the list maintenance process.

Other courts have reasoned that a voter registration list is a record *concerning* the activities used to maintain that list because the voter registration list is "the output and end result of such activities."  *Bellows*, 92 F.4th at 47.  But it is necessary to distinguish between two closely connected (yet different) meanings of the word "concerning."  On the one hand, "concerning" can mean "relating to"; on the other, it can mean "regarding, respecting, [or] about."  *Concerning*, *Merriam-Webster's Unabridged Dictionary*, https://unabridged.merriam-webster.com (last visited Jan. 30, 2026).  The first meaning is broader than the second.  For instance, the summary of a book is *related to* the book, and the book in turn is *related to* the summary.  The summary is also *about* the book—but the book is not *about* the summary.  "Relating to" encompasses connections of any kind, and thus a relation is symmetrical: "X relates to Y" entails that "Y relates to X."  By contrast, "about" denotes an asymmetrical connection: "X is about Y" does not entail that "Y is about X."

Here, one might say that the process used to manage a voter registration list is *related to* the list, and therefore that the list is *related to* the process.  The process is also (in some sense) *about* the list, but the list is not *about* the process.  Thus, whether the list is a record *concerning* the process that creates it depends on whether "concerning" in § 20507(i) is taken to mean "relating to" or "about."  And the second meaning is more plausible.  "Concern" is commonly understood in the narrower asymmetrical sense: it is natural to say that a summary "concerns" a book, but

awkward to say that a book "concerns" its summary.  The word "records" also clarifies the meaning of "records concerning the implementation."  A record is always *about* something—i.e., the thing it is a record *of*.  So "records concerning the implementation" naturally means records *of* the implementation.  And records of the implementation are records *describing* the implementation, not records *produced by* the implementation.

The courts that have disagreed with this interpretation have relied on other statutory language to infer the scope of § 20507(i), but this Court does not find their reasoning persuasive.  First, courts point to § 20507(i)(1)'s exception for records that "relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered."  Because this exception appears to cover individualized voter information, courts reason that the scope of § 20507(i) must cover such individualized information, or else there would be no need for such an exception.  *See Kemp*, 208 F. Supp. 3d at 1339–40.  But that conclusion does not necessarily follow; perhaps Congress included the exception to clarify § 20507(i)'s scope out of an abundance of caution.  And even if the Court read the exception as implying that individualized information about voting declination or where people registered would otherwise have been within the scope of § 20507, the exception may simply evince Congress's concern that such information could inadvertently appear within records regarding voter list maintenance policies.  This understanding of Congress's intent would not entail that voter registration lists themselves are within the scope of § 20507.

Other courts also point to § 20507(i)(2), which provides that "[t]he records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices [of removal from the voting list] are sent."  52 U.S.C. § 20507(i)(2).  Courts reason that the word "includes" implies that this individualized information was already covered by the scope

of § 20507(i)(1), and thus that voter registration lists are covered too.  *See Kemp*, 208 F. Supp. 3d at 1339.  But again, that conclusion does not follow from the text.  It is perfectly natural to use the phrase "the records include" to introduce an additional category of documents that must be disclosed.  *See Include*, *Black's Law Dictionary* (6th ed. 1990) (noting that "including" "may, according to context, express an enlargement and have the meaning of *and* or *in addition to*"); *Adams v. Dole*, 927 F.2d 771, 775 (4th Cir. 1991) ("If we say that 'all licensed drivers, including applicants for driver's licenses, shall take an eye exam,' the word 'including' means 'and' or 'in addition to.'").  For example, in *Adams* the Fourth Circuit interpreted the scope of a statute that referred to "employer[s], including a Commission licensee, an applicant for a Commission license, or a contractor or a subcontractor of a Commission licensee or applicant."  927 F.2d at 775.  The court noted that an "applicant" cannot be an "employer," and instead took the statutory language to mean "no employer, *by which we mean to include* an applicant."  *Id.* at 777.  Similarly, here the Court reads "shall include" as adding an additional category of records to those requestable under § 20507(i).  In fact, if § 20507(i)(2) was instead understood to describe records already covered by § 20507(i)(1)'s language, then § 20507(i)(2) would be surplusage.  *See Nielsen v. Preap*, 586 U.S. 392, 414 (2019) (canon against surplusage expresses "the idea that 'every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.'" (alteration in original) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012))).[2]

---

[2] Furthermore, even if § 20507(i)(2) implies that the names of people who have been sent notices are contained within the scope of § 20507(i)(1), that does not necessarily imply that the voter registration list is within the scope of § 20507(i)(1).  The list of people who were sent notices of removal is more closely tied to the process of list management, and thus more arguably *about* that process than the list itself is.

In sum, a natural reading of § 20507(i) suggests that it requires states to disclose information regarding the process by which they maintain their voter registration list but not the list itself.  Perhaps this result seems odd, but this oddity disappears when one considers that state voter registration lists were often already subject to public disclosure under state law when the NVRA was enacted.  *See True the Vote*, 43 F. Supp. 3d at 735 (noting that "Mississippi enacted its Public Records Act in 1983, at approximately the same time that other States enacted similar public disclosure-type laws," and collecting similar state statutes); *Prac. Pol. Consulting v. Sec'y of State*, 789 N.W.2d 178, 182 (Mich. Ct. App. 2010) (discussing history of Michigan's public disclosure laws regarding voter registrations).  There was therefore no need for the NVRA to require disclosure of voter registration lists.  But since the NVRA imposed a set of new list maintenance requirements, it makes sense that Congress required states to preserve and disclose records about the process used to meet those requirements.

To recap: the Court's interpretation of § 20507(i) avoids the implausible suggestion that Congress intended for every member of the public to access voters' sensitive information.  Just as importantly, it avoids reading into § 20507(i) a privacy exception that appears nowhere in the text.  Instead, the most plausible interpretation of § 20507(i) is that Congress did not intend to mandate disclosure of voters' personal information because that information is not about the voter list maintenance process.  Thus, the United States cannot obtain Michigan's voter list under § 20507(i), and the Court will dismiss the United States' NVRA claim.

### C. Title III of the Civil Rights Act of 1960 (CRA)

Finally, the United States argues that it can compel disclosure of Michigan's voter registration list under Title III of the CRA.  The CRA requires states to preserve election records for 22 months after any given federal election.  The records to be preserved are "all records and papers which come into [a state officer of election's] possession relating to any application,

13

registration, payment of poll tax, or other act requisite to voting in such election."  52 U.S.C. § 20701.  The CRA also mandates that "[a]ny record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative . . . be made available for inspection, reproduction, and copying."  *Id.* § 20703. When making such a demand, the Attorney General must provide "a statement of the basis and the purpose therefor."  *Id.*   If a state does not comply with a demand from the Attorney General, federal courts "shall have jurisdiction by appropriate process to compel the production of such record or paper."  *Id.* § 20705.

As an initial matter, the Court construes a request for records under the CRA as a form of administrative subpoena.  The CRA's language is similar to that of 31 U.S.C. § 3733, a provision of the False Claims Act that allows the DOJ to issue "civil investigative demands" requiring the production of documents or compelling testimony.  31 U.S.C. § 3733(a)(1).  The Sixth Circuit has held that civil investigative demands are a type of administrative subpoena.  *United States v. Markwood*, 48 F.3d 969, 975–76 (6th Cir. 1995).  And the Fifth Circuit has held that a records request under the CRA is "comparable to the form of a traditional order to show cause, or to produce in aid of an order of an administrative agency."  *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962); *see also In re Gordon*, 218 F. Supp. 826, 826–27 (S.D. Miss. 1963) ("A careful study and analysis of the [CRA] reveals that it creates a new right and provides a remedy therefor in the nature of a summary proceeding . . . .")  The characterization of a CRA request as an administrative subpoena has both procedural and substantive consequences.

Beginning with the procedural implications, the Federal Rules of Civil Procedure generally "apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute."  Fed. R. Civ. P. 81(a)(5).

14

However, in determining the propriety of an administrative subpoena, a court may conduct "a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Becker v. United States*, 451 U.S. 1306, 1308 (1981) (quoting *Donaldson v. United States*, 400 U.S. 517, 529 (1971)).  The Sixth Circuit has indicated that "[m]ost of the Federal Rules of Civil Procedure are simply inapplicable to the . . . enforcement of an administrative subpoena."  *Markwood*, 48 F.3d at 982.  For example, "in summary subpoena enforcement proceedings, discovery is generally disallowed absent 'extraordinary circumstances.'"  *Id.* (quoting *SEC v. McGoff*, 647 F.2d 185, 193 (D.C. Cir. 1981)).  And generally, "[t]he proceedings are instituted by filing a complaint" or petition to enforce the subpoena, "followed by answer and hearing."  *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964); *see also, e.g.*, *United States v. Brown*, 223 F. Supp. 3d 697 (N.D. Ohio 2016).  Here, the procedural circumstances are somewhat abnormal because the United States brings its CRA records request alongside claims under the NVRA and HAVA, which do not confer administrative subpoena authority.  The United States' complaint thus takes the form of a traditional civil complaint, not a petition for summary enforcement.  Accordingly, the Court will apply the Rule 12(b)(6) standard to evaluate the United States' CRA claim.

As to the substantive implications of applying the law of administrative subpoenas, "it must be emphasized that a district court's role in the enforcement of an administrative subpoena is a limited one."  *Markwood*, 48 F.3d at 976.  The court must "decide whether the agency has met the statutory requirements pertaining to the issuance and enforcement of the subpoena" and "whether the agency has satisfied or complied with the judicially created standards for enforcement of the subpoena."  *Id.* at 976–77.  To satisfy these judicially created standards, an agency must show "that [its] investigation ha[s] a legitimate purpose, that its inquiry may be relevant to that purpose,

that it d[oes] not already have the [requested] information and that it otherwise [has] followed any statutory requirements." *Id.* at 978 (citing *Powell*, 379 U.S. at 57–58). Even if these standards are satisfied, "[a]n agency investigatory tool might be resisted if the agency acted in 'bad faith,'" such as with the purpose of harassing the subpoena recipient or "pressur[ing] the recipient to settle a collateral dispute." *Id.* An investigation would also be in bad faith if the agency made "a conscious decision . . . to pursue a groundless allegation without hope of proving that allegation." *Id.* (quoting *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 (3d Cir. 1981) (en banc)). Finally, the court may also decline to issue a subpoena if the agency is "found to be abusing the court's process." *Id.* (quoting *Wheeling-Pittsburgh*, 648 F.2d at 125).

The United States contends that § 20703 requires Michigan to provide its voter registration list to the Attorney General. Michigan and Defendant-Intervenors make several arguments in response. As explained below, the Court rejects Michigan's arguments but finds persuasive Defendant-Intervenors' argument as to the scope of documents requestable under the CRA.

First, Michigan contends that the DOJ failed to assert a proper basis for its request, as required by the CRA. The DOJ's July 21, 2025, letter to Michigan cited the State's obligations under the NVRA and HAVA and pointed to several purported anomalies within Michigan's voter registration data: a high percentage of registered voters, a low confirmation notice rate, a low voter removal rate, and a high duplicate registration rate. (ECF No. 39-2, PageID.492–493.) The letter also indicated that the DOJ had received a complaint regarding Michigan's compliance with HAVA's requirements relating to the provision of unique voter identifiers. (*Id.*, PageID.494.) These asserted bases for reviewing Michigan's voter registration list are sufficient to comply with the CRA. Michigan disputes the accuracy of DOJ's claims about the State's list maintenance practices, but the CRA does not allow courts to evaluate the substance of the DOJ's purported

16

basis and purpose.  *See Kennedy*, 306 F.2d at 226 (courts lack the power "to ascertain the factual

support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose

therefor' as set forth in the written demand").  And insofar as Michigan contends that the DOJ's

request is in bad faith, that contention goes to the truth of the DOJ's allegations and cannot be

addressed on a motion to dismiss.[3]

Second, Michigan argues that the DOJ cannot use the CRA's disclosure provision to

investigate potential violations of the NVRA.  One district court has agreed with Michigan that the

DOJ cannot use the CRA to enforce the NVRA "because the passage of [the CRA] in 1960

preceded the NVRA by several decades," *Weber*, 2026 WL 118807, at *9, but the Court finds this

temporal argument unavailing.  There is no rule of statutory interpretation that prevents a statute

from interacting with, or being used in conjunction with, subsequently enacted statutes.  Michigan

also argues that the NVRA falls outside the scope of the CRA's intended use because the NVRA

is unrelated to the remediation of racially discriminatory voter registration practices.  *See* H. Rep.

86-956, at 7 (1959) ("The purpose of title III [of the CRA] is to provide a more effective protection

of the right of all qualified citizens to vote without discrimination on account of race.").  But the

CRA's text includes no such limitation, and courts "have no warrant to elevate vague invocations

of statutory purpose over the words Congress chose."  *Sw. Airlines Co. v. Saxon*, 596 U.S. 450,

463 (2022).  The CRA aids the Attorney General in assessing states' compliance with federal

election law and protecting voting rights; the NVRA is a federal election law that protects voting

rights.  *See* 52 U.S.C. § 20501(a)(1) ("[T]he right of citizens of the United States to vote is a

fundamental right[.]"); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("The right of suffrage can be

---

[3] Michigan also notes that the DOJ did not cite its authority under the CRA until a follow-up letter on August 14, 2025 (ECF No. 39–4), and argues that the DOJ was required to include its basis and purpose and its reference to the CRA in the same letter.  But the DOJ's communications collectively put Michigan on notice of the basis and purpose of its request, which is sufficient to comply with the CRA.

denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." (cleaned up)).  Thus, the DOJ may use the CRA to investigate possible violations of the NVRA.  *See also United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (administrative subpoena should be enforced "if the inquiry is within the authority of the agency"); *Markwood*, 48 F.3d at 977 ("[T]he district court should have enforced the subpoena where 'the evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose of the Secretary in the discharge of her duties.'" (quoting *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943))).

Finally, Michigan contends that the DOJ's records request is not reasonably related to investigating Michigan's compliance with the NVRA.  The DOJ asserts that it intends to use Michigan's voter registration list to determine whether the State is properly removing ineligible voters and duplicate registrations from the rolls.  It further contends that the entries Michigan seeks to omit from the list—such as SSNs and driver's license numbers—are "necessary to identify duplicate registration records, registrants who have moved, and registrants who have died or otherwise are no longer eligible to vote in federal elections."  (U.S. Br. in Opp'n 12, ECF No. 53.)  Given the Court's limited role in reviewing the purpose behind an administrative subpoena, the DOJ's representations sufficiently establish that Michigan's voter registration list is relevant to investigating the State's compliance with the NVRA.

In sum, the Court is not persuaded by Michigan's arguments regarding the scope of the CRA.  However, Defendant-Intervenors make an additional argument as to why the voter registration list is not requestable: a voter registration list is not a "record" that "c[a]me into [the state's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election."  52 U.S.C. § 20701.  They contend that this language refers

only to documents that people submit to the State as part of the voter registration process, not a document like the voter registration list that is created by state officials.  The Court agrees.

The phrase "come into [their] possession" naturally refers to a process by which someone *acquires* an item from an external source.  *See, e.g.*, *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting *Random House Dictionary of the English Language* 995 (1966))); *Receive*, *Black's Law Dictionary* (11th ed. 2019) (defining "receive" as "to come into possession of or get from some outside source"); 16 U.S.C. § 620e (defining "acquire" as "to come into possession of").  As Intervenors observe, Congress frequently uses the phrase "come into possession" to refer to items that a person *obtains* rather than *creates*. *See, e.g.*, 18 U.S.C. § 1703(a) (prohibiting postal employees from destroying letters that "come into [their] possession"); 50 U.S.C. § 217 (requiring soldiers to report when abandoned property "comes into [their] possession"); 13 U.S.C. § 214 (prohibiting census takers from disclosing information that "comes into [their] possession"); 18 U.S.C. § 654 (prohibiting embezzlement of property that "comes into [one's] possession"); 46 U.S.C. § 10705 (describing process to follow "[w]hen money, property, or wages of a deceased seaman comes into possession of a consular officer"); 44 U.S.C. § 3572 (imposing limits on federal employees' use of confidential information that they "come[] into possession of").  Indeed, at least one federal statute draws an explicit distinction between possessing something and having something come into one's possession.  *See* 8 U.S.C. § 1454 ("If the certificate or declaration has been lost, the applicant or any other person who *shall have, or may come into possession of it* is required to surrender it . . . ." (emphasis added)).  Here, Congress could have referred simply to "records in the possession of" election officials, or even just "records" without any qualifier, which is the language used in the NVRA, *see* 52 U.S.C. § 20507(i)(1).  In order to give effect to the phrase "come into [their] possession"

and prevent it from being surplusage, the Court interprets the phrase as referring to only those documents that state election officials receive from prospective voters.

This interpretation of "come into [their] possession" is bolstered by the next words in the sentence: "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election."  Each of these terms refers to something that the voter submits or does as part of the registration process.  Here, the meaning of "come into possession" is clarified by the rest of the sentence, which indicates the sorts of records covered by the statute: namely, records that election officials *receive*, rather than *create*.  This fact supports the conclusion that the provision requires officials to preserve voters' submissions to the State so that the federal government can determine whether the State is improperly rejecting voter registration applications.  Such an interpretation makes sense given that when the CRA was passed, the federal government's attempts to protect the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications.  *See Report of the United States Commission on Civil Rights* 93 (1959), https://perma.cc/2PDF-GZHB ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible.").[4]  The CRA responded to that problem by requiring states to preserve records that voters submit to them—not records that states create.

At first glance, drawing a distinction between voter registration applications and the voter registration list—which is largely a compilation of information from those applications—may

---

[4] Additional evidence for this reading of the statute is found in the report of the House Judiciary Committee on the CRA, which justified the disclosure provision by citing a recent case in which a court had explained that "the inspection of voting records[ ] 'must be considered to be an essential step in the process of enforcing and protecting the right to vote.'"  H. Rep. 86-956, at 7 (quoting *In re Wallace*, 170 F. Supp. 63, 67 (M.D. Ala. 1959)).  The records requested in that case were those "pertaining to the registration of all persons heretofore registered as voters, including applications, questionnaires, and other evidence touching upon the qualifications of such persons registered and not registered."  *In re Wallace*, 170 F. Supp. at 70.  In other words, the federal government sought records of the documents that prospective voters submitted to the State.

seem needlessly pedantic. *Cf. Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 440–41 (D. Md. 2019) (rejecting as "a purposeless obstruction" state's argument that NVRA requires disclosure of individual voter registration records but not voter list). However, the voter registration list is not assembled purely from information in voter registration applications, as it includes information that election officials obtain about individual voters from other state agencies. *See* Mich. Comp. Laws § 168.509r(2). Michigan also makes changes to the voter registration list based on data from the United States Social Security Administration and information shared by other states. *See id.* § 168.509o(4)–(5). And the voter registration list includes individuals' voting histories, which is not information that would appear on a voter registration application. *See id.* § 168.509q(f).

Even if the voter registration list and the individual applications contained identical information, the distinction between them would still be significant. First, this distinction only appears meaningless when the DOJ's request is framed as one for voter *information*—after all, the information in the list comes from applications. But the CRA is not designed to facilitate the disclosure of voter information. Rather, it requires the disclosure of *documents*, such as the voter applications that a state might be improperly discarding. Given this understanding, the distinction between applications and a voter list is perfectly logical: a voter application can be examined to determine whether it was unlawfully rejected, whereas a list of those who *successfully* registered to vote would be little help in such an investigation. This is not to say that the DOJ is precluded from using the statute to acquire individualized information from voter applications. The Court simply notes that the DOJ's abnormal use of the statute may run into abnormal procedural obstacles.

Second, any document subject to disclosure under the CRA must also be preserved. *See* 52 U.S.C. §§ 20701, 20703. If the Court were to hold that the voter registration list is disclosable

because it contains the same information as the individual voter registration applications, that holding would entail that the voter registration list—and any document produced by a state that contains voter information—must be preserved.  But nothing in the CRA's text implies an intent to require states to preserve every election-related record that they *create*.  And if the states can destroy records that they create, then they also have no obligation to disclose them.

Finally, the Court returns to the touchstone of statutory interpretation: the text itself.  As discussed above, the Court's conclusion that the voter registration list is not subject to disclosure is based on the statutory text.  If the distinction between voter registration applications and voter registration lists is overly pedantic, it is a pedantic distinction *made by Congress*, and it is Congress's prerogative to make distinctions that may seem unnecessary to a person reading the statute over six decades after its passage.  Needless to say, the existence of a statewide computerized voter list was not foreseeable to the Congress of 1960, and it is possible that legislators would have included such a list in the CRA's disclosure provisions had they imagined the possibility.  But a court is not a "telepathic time-traveler," Scalia & Garner, *supra*, at 350, and thus it "cannot rewrite Congressional legislation to cover a situation that Congress may not have foreseen," *King Ranch, Inc. v. United States*, 946 F.2d 35, 37 (5th Cir. 1991).  As much as we might wish for prophetic legislatures or impeccably logical statutes, "[w]ishes are not laws." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (quoting *McGirt v. Oklahoma*, 591 U.S. 894, 907 (2020)).

In sum, the records requested by the United States do not fall under the CRA's disclosure provision, and the Court will grant Defendants' motion to dismiss the CRA claim.

**IV. CONCLUSION**

HAVA, the NVRA, and the CRA do not allow the United States to obtain the records at
issue in this case.  Therefore, the Court will grant the motions to dismiss.  An order and judgment
will enter in accordance with this Opinion.


Dated: February 10, 2026                    /s/ Hala Y. Jarbou
                                            HALA Y. JARBOU
                                            CHIEF UNITED STATES DISTRICT JUDGE