# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

SARAH COPELAND HANZAS, in her official
capacity as the Secretary of State of Vermont,

*Defendant*.

Case No. 2:25-cv-00903-MKL

## INTERVENOR-DEFENDANT VERMONT PUBLIC INTEREST RESEARCH GROUP'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

ARGUMENT ......................................................................................................................1

I.    The Federal Rules of Civil Procedure apply, and the Court should use a normal, thorough process in assessing Plaintiff's claims.............................................................1

II.   The Court should dismiss the Complaint because Plaintiff failed to state a claim under the CRA .......................................................................................................................5

CONCLUSION....................................................................................................................9

## INTRODUCTION

Plaintiff the United States sued Secretary Copeland Hanzas for Vermont's unredacted statewide Voter Registration List (SVRL) without articulating any substantive rationale for why it is entitled to this information. It now asks this Court to rubber stamp its request for Vermonters' most sensitive data. In doing so, Plaintiff contends that the Court should follow none of the normal rules required for civil litigation—including rules that apply when federal agencies seek investigative information—nor ask any questions as to whether Plaintiff fulfilled statutory prerequisites or about the motives behind this extraordinary request. This Court should decline Plaintiff's request and dismiss Plaintiff's Complaint for failing to state a claim under the Civil Rights Act (CRA).

## ARGUMENT

I.    **The Federal Rules of Civil Procedure apply, and the Court should use a normal, thorough process in assessing Plaintiff's claims.**

The CRA does not relieve Plaintiff of its responsibility to state a claim in its Complaint. As Vermont Public Interest Research Group (VPIRG) explained in its opposition to Plaintiff's Motion to Compel, ECF Nos. 2, 38-3, the Federal Rules of Civil Procedure (FRCP) apply here as they do in almost all civil litigation. This includes dismissal under FRCP 12(b)(6), which is warranted here. Plaintiff argues that the CRA confines this Court to a special, truncated proceeding shielded from ordinary judicial scrutiny. *See, e.g.*, ECF No. 58 ("Br.") at 3, 7-12. But all three other federal district courts to consider parallel cases so far have applied the FRCP to dismiss nearly identical claims under the CRA. *United States v. Benson*, No. 1:25-CV-1148, 2026 WL 362789, at *11 (W.D. Mich. Feb. 10, 2026)[1]; *United States v. Oregon*, No. 6:25-cv-1666-MTK, 2026 WL 318402, at *13 (D.

---

[1] The *Benson* court concluded in dicta that a request under the CRA may operate "as a form of administrative subpoena," 2026 WL 362789, at *7, which still requires a type of judicial review

Or. Feb. 5, 2026); *United States v. Weber*, No. 2:25-CV-9149-DOC-ADS, 2026 WL 118807, at *10 (C.D. Cal. Jan. 15, 2026). This Court should do the same, since neither the text of the CRA nor case law concerning agencies' investigative authority supports departing from the FRCP.

Title III of the CRA does not authorize a special statutory proceeding or abbreviated process outside the FRCP. Rather, the Act provides that that a district court "shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). The statute does not define what "appropriate process" is, but nothing in the text suggests that this Court should depart from the normal standard for a motion to dismiss, or that the Court must grant Plaintiff's Motion to Compel based exclusively on Plaintiff's representations without the opportunity for adverse parties to challenge the legal sufficiency of its request. *See Weber*, 2026 WL 118807, at *8 (holding that "appropriate process" under the CRA requires application of the FRCP to properly allow the court to determine whether Plaintiff has met the CRA's statutory requirements); *Oregon*, 2026 WL 318402, at *8 (same).

The courts' holdings in *Weber* and *Oregon* accord with well-established case law in this area. Long before Plaintiff began this novel effort to collect voters' sensitive data from nearly every state in the country, courts repeatedly held that federal agencies' efforts to compel information are subject to meaningful judicial review, including through compliance with the FRCP. *United States v. Powell* explained the meaning of "appropriate process" in the context of federal court jurisdiction over the use of agency investigative authority. 379 U.S. 48 at 58. Assessing a statutory scheme analogous to Title III of the CRA, the Supreme Court held that "appropriate process" in that context required courts to apply standard civil procedure and to ensure the relevant agency

---

and general procedure. *See United States v. Powell*, 379 U.S. 48, 58 (1964). It went on to dismiss Plaintiff's CRA claim for failure to state a claim just as VPIRG asks this Court to do.

satisfied statutory prerequisites to compel the production of records.[2] *Powell*, 379 U.S. at 57-58 & n.18. Given the similarity between the two statutes, "appropriate process" must carry the same meaning in the CRA as it did in the statute at issue in *Powell*. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 574 (2019) ("This Court does not lightly assume that Congress silently attaches different meanings to the same term in the same or related statutes.").

Plaintiff's attempts to put daylight between *Powell* and its own demands are unavailing. It claims that *Powell* is distinguishable because the statute at issue explicitly "prohibited the Government from subjecting a taxpayer to unnecessary examination," and the CRA contains no such prohibition. Br. at 10 (quotations omitted). This suggestion—that the absence of a limiting statement implies that Congress meant to give the Department of Justice unbounded power to conduct unnecessary and bad-faith investigations—is absurd on its face. As the Supreme Court has made clear, "[t]o protect against mistaken or arbitrary orders" by administrative officials, "judicial review is provided." *United States v. Morton Salt Co.*, 338 U.S. 632, 640 (1950). Following this principle, the Second Circuit and others have extended *Powell* to other prelitigation agency requests for data, regardless of issuing agency. *See RNR Enters., Inc. v. S.E.C.*, 122 F.3d 93, 96 (2d Cir. 1997) (prelitigation SEC subpoena); *United States v. Markwood*, 48 F.3d 969 (6th Cir. 1995) (prelitigation DOJ administrative subpoena). In short, applying the Federal Rules to such a demand is the norm, not merely a product of one sentence in the Internal Revenue Code.

*Markwood* further demonstrates why Plaintiff's interpretation fails. In that case, the Sixth Circuit determined *Powell* had changed the judicial standards applicable to agency demands for

---

[2] The statute at issue in *Powell* provided the IRS with authority to issue administrative summonses and demand records as part of its prelitigation investigatory powers. It provided that federal courts had jurisdiction "*by appropriate process* to compel such attendance, testimony, or production of books, papers, or other data." 379 U.S. at 52 n.10 (emphasis added).

documents. "[A]fter *Powell*," it observed, an agency was required to show that its "investigation had a legitimate purpose, that its inquiry may be relevant to that purpose, that it did not already have the information and that it otherwise followed any statutory requirements." *Markwood*, 48 F.3d 969 at 978. *Powell*, it noted, "also gave subpoena recipients an additional defense against enforcement . . . . An agency investigatory tool might be resisted if the agency acted in 'bad faith.'" *Id.* The history detailed in *Markwood* makes clear that *all* agency investigations are subject to *Powell*'s good-faith requirement, and in no way does the analysis hinge on the presence (or absence) of a prohibition on improper investigations in the statutes at issue. *Id.*

Because *Powell* provided updated judicial standards for assessing agency investigations, Plaintiff's singular reliance on *Kennedy v. Lynd*, 306 F. 2d 222 (5th Cir. 1962)—and other case law predating *Powell*—is unpersuasive. In addition to being narrowed by *Powell*, which the Supreme Court decided four years later, *Lynd* does not suggest that even such a "comparable" proceeding is warranted in all CRA cases. In the intervening 60 years, the Supreme Court has further clarified that normal procedure attaches when a federal agency seeks to compel the production of records. *See, e.g.*, *Becker v. United States*, 451 U.S. 1306, 1308 (1981).

Contrary to Plaintiff's assertions, Title III of the CRA is not unique in authorizing prelitigation investigation. Br. at 7-8. Indeed, *Powell*, *RNR Enterprises*, *Markwood*, and *Morton Salt* all required that similar prelitigation investigatory tools be deployed consistent with the law, while still allowing agencies to conduct their important investigatory functions. Plaintiff acknowledges in a footnote that cases analyzing federal agencies' authorities to compel the production of information prior to litigation are instructive for how this Court should handle its Complaint, *see* Br. at 7 n.3, without admitting that all require much more judicial scrutiny than Plaintiff argues is appropriate here. *See, e.g.*, *United States v. Bisceglia*, 420 U.S. 141, 146 (1975)

("Once a summons is challenged it must be scrutinized by a court to determine whether it seeks information relevant to a legitimate investigative purpose.").

In sum, the binding case law regarding the enforcement of agency demands for data establishes that the Federal Rules apply and this Court's role is not limited to rubber stamping Plaintiff's sweeping request. Given the extraordinary nature and breadth of Plaintiff's demand in this case and parallel litigation playing out across the country, the Court should exercise its judgment and apply the "appropriate process" to ensure that Plaintiff is complying with the law and that its requests are made in good faith.

## II.    The Court should dismiss the Complaint because Plaintiff failed to state a claim under the CRA.

Rather than fulfill its statutory obligations to allege the "basis" and the "purpose" for its demand under the CRA, Plaintiff argues that neither the Court nor any party may challenge (or even inquire into the nature of) its demand. Br. at 16. As discussed in Section I, *supra*, and in VPIRG's opening brief, ECF No. 44, this is plainly wrong—courts have an obligation to review such requests. *See Lynd*, 306 F.2d at 225 (quoting *Tutun v. United States*, 270 U.S. 568, 578 (1926)) (A court "exercises judicial judgment. It does not confer or withhold a favor."). Neither the CRA nor any other statute Plaintiff cites provides free rein to request records from election officials without articulating a sufficient justification. Rather, the statutory requirement of stating basis and purpose and the statute's inclusion of judicial review demonstrates that Congress did not intend the Attorney General to make unbounded demands without judicial scrutiny. *See* 52 U.S.C. § 20703. Plaintiff's argument would limit this Court to simply a reading exercise. This is not "appropriate process." Because Plaintiff has failed to meet its statutory obligations under the CRA to state a basis and purpose for its demand, this Court should dismiss the Complaint.

The only "basis" that Plaintiff provided along with its September 8, 2025 demand for Vermont's SVRL was a reference to the CRA. ECF No. 2-3. Plaintiff argues that such "a reference to the statutory basis for making the demand, namely the CRA, suffices." Br. at 18. Plaintiff cites nothing to support this proposition, because it cannot possibly be accurate. The CRA requires that the Attorney General provide both a basis and a purpose alongside any CRA demand, but Plaintiff's assertion collapses these two distinct requirements. *See Oregon*, 2026 WL 318402, at *9 ("If the purpose is to investigate violations of a statute, the basis must be something else; the statute underlying the investigation is nothing more than a component of the purpose."). Since basis and purpose cannot refer to the same thing, basis "mean[s] a factual basis for investigating a violation of a federal statute." *Id*. Because Plaintiff provided no factual predicate for its September 2025 demand (which pursuant to statute must "contain" the statement of basis and purpose), Plaintiff does not state a claim under the CRA.

Having failed to provide a basis at the required stage, Plaintiff cannot now supply a post-hoc justification for its demands as it attempts to do through the declaration of Eric Neff, ECF No. 58-2. The Second Circuit has made clear that courts may not consider "extra-pleading" material like the Neff Declaration at the Motion to Dismiss stage without "conver[ting] the motion to one for summary judgment" and "giv[ing] the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002). And even if this Court could consider a post hoc justification in a declaration, the Neff Declaration would still fail to satisfy the CRA's requirements since it provides no specific reason to believe that Vermont has violated federal voting laws. Plaintiff's failure to provide the basis for its request becomes clearer within the broader context: It has demanded unredacted voter rolls from almost every state and sued 29 states and the District of

Columbia without providing individualized reasons showing a good-faith belief that nearly every state in the country is violating federal voting law.

Plaintiff has likewise failed to identify a legitimate purpose for its demand, which includes all fields of the SVRL, both public and nonpublic. Plaintiff claims, again post hoc, that the nonpublic information it seeks "is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections." ECF No. 58-2 at 2. But the Constitution and statutes Plaintiff invokes establish that the states, not the federal government, are in charge of maintaining voter rolls, *i.e.* the process of removing and adding individual voters. *See* 52 U.S.C. § 20507(a)(4); 52 U.S.C. § 21083(a)(1)(A). Plaintiff's post hoc purported purpose would supplant Vermont's role in list maintenance by substituting its own judgment and process, which violates the Constitutional and statutory assignments of election administration duties.[3] Usurpation of these duties cannot serve as a legitimate purpose for Plaintiff's demands. *See Weber*, 2026 WL 118807, at *2 ("The DOJ cannot go beyond the boundaries provided by Congress and use these legislative tools in a manner that wholly disregards the separation of powers provided for in the Constitution.").

Moreover, Plaintiff's request for Vermonters' nonpublic data is itself inconsistent with the CRA. The very cases Plaintiff cites in support of its demand contemplate the CRA as an investigative tool to obtain public records, not sensitive information like social security numbers and drivers' license numbers. *See Lynd*, 306 F.2d at 231 ("[W]e are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection."); *In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963)

---

[3] The proposed Memorandum of Understanding (MOU) that the United States has offered Colorado and other states confirms that this is precisely what the United States intends to do. *See* ECF No. 44-1 at 1-2 (describing MOU).

(describing the proceeding as "one against the county officer in his official capacity for the inspection and copying of public records not belonging to him but in his possession or under his control as a public official of the county.").

Plaintiff cites only two instances from the last fifty years in which the DOJ used the CRA to seek states' unredacted voter files. *See* ECF Nos. 58-3, 58-4, 58-5.[4] Neither of these 20-year-old agreements helps its case. Most importantly, the parties in both cases negotiated consent decrees with no legal reasoning by the court, so neither is helpful in determining the scope of the Attorney General's authority under the CRA or whether DOJ followed proper procedure. *See*, *e.g.*, *Lazaro v. Liberty Car Serv., Inc.*, No. 19-CV-7314, 2021 WL 5508071, at *4 n.3 (E.D.N.Y. Mar. 23, 2021), *report and recommendation adopted*, No. 19-CV-7314, 2021 WL 4487874 (E.D.N.Y. Sep. 30, 2021) ("Counsel's own motion seeking settlement approval in another matter is far from persuasive authority.").

Moreover, both agreements provide much more protection for the data than DOJ has indicated would occur here. For example, in its Memorandum of Understanding with Texas, DOJ agreed to give the state notice before disclosing any of the information received outside of DOJ, and that it would destroy the information after its use. ECF No. 58-3 at 2. Similarly, in the Georgia consent decree, the court limited DOJ's use of the data received and similarly prohibited its redisclosure except to Congress, a court, or grand jury, and required DOJ to eventually destroy the records. ECF No. 58-5 at 3-4. Plaintiff provides no such assurances here, and its proposed Memorandum of Understanding with other states indicates that it will not abide by such limitations. That Plaintiff is only able to cite the Texas and Georgia examples demonstrates that

---

[4] *United States v. North Carolina State Board of Elections* was not brought under the CRA and did not result in North Carolina turning over nonpublic voter data to the Department of Justice. ECF No. 58-6.

Plaintiff's current use of the CRA to sweep up sensitive data from across the country is far outside normal bounds. *See* Brief for Former Employees of the U.S. Department of Justice as Amici Curiae at 21-23, *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS (C.D. Cal Dec. 22, 2025), ECF No. 121.

Plaintiff's further attempts to minimize the significance of these improper requests are without merit. First, it argues that Vermont already provides this information to Electronic Registration Information Center (ERIC). Br. at 27-28. But ERIC is a tool used by states to assist with their statutorily required list maintenance responsibilities.[5] Just because some states give certain information to ERIC does not support Plaintiff's claim that it is also entitled to private individual data. In fact, Vermont's participation in ERIC undermines Plaintiff's claim that there is reason to believe Vermont is not meeting its obligations to remove voters from the rolls. Second, Plaintiff incorrectly describes the data received by private litigants in *Coalition for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025). Br. at 28. Plaintiff's description is incorrect in two crucial ways: (1) private litigants obtained the state voter roll as part of discovery in litigation of constitutional claims and with the protection of a strict protective order; and, importantly, (2) the private litigants in that case did not receive social security numbers and other specific types of voter information. 2025 WL 1503937 at *5; Protective Order, *Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE (June 18, 2025), ECF Nos. 87, 87-1.

## CONCLUSION

Plaintiff's Complaint should be dismissed. Even if this Court does not grant the Motions to Dismiss, it should not summarily grant Plaintiff's Motion to Compel, but should first allow for

---

[5] *See* ERIC Overview, ERIC, https://perma.cc/V3YF-9R78 (last visited Feb. 26, 2026).

expedited discovery and an evidentiary hearing. This is particularly true here, where Plaintiff has attempted to supplement its Complaint through a declaration raising new facts.

March 3, 2026                                        Respectfully submitted,

*/s/ Kate Hamilton*
Kate Hamilton*
Brent Ferguson*
Daniel S. Lenz*
Sejal Jhaveri*
Renata O'Donnell*
Alexis Grady*
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
Tel: (202) 736-2200
Fax: (202) 736-2222
khamilton@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
dlenz@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
agrady@campaignlegalcenter.org

*/s/ Anthony Iarrapino*
Anthony Iarrapino
Wilschek Iarrapino Law Office, PLLC
35 Elm St., Ste. 200
Montpelier, VT 05602
Tel: (802) 522-2802
anthony@ilovt.net

Maura Eileen O'Connor *
Brennan Center for Justice
at NYU School of Law
777 6th St. NW, Ste. 1100
Washington, DC 20001
Tel: (202) 249-7190
oconnore@brennan.law.nyu.edu

Andrew Garber*
Brennan Center for Justice
at NYU School of Law
120 Broadway, Ste. 1750
Tel: (646) 292-8310

Fax: (212) 463-7308
garbera@brennan.law.nyu.edu

*Admitted pro hac vice*

*Counsel for Intervenor-Defendant Vermont Public Interest Research Group*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 3rd day of March, 2026, I caused to be served a copy of the above

document on all counsel of record and parties via the ECF system.

*<u>/s/ Kate Hamilton</u>*
Kate Hamilton
